**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARY STOUMBOS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>VISA INC., et al,<br><br>Defendants. | No. 1:11-cv-1882 (ABJ) |

**INDEPENDENT ATM CUSTOMERS' OPPOSITION TO VISA AND MASTERCARD DEFENDANTS' MOTION TO DISMISS**

**Table of Contents**


I. Introduction ........................................ 1

II. Facts ........................................ 4

III. Standards of Law ........................................ 6

IV. Plaintiff Adequately Pleads Concerted Conduct that Violated the Sherman Act ......... 7

a. Defendants Have Participated In A Continuing Horizontal Agreement that Predates The Defendants IPOs ........................................ 7

b. Plaintiff Alleges A Horizontal conspiracy Under *American Needle* ........................ 8

c. Plaintiff Has Adequately Alleged A Hub-and-Spoke Conspiracy ........................ 9

V. Plaintiff Properly Pleads Antitrust Injury ........................................ 10

a. Plaintiff Alleges That The ATM Restraints Increased Consumer Prices ............. 10

b. Defendants' Characterization Of The ATM Restraints as a Typical Buyers' Side Most Favored Nations Clause Is Unavailing ........................................ 11

c. Plaintiff Properly Alleges Injury Flowing From the ATM Restraints .................. 13

VI. Plaintiffs State Law Claims Survive ........................................ 14

a. Plaintiff's State Antitrust Claims Survive ........................................ 14

b. Plaintiff's Consumer Protection Claims Survive ........................................ 15

VII. Conclusion ........................................ 19

## Table of Authorities

**Federal Cases**

*Adams v. Pan American World Airways, Inc.*,
828 F.2d 24 (D.C. Cir. 1987). .......... 10, 14

* *American Needle, Inc. v. NFL*,
130 S.Ct. 2201(2010) .......... 2, 8, 13

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*,
256 F.3d 799 (D.C. Cir. 2001) .......... 6

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) .......... 6

*Austin v. Stokes-Craven Holding Corp.*,
691 S.E.2d 135 (S.C. 2010) .......... 16

*Bell Atlantic. Corp. v. Twombly,*
550 U.S. 544 (2007) .......... 2, 3, 6, 8, 9, 11

*Blue Cross & Blue Shield of New Jersey., Inc. v. Philip Morris USA Inc.*,
818 N.E.2d 1140 (N.Y. 2004) .......... 15

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) .......... 12

*Brader v. Allegheny General Hospital*,
64 F.3d 869 (3d Cir. 1995) .......... 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .......... 10

*CEI Engineering Associates, Inc. v. Elder Construction Co.*,
306 S.W.3d 447 (Ark. Ct. App. 2009) .......... 15

*Davis v. Four Seasons Hotel Ltd.*,
228 P.3d 303 (Haw. 2010) .......... 15

*District Cablevision Ltd. Partnership v. Bassin*,
828 A.2d 714 (D.C. 2003) .......... 16

*Federal Trade Commission v. Mylan Laboratories, Inc.*,
99 F. Supp. 2d 1 (D.D.C. 1999) .......... 17, 18

*Gossels v. Fleet National Bank*,
902 N.E.2d 370 (Mass. 2009) .......... 15

*Hair Excitement, Inc. v. L'Oreal United States of America, Inc.*,
965 A.2d 1032 (N.H. 2009) .......... 15

*Herrig v. Herrig*,
844 P.2d 487 (Wyo. 1992) .......... 16

*Ianelli v. United States Bank*,
996 A.2d 722 (Vt. 2010) .......... 16

*In re Chocolate Confectionary Antitrust Litigation*,
602 F. Supp. 2d 538 (M.D.Pa. 2009) .......... 16, 18

*In re Digital Music Antitrust Litigation*,
06-1780, 2011 WL 2848195 (S.D.N.Y. July 18, 2011) .......... 10, 18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007); .......... 17, 18

*In re Flat Glass Antitrust Litigation*,
385 F.3d 350 (3d Cir. 2004) .......... 8

*In re Microsoft Corp. Antitrust Litigation*,
127 F. Supp. 2d 702 (D. Md. 2001) .......... 18

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
350 F. Supp. 2d 160 (D.Me. 2004) .......... 16, 17, 18

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
233 F.R.D. 229 (D.Mass.2006) .......... 18

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,
07-MD-01819 CW, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) .......... 19

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
M 07-1827 SI, 2011 WL 4387812 (N.D. Cal. Sept. 20, 2011) .......... 17

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
586 F. Supp. 2d 1109 (N.D.Cal. 2008) .......... 16, 17, 18

*Interstate Circuit, Inc. v. United States*,
306 U.S. 208 (1939) .......... 9

*Kenai Chrysler Center., Inc. v. Denison*,
167 P.3d 1240 (Alaska 2007) .......... 15

*Kotteakos v. United States*,
328 U.S. 750 (1946) ........................................ 2

*Levine v. Blue Shield of California*,
189 Cal. App. 4th 1117 (2010) ........................................ 15

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*,
883 F.2d 1101 (1st Cir. 1989) ........................................ 11, 12

*Olsen v. University of Phoenix*,
244 P.3d 388 (Utah Ct. App. 2010) ........................................ 16

*Park v. Ford Motor Co.*,
844 A.2d 687 (R.I. 2004) ........................................ 16

*People v. National Association of Realtors*,
120 Cal. App. 3d 459 (Ct. App. 1981) ........................................ 17

*Rathgeber v. James Hemenway, Inc.*,
69 P.3d 710 (Or. 2003) ........................................ 16

*Richards v. Arteva Specialties S.A.R.L.*,
850 N.E.2d 1068 (Mass. App. 2006) ........................................ 17

*Rohrer v. Knudson*,
203 P.3d 759 (Mont. 2009) ........................................ 15

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010) ........................................ 18

*Snowder v. Disrict of Columbia*,
949 A.2d 590 (D.C. Ct. App. 2008) ........................................ 15

*Sprint Nextel Corp. v. AT & T Inc.*,
CIV.A. 11-1600 ESH, 2011 WL 5188081 (D.D.C. Nov. 2, 2011) ........................................ 3, 10

* *Starr v. Sony BMG Music Entertainment*,
592 F.3d 314 (2d Cir. 2010) ........................................ 3, 10, 12

*State ex. rel. Stenberg v. Consumer's Choice Foods, Inc.*,
755 N.W.2d 583 (Neb. 2008) ........................................ 15

*State v. Commerce Commercial Leasing LLC*,
946 So.2d 1253 (Fla. Dist. Ct. App. 2007) ........................................ 15

*Taylor v. McNichols*,

243 P.3d 642 (Idaho 2010)........................................................................................ 15

* *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................ 6, 7

*Truong v. Allstate Inurance. Co.*,
227 P.3d 73 (N.M. 2010) ........................................................................................ 15

* *United States v. Oregon State Medical Soc*iety,
343 U.S. 326 (1952)........................................................................................ 2, 7, 8

*United States v. Visa, Inc.*,
344 F.3d 229 (2d Cir. 2003)........................................................................................ 2, 7

*Unruh v. Purina Mills, LLC*,
221 P.3d 1130 (Kan. 2009)........................................................................................ 15

*Voss v. Woodmaster of Maine, Inc.*,
2005 WL 2804826 (Me. Super. Ct. Aug. 12, 2005) .............................................................. 16

*Walker v. Fleetwood Homes of North Carolina., Inc.*,
653 S.E.2d 393 (N.C. 2007)........................................................................................ 16

*White v. Wyeth*,
705 S.E.2d 828 (W. Va. 2010)........................................................................................ 15

**Statutes**

Arkansas Code Ann. § 4–88–107 ........................................................................................ 17

California Business& Profressional Code § 17200 .............................................................. 17

District of Columbia's Consumer Practices Protection Act, D.C. Code. §§ 28-3901 .................. 16

Kansas Statue Ann. § 50-627........................................................................................ 18

Oregon Revised Statue Ann. § 646.608........................................................................................ 18

Wyoming Statutes Ann. § 40-12-105 ........................................................................................ 18

Plaintiff Mary Stoumbos hereby opposes Visa and MasterCard Defendants' Motion to Dismiss ("MTD" or "Motion") Plaintiff's Complaint.[1] Where possible and to further judicial efficiency, Plaintiff incorporates by reference the Bank ATM Customers' Memorandum in Opposition to Visa and MasterCard Defendants Motion to Dismiss ("Bank Customers Visa/MasterCard Opp") and the Bank ATM Customers' Memorandum in Opposition to the Bank Defendants' Motion to Dismiss ("Bank Customers Bank Opp"), both filed by the plaintiffs in *Mackmin, et al. v. Visa Inc., et al.* (No. 1:11-cv-1831). Plaintiff identifies specific relevant portions of those briefs at the appropriate points herein.

## I. INTRODUCTION

Plaintiff Stoumbos asserts claims on behalf of herself and a putative class of customers ("Independent ATM Customers") who paid a fee during the relevant class period at an "independent" automated teller machine ("ATM"), i.e., an ATM not owned by Visa, MasterCard or any of their member banks. ¶ 22.[2] As set forth more fully below, *see* § II, *infra*, Plaintiff alleges Defendants and certain unnamed co-conspirators artificially inflated those fees ("ATM Access Fees") through a horizontal agreement that effectively sets a floor price on the amount that Independent ATM Operators may charge, thereby violating the federal and state antitrust laws.

Defendants' Motion rests on two propositions: first, that Plaintiff failed to adequately plead a plausible conspiracy and, second, that the ATM Restraints did not cause Plaintiff antitrust injury. Neither argument is valid.

---

[1] Citations to Plaintiff's Complaint are in the form ("¶ ___").

[2] Plaintiff thus seeks to represent a different putative class than plaintiffs in *Mackmin, et al. v. Visa Inc., et al.*, No. 1:11-cv-1831, who press claims on behalf of those charged fees at ATMs owned by banks that are members of the Visa/MasterCard networks ("Bank ATM Customers") as well as plaintiffs in *National ATM Council, Inc. et al. v. Visa, Inc., et al.*, No. 1:11-cv-01803, who press claims on behalf of Independent ATM Operators.

***First***, Plaintiff alleges that Defendants collectively agreed to implement the ATM Restraints (defined *infra*) at the time when certain banks (identified as "member banks" who are unnamed members of the conspiracy, ¶¶ 20-21) owned and controlled Visa and MasterCard – a circumstance that the Second Circuit has held rendered both of those Defendants "consortiums of competitors" whose rules were "exemplars of the type of anticompetitive behavior prohibited by the Sherman Act." *United States v. Visa U.S.A*, 344 F.3d 229, 242 (2d Cir. 2003). The ATM Restraints are thus horizontal price fixing agreements and *per se* violative of the antitrust laws.

Defendants respond that their subsequent initial public offerings ("IPOs") transformed their horizontal agreement into vertical ones, MTD at 8, but Defendants provide none of the "clear proof" necessary to demonstrate that their previous agreement ended (nor could they, at this stage). *United States v. Oregon State Med. Soc*., 343 U.S. 326, 333 (1952). In any event, the IPOs are red herrings because the member banks have reaffirmed the agreements and continue to abide by them. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (parallel conduct "placed in a context that raises a suggestion of a preceding agreement" survives MTD); *see also infra* §§ IV(a). Even if that were not enough, Plaintiff alleges that Defendants' member banks collectively ceded the responsibility to set ATM Access Fees to Defendants, thereby "depriv[ing] the marketplace of independent centers of decision-making." *Am. Needle, Inc. v. NFL*, 130 S.Ct. 2201, 2213 (2010) (quotations omitted); *see infra* § IV(b). Plaintiff further alleges that Defendants stood at the center of a "hub and spoke" conspiracy, which exists when competitors make agreements with a common "hub" with the knowledge that their competitors are also participating and the competitors' participation is necessary to effectuate the agreement. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *see infra* § IV(c).

***Second***, Plaintiff pleads antitrust injury through allegations plausibly suggesting the ATM Restraints increased prices paid for ATM Services. ¶¶ 34-40. "[H]arm to consumers by way of increased prices is the type of injury the antitrust laws were designed to prevent." *Sprint Nextel Corp. v. AT & T Inc*., CIV.A. 11-1600 ESH, 2011 WL 5188081, at *6 (D.D.C. Nov. 2, 2011); *see infra* § V(a). Defendants respond by requesting this Court make the factual conclusion that the ATM Restraints operate to lower rather than increase prices. *See* MTD at 14-17. This request seeks to reverse the well-settled standard that this Court must take Plaintiff's allegations as true at the pleading stage. *Twombly*, 550 U.S. at 556.

Defendants also attempt to analogize the ATM Restraints to typical buyers-side "most favored nations" agreements, which some courts have found procompetitive. MTD at 14-15. But these are not such arrangements: rather, the restrictions at issue here operate to prevent the third-party *seller* of ATM Services (here, the Independent ATM Operators) from discounting such services to their customers. *See Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 324 (2d Cir. 2010) (existence of secret "seller-side MFNs" suggestive of antitrust conspiracy); *infra* § V(b). Defendants' final "injury" argument – that Plaintiff fails to allege any injury flowing from the ATM Restraints – runs counter to the allegations of Plaintiff's complaint, and this Court should accordingly reject it. *Twombly*, 550 U.S. at 556; *infra* § V(c).

Finally, Defendants' arguments against Plaintiff's alternative state law claims are largely duplicative and derivative of their other claims, and misstate the applicable state law. § VI, *infra*. This Court should accordingly reject them.

## II. FACTS

Plaintiff's Complaint describes the origin and continuation of horizontal agreements not to discount prices charged to ATM consumers for ATM Services. ¶¶ 27–33. The horizontal agreements are embodied in certain rules promulgated and enforced by Visa and MasterCard ("ATM Restraints") that prevent operators of independent ATMs ("Independent ATM Operators") from charging less for transactions processed through independent networks than they charge for transactions processed through either Visa or MasterCard's network. ¶ 21. Visa's rule provides that ATM operators may only implement an ATM Access Fee (as defined at ¶ 8) if it "imposes an Access Fee on all other Financial Transactions through other shared networks at the same ATM" and if "[t]he Access Fee is not greater than the Access Fee amount on all other Interchange Transactions through other shared networks at the same ATM." ¶ 31. MasterCard's rule provides that "[a]n Acquirer must not charge an ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged by that Acquirer in connection with the transactions of any other network accepted at that terminal." ¶ 32. The ATM Restraints effectively fix and enforce a floor price to the customer for ATM usage of no less than the price an ATM Operator charges for a Visa or MasterCard network transaction. ¶ 21.

The ATM Restraints were first agreed to and enacted at a time when Defendants were jointly owned and operated by most of the retail banks in the United States, identified as non-party co-conspirators in this case (and named as defendants in the Bank ATM Consumers complaint). ¶ 20. In short, these member banks – horizontal competitors in the ATM Services market – jointly agreed to the ATM Restraints, which were then enforced through Visa and MasterCard both on the member banks and on Independent ATM Operators. ¶ 21. This

continuing agreement has continued undisturbed to the present. *Id.* Accordingly, even after Visa and MasterCard became public companies in 2008 and 2006, respectively, the member banks have effectively ceded power to Visa and MasterCard to set, implement, and enforce the ATM Restraints. *Id.* Thus, even after Visa and MasterCard's initial public offerings ("IPOs"), their member banks continued to agree to and enforce the ATM Restraints with full understanding (and tacit agreement) that the other member banks would do the same. *Id*. Economic pressure requires Independent ATM Operators to gain access to Visa and MasterCard's networks, *id.*, and they must do so through sponsoring member banks. ¶ 29. Independent ATM Operators accordingly agree with their sponsoring banks that they will adhere to the ATM Restraints, albeit unwillingly. ¶ 21.

Plaintiff alleges how the ATM Restraints directly impact competition, Plaintiff, and the putative class of Independent ATM Customers in a number of ways. ¶¶ 36, 39-40. The ATM Restraints prevent Independent ATM Operators from discounting ATM Access Fees associated with transactions processed through networks other than those owned or controlled by Defendants, thereby raising the ATM Access Fees associated with such transactions to the fee necessary to support a Visa/MasterCard transaction. ¶ 36. In practice, then, the purpose and effect of the ATM Restraints is to protect a higher cost, less efficient competitor from lower cost, more efficient rivals. ¶ 37. By preventing Independent ATM Operators from offering their customers lower fees for transactions routed through lower cost networks, the VISA and MasterCard rules fix a floor price for ATM Access Fees tied to the highest cost, least efficient networks' charges to Independent ATM Operators. ¶ 34. The rules prevent Independent ATM Operators from lowering ATM Access Fees by directing transactions to lower cost competing networks, stifle the growth and expansion of those lower cost competing networks by preventing

them from fully exploiting the benefits of their greater efficiency, and foreclose consumer choice in signing up for cards that enable processing through the competing, lower cost networks. ¶¶ 40-41.

Simply put, by removing price competition from the marketplace, the ATM Restraints enable Visa and MasterCard to "escape the competitive discipline that would otherwise be brought to bear on them by competing PIN-based networks" and accordingly inflate the price for transactions processed through those competing networks. ¶ 40. In a world without the ATM Restraints, retail prices for ATM Services would be lower, ¶ 39, competition between networks would increase, ¶ 37, Defendants would be subject to competitive discipline, ¶40, and lower cost networks would grow and compete effectively. ¶ 41.

## III. <u>STANDARDS OF LAW</u>

On a motion to dismiss, courts must "liberally construe the complaint in the plaintiff's favor and grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C. Cir. 2001). Moreover, a court "must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Therefore, the Court's inquiry is "whether *all* of the facts, taken collectively," state a valid claim for relief, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (citations omitted; emphasis in original). Applying these standards, this Court should only dismiss Plaintiff's complaint if it fails to contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (internal quotations omitted) (*quoting Twombly,* 550 U.S. at 570).

## IV. PLAINTIFF ADEQUATELY PLEADS CONCERTED CONDUCT THAT VIOLATES THE SHERMAN ACT

Defendants' contention that "Plaintiffs do not allege an 'inter-network' conspiracy between Visa and MasterCard" is beside the point. MTD at 8 n.2. As set forth below, Plaintiff alleges a single agreement between horizontally aligned member banks and effectuated through Visa and MasterCard which directly affected Independent ATM Customers.

### a. Defendants Have Participated In A Continuing Horizontal Agreement That Predates The Defendants' IPOs

Defendants largely premise their challenge to Plaintiff's complaint on the proposition that any pre-IPO conduct is irrelevant to the alleged Sherman Act violations because the member banks no longer own Visa and MasterCard. MTD at 8 (allegations of conspiracy insufficient because "Visa and MasterCard [are] publicly held corporations.") However, Defendants' request that this Court ignore the pre-IPO conduct is contrary to the explicit requirement that Plaintiff's complaint be considered as a whole, *Tellabs*, 551 U.S. at 322, and runs counter to the precept that "[w]hen defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of anti-trust laws, courts will not assume that it has been abandoned without clear proof." *Or. State Med. Soc.*, 343 U.S. at 333.

The Bank ATM Customers describe the conspiratorial nature of the ATM Restraints in Sections II(A) & (B)(1) of the Bank Customers' Bank Opp, which Plaintiff incorporates. Like those customers, Plaintiff alleges the "genesis" of the ATM Restraints lies in a horizontal agreement between Visa and MasterCard's member banks, implemented at a time when the Second Circuit has held Defendants functioned as "consortiums of competitors." *Visa U.S.A., Inc.*, 344 F.3d at 242; *see also* ¶ 20. Defendants fail even to argue that the IPOs changed this continuing violation, that any member bank ever repudiated those rules, or that the member

banks, Visa or MasterCard made any effort to eliminate such restrictions. Rather, the ATM Restraints continue apace. ¶¶ 20-21. When competitors form a horizontal restraint and when that restraint proceeds undisturbed despite a nominal structural change among the participants to the restraint, courts can plausibly infer the continued existence of the restraint is the product of conspiracy, not chance. *Cf. Or. State Med. Soc*., 343 U.S. at 333; *Twombly*, 550 U.S. at 557 n.4 (allowing inference of conspiracy based on unprecedented pricing changes in a formerly unrestrained market.).

**b. Plaintiff Alleges A Horizontal Conspiracy Under *American Needle***

Even assuming the IPOs somehow marked the cessation of that conspiracy, the nominal separation between the Visa/MasterCard member banks and the networks after the IPOs would not transform the continuing ATM Restraints from a horizontal agreement into a purely vertical agreement. MTD at 12-13. Concerted conduct between competitors under Section 1 of the Sherman Act exists when actions "deprive[] the marketplace of independent centers of decision-making." *Am. Needle*, 130 S.Ct. at 2213 (quotations omitted).[3] Section II(B)(3) of the Bank Customers' Bank Opp describes why Defendants' conduct falls squarely within that paradigm, and Plaintiffs incorporate that section by reference.

Defendants' argument to the contrary rests on the proposition that "plaintiffs here do not allege that any bank ever independently had the authority to determine Plus or Cirrus ATM network access fee rules, which the banks could have ceded to Visa and MasterCard." MTD at

---

[3] Plaintiff alleges that the non-named member banks' choice to cede decision-making authority to Visa and MasterCard caused such a deprivation, which continued after the IPOs. In an unrestrained market, each ATM Operator (member banks included) would have been able independently to choose what discounts to offer ATM customers for transactions processed through alternative networks, and would have an economic incentive to do so. ¶¶ 36-37. In an unrestrained market, all ATM Operators would be able to steer consumers to alternative and cheaper networks by charging lower ATM Access Fees for transactions processed through alternative networks, and card-issuing banks would have every incentive to issue cards offering access to those lower-priced networks to reduce prices to their customers and to compete for debit card customers. ¶ 37; *see also In re Flat Glass Antitrust Litig*., 385 F.3d 350, 360-361 (3d Cir. 2004) ("In a competitive industry . . . a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs.").

13. As an initial matter, Defendants' reasoning ignores Plaintiff's allegations that the "Plus or Cirrus ATM network access fee rules" were collectively developed by the member banks themselves. ¶ 20. In any event, Defendants' brief mischaracterizes Plaintiff's allegations, which make clear that the member banks had the ability to set their own ATM Access Fees and to permit discounting for transactions conducted through alternative networks, but instead collectively ceded this ability to Defendants. ¶¶ 21, 40. Put another way, Defendants' reasoning is circular: Defendants argue the member banks do not have the power independently to set network access fee rules because they have never exercised that power in the past. The correct question, however, is what would happen in a world in which the banks do not collectively agree to the ATM Restraints. The correct answer is that the banks who issue the cards and own the ATM machines would, as independent competitors, have the incentive to discount the fees to customers in order to attract more ATM and card business. ¶¶ 36, 39.

**c. <u>Plaintiff Has Adequately Alleged A Hub-and-Spoke Conspiracy</u>**

Even if Defendants were entitled to the assumption that their member banks had retained the power to set ATM Access Fees instead of ceding that power to Defendants (which they are not, *Twombly*, 550 U.S. at 556) Plaintiff has still provided sufficient allegations to hold Defendants liable for their post-IPO conduct as participants in a hub-and-spoke conspiracy. Section II(B)(2) of the Bank Customers' Bank Opp describes Defendants' involvement in such a conspiracy, and Plaintiff incorporates that section by reference. In short, Defendants' continued agreement to serve as the "hub" of a conspiracy between their member banks suffices to establish a horizontal agreement. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000).

## V. PLAINTIFF PROPERLY PLEADS ANTITRUST INJURY

### a. Plaintiff Alleges That The ATM Restraints Increased Consumer Prices

Plaintiffs have alleged "antitrust injury," – i.e. an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). It is black letter law that "harm to consumers by way of increased prices is the type of injury the antitrust laws were designed to prevent." *Sprint Nextel Corp*., 2011 WL 5188081, at *6; *see also Adams v. Pan Am. World Airways, Inc*., 828 F.2d 24, 27 (D.C. Cir. 1987) (noting "decreased competition will almost invariably harm consumers"). Plaintiff's Complaint is replete with allegations that the ATM Restraints increased ATM Access Fees, which Independent ATM Customers pay directly. *See* ¶¶ 34, 37- 40.[4] As detailed above, the ATM Restraints themselves violate the antitrust laws and reduce competition by restraining trade in the ATM Services market. This more than sufficiently pleads antitrust injury, particularly at this early stage of the proceeding. *See In re Digital Music Antitrust Litig.,* 06-1780, 2011 WL 2848195, at * 7 (S.D.N.Y. July 18, 2011) (complaint "alleges that Defendants' price-fixing in the Internet Music market caused prices of Internet Music to be supracompetitive. This allegation is sufficient.").

Defendants argue to the contrary, asking this Court to ignore or characterize unfavorably the allegations in Plaintiff's Complaint and, remarkably, seek a factual finding that the ATM Restraints operate to lower prices rather than raise them. MTD at 14-17. Defendants' effort runs

---

[4] This injury extended to consumers of Independent ATMs, like Plaintiff. Plaintiff alleges that the conspiracy at issue involved "enforc[ing] rules and operating regulations" requiring Independent ATM Operators to apply the ATM Restraints to "the ATM Access Fees charged for Visa and MasterCard network transactions." ¶ 21; see also ¶ 34 (fee restraints "implement[] a uniform horizontal agreement to fix ATM Access Fees in a manner that ensures the ATM Access Fee for a transaction carried over a competing network is not less that the ATM Access Fee charged for a transaction carried over Visa or Mastercard's network."). This renders customers of Independent ATMs victims of Defendants' combination in restraint of trade. *Starr*, 592 F.3d at 318-19 (conspiracy affected sales through entities defendants "did not own or control" because defendants conspired to impose anticompetitive restraints on such sales).

counter to the standards applicable on a motion to dismiss. *Twombly*, 550 U.S. at 556 (all facts taken as true). Plaintiff alleges that the Rules operate to "ensure[] that the ATM Access Fee for a transaction carried out over a competing network is not less than the ATM Access Fee charged for a transaction carried out over Visa and MasterCard's network." ¶ 34. Such a restriction does not ensure that "buyers pay only the lowest price . . . for competing services," MTD at 15, but rather ***increases*** those prices by preventing discounting. These allegations plausibly support a finding of antitrust injury, and Defendants' improper and conclusory view of the ATM Restraints alleged in Plaintiff's complaint should be rejected.

**b. Defendants' Characterization Of The ATM Restraints as a Typical Buyers' Side Most Favored Nations Clause Is Unavailing**

Defendants attempt to buttress their argument by improperly and inaccurately recasting the ATM Restraints as typical, buyers' side "Most Favored Nations" (MFN) clauses, the likes of which other courts have found to be pro-competitive or not to constitute *per se* violations of Section 1 the Sherman Act. MTD at 14-15. Even a cursory review of the terms of the restrictions in this case reveals only a surface resemblance to those other agreements. Defendants' effort to misconstrue the complaint allegations and shift the presumption on a motion to dismiss should be rejected.

In a typical MFN scenario, a ***buyer*** requires a ***seller*** to afford the buyer the lowest price it offers to any other buyer. For example, in *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode* Island, 883 F.2d 1101 (1st Cir. 1989), which Defendants feature prominently in their brief, Blue Cross required physicians participating in its network to offer it the lowest prices offered to any other HMO.[5] The First Circuit affirmed that "the record amply

---

[5] *See id.* at 1109 ("The Prudent Buyer policy involves Blue Cross's relationships not with its subscribers but with its provider physicians.").

supports Blue Cross's view that [the MFN] was a bona fide policy to ensure that Blue Cross would not pay more than any competitor paid for the same services." *Id.* at 1110. Similarly, in *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406 (7th Cir. 1995), a medical clinic would not pay affiliated doctors more than what the doctors charged their other patients. *Id.* at 1415.

Defendants' attempt to analogize those facts to this case is unavailing. Here, Visa and MasterCard do not require that *they* pay the lowest prices, but that ATMs cannot charge *ATM customers* lower prices for services provided through networks ***other*** than Visa and MasterCard, *even if those other networks offer the same service for less money*.[6] *See Starr,* 592 F.3d at 324 (secret "seller-side MFNs" suggest conspiracy). In other words, the ATM Restraints are the functional equivalent of Coca-Cola promulgating rules barring convenience stores from charging less for Pepsi or RC Cola than Coke, even if the convenience store operator's acquisition costs were lower for those competing cola products. Such an agreement would have the inevitable effect of inflating the price of Pepsi and RC Cola. *Cf. Starr*, 592 F.3d at 323. (antitrust conspiracy plausible when "defendants used the [seller-side] MFNs to enforce a wholesale price floor of about 70 cents.")

Another example illustrates the fallacy in Defendants' interpretation of the allegations: suppose that Visa charges the ATM operator $1 per withdrawal, and the ATM operator has to charge the customer $2 to make a profit. A competitor network offers to handle the same transaction for 50 cents, thus the bank could make a profit charging only $1.50 (and probably less, because the lower price would drive more ATM volume). Visa and MasterCard stop this

[6] In the *Ocean State Physicians* scenario, a more analogous situation would be if Blue Cross required doctors to charge their patients no more for procedures than they charged patients in other HMO plans, regardless of what the competing HMOs charged in premiums. As here, that likely would have the anticompetitive effect of reducing competition among HMOs, and among doctors, and raising prices to patients.

pro-competitive discounting from happening. The ATM operator cannot make a profit if it charges $1.50 for both transactions, so it has to charge more. In addition, other ATM networks find no reward for competing on price, so they cease doing so: the price they charge will tend to rise towards the supracompetitive level set by Visa and MasterCard. *Every* ATM customer is injured by this restriction on discounting.

Section IV of the Bank Customers Bank Opp and Section III(A)(3) of the Bank Customers Visa/MasterCard Opp describe at length the anticompetitive effects of even traditional, buyer's side MFNs as well as why the cases on which Defendants rely are inapposite. Plaintiff incorporates those sections by reference here. Even under Defendants' analysis, the legality and proper treatment of traditional buyer's-side MFNs depends on evidence, rendering Plaintiff's Complaint inappropriate for dismissal on the pleadings.

**c. <u>Plaintiff Properly Alleges Injury Flowing From The ATM Restraints</u>**

Defendants argue that Plaintiff fails to plead that "a consumer . . . has the power to select the ATM network over which the ATM transaction is completed," and posit that the absence of this specific condition means that Plaintiff fails to allege injury flowing from the ATM Restraints. MTD at 18. Defendants' limited construction of the allegations and the pleading standard is wrong. Plaintiff pleads that the ATM Restraints operate to *prevent* Independent ATM Operators from "offer[ing] a discount or any other benefit to persuade consumers to complete their transactions over competing, lower cost PIN-based networks" or from "offer[ing] a rebate that might circumvent to fixed ATM Access Fee." ¶ 36. It is settled law that "[a]bsence of actual competition may simply be a manifestation of the anticompetitive agreement itself." *Am. Needle*, 130 S. Ct. at 2213-14 (quotation and citation omitted). Defendants' argument that Plaintiff is required to plead the existence of the differential pricing barred by the ATM Restraints to state a valid claim is both circular and inconsistent with the law. *Id.*

It is elementary that "decreased competition will almost invariably harm consumers." *Adams*, 828 F.2d at 27. Plaintiff pleads all manner of impact on competition caused by the ATM Restraints, and details precisely how the injuries flowing from that reduced competition directly impacts consumers. ¶¶ 34-41. This Court should not accept Defendants' factual arguments to the contrary on this motion to dismiss. *See Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) ("[T]he existence of an "antitrust injury" is not typically resolved through motions to dismiss.").

Finally, it is inherently implausible for Defendants to argue differential pricing would not exist in a market unrestrained by the ATM Restraints. MTD at 18. If Defendants were not concerned about differential pricing, there would be no need to implement the ATM Restraints at all: pricing for all transactions would be identical, rules or not. Thus, the mere fact that Defendants felt it necessary to implement and continue unabated those restraints strongly suggests they believe ATM operators would discount transactions processed through alternative networks if permitted to do so. This independently and plausibly supports the allegations of antitrust injury flowing from those restraints.

Section III(4)(b) of the Bank Customers' Visa/MasterCard Opp describes why the authorities upon which Defendants rely are inapposite, and Plaintiff incorporates those arguments by reference. In short, Defendants cite no cases involving agreements fixing prices at super-competitive rates or eliminating choices for consumers, for which antitrust injury is inherently plausible.

## VI. PLAINTIFF'S STATE LAW CLAIMS SURVIVE

### a. Plaintiff's State Antitrust Claims Survive

Defendants' request to dismiss Plaintiff's state antitrust claims hinges on the proposition – refuted above – that Defendants have met their dismissal burden as to Plaintiff's federal

antitrust claims. MTD at 19-21. Because Plaintiff adequately states a claim for violations of the Sherman Act, and because Defendants offer no separate argument for dismissal of Plaintiff's state antitrust claims, Defendants have failed to offer any basis to dismiss Plaintiff's state antitrust claims. *See* MTD at 20 n.6 (noting courts construe state antitrust laws in accordance with federal interpretations of the Sherman Act).

Plaintiff concedes that her Tennessee claim cannot survive.

**b. <u>Plaintiff's Consumer Protection Claims Survive</u>**

Defendants broadly argue that horizontal price-fixing is not actionable under Plaintiff's third claim for relief, which encompasses the state consumer protection and unfair competition laws of 25 states. Defendants' rationale is that the antitrust violations inherent in the ATM Restraints are purportedly not deceptive, unconscionable, unfair, or unlawful within the meaning of those statutes. Defendants do not identify any particular state laws in the body of their brief, instead seeking to tar all states with the same broad brush and relegating their analysis to a string cited footnote. MTD at 22 n. 7. That footnote does not contain a single case addressing antitrust claims.[7]

---

[7] MTD at 22 n.7 (citing *Kenai Chrysler Ctr., Inc. v. Denison*, 167 P.3d 1240 (Alaska 2007) (challenging sale of automobile to disabled man); *CEI Eng'g Associates, Inc. v. Elder Const. Co*., 306 S.W.3d 447 (Ark. Ct. App. 2009) (dispute between construction firm and engineering company stemming from poor performance under a contract); *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117 (Cal. Ct. App. 2010) (alleging Blue Shield had a duty to disclose strategy to lower health insurance premiums); *Snowder v. Dist. of Columbia*, 949 A.2d 590 (D.C. Ct. App. 2008) (alleging wrongful towing); *State v. Commerce Comm'l Leasing LLC*, 946 So.2d 1253 (Fla. Dist. Ct. App. 2007) (alleging telecommunications company functioned as Ponzi scheme); *Davis v. Four Seasons Hotel Ltd*., 228 P.3d 303 (Haw. 2010) (alleging hotel wrongfully retained "service charge" without disclosing it was doing so); *Taylor v. McNichols*, 243 P.3d 642 (Idaho 2010) (alleging attorneys' conduct in related case were improper and tortuous); *Unruh v. Purina Mills, LLC*, 221 P.3d 1130 (Kan. 2009) (allegations manufacturer of feed supplements sold substandard product); *Voss v. Woodmaster of Me., Inc.*, No. Civ.A. AUG-CV-03-137, 2005 WL 2804826 (Me. Super. Ct. Aug. 12, 2005) (allegations defendant failed to install roof properly); *Gossels v. Fleet Nat'l Bank*, 902 N.E.2d 370 (Mass. 2009) (allegations bank improperly handled check presented to it for collection); *Rohrer v. Knudson*, 203 P.3d 759 (Mont. 2009) (allegations lot seller sold lot containing unusable fill); *State ex. rel. Stenberg v. Consumer's Choice Foods, Inc*., 755 N.W.2d 583 (Neb. 2008) (allegations of misconduct in connection with food sales contract); *Hair Excitement, Inc. v. L'Oreal U.S.A., Inc*., 965 A.2d 1032 (N.H. 2009) (dispute in connection with cancellation of chain account agreement); *Truong v. Allstate Ins. Co*., 227 P.3d 73 (N.M. 2010) (allegations claims processing programs underestimated insurance claims' true value); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140 (N.Y. 2004) (allegations tobacco company distorted public knowledge

To the extent Defendants mean to argue that Plaintiff does not adequately allege violations of the federal antitrust laws, that argument is insufficient for the reasons stated above. To the extent Defendants mean to argue that their antitrust violations are not independently actionable under the state consumer laws identified in Plaintiff's Complaint, that argument fails as well. To take an example from the district in which this Court sits: the District of Columbia's Consumer Practices Protection Act, D.C. Code. §§ 28-3901 *et seq.*, articulates a broad range of specific practices violative of the Act, and D.C. courts construing that code have noted that this "enumeration is not exclusive." *District Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714, 723 (D.C. 2003). Thus, "trade practices that violate other laws, including the common law, also fall within the purview of the CPPA." *Id.* In line with this precept, multiple courts have held horizontal price fixing an actionable violation of D.C.'s Consumer Practices Protection Act. *See, e.g. In re Chocolate Confectionary Antitrust Litig.,* 602 F.Supp.2d 538, 583 (M.D.Pa. 2009) ("*Chocolate*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F.Supp.2d 1109, 1125 (N.D.Cal. 2008) ("*LCD*"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 183 (D. Me. 2004) ("*New Motor Vehicles*").

Each other state subject to Defendants' motion permits recovery for price fixing, either for similar reasons or because such actions are unfair or unconscionable. Indeed, Defendants

---

regarding risks of smoking); *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393 (N.C. 2007) (allegations defendant sold defective mobile home); *Rathgeber v. James Hemenway, Inc.*, 69 P.3d 710 (Or. 2003) (allegations realtor failed to adequately inspect property); *Park v. Ford Motor Co.*, 844 A.2d 687 (R.I. 2004) (allegations truck manufacturer failed to provide promised securities system); *Austin v. Stokes-Craven Holding Corp.*, 691 S.E.2d 135 (S.C. 2010) (allegations auto dealer sold defective vehicle); *Olsen v. Univ. of Phoenix*, 244 P.3d 388 (Utah Ct. App. 2010) (allegations school wrongfully imposed e-resource fee); *Ianelli v. U.S. Bank*, 996 A.2d 722 (Vt. 2010) (allegations of misconduct in handling overdrawn bank account); *White v. Wyeth*, 705 S.E.2d 828 (W. Va. 2010) (allegations defendants engaged in misconduct related to the sale of drugs); *Herrig v. Herrig*, 844 P.2d 487 (Wyo. 1992) (alleging insurance company engaged in bad-faith settlement practices)).

ignore the fact that courts have already found antitrust violations actionable under the vast majority of the consumer protection laws identified in Count 3 of Plaintiff's complaint.[8]

---

[8] Each of the cases below recognizes antitrust or price fixing claims under the state statutes in Plaintiff's Complaint:

- **Alaska**: Alaska's consumer protection laws permit antitrust claims. *Fed. Trade Comm'n v. Mylan Laboratories, Inc.*, 99 F. Supp. 2d 1, 5 (D.D.C. 1999) (permitting Alaska to pursue antitrust claims under Alaska's Unfair Trade Practices and Consumer Protection Act).

- **Arkansas:** Arkansas' Deceptive Trade Practices act prohibits unconscionable trade practices, Ark.Code Ann. § 4–88–107(a)(10), which courts find encompasses price fixing claims. *See, e.g. Chocolate*, 602 F. Supp. 2d at 583; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1109 (N.D. Cal. 2007); *New Motor Vehicles*, 350 F. Supp. 2d at 178-79.

- **California:** California courts have long held acts restraining trade violate California's unfair competition law. *People v. Nat'l Ass'n of Realtors*, 120 Cal. App. 3d 459, 473 (Ct. App. 1981) (construing Cal. Bus & Prof. Code § 17200).

- **Florida:** Courts permit plaintiffs to prosecute antitrust laws under Florida's consumer protection law. *In re TFT-LCD (Flat Panel) Antitrust Litig*., M 07-1827 SI, 2011 WL 4387812, at *1 (N.D. Cal. Sept. 20, 2011); *see also Mylan Laboratories, Inc.*, 99 F. Supp. 2d at 6 (permitting Florida to pursue antitrust claims under its consumer protection act).

- **Hawaii:** Price fixing is actionable under Hawaii's consumer protection law. *DRAM*, 516 F. Supp. 2d at 1109.

- **Idaho:** Courts permit plaintiffs to pursue cases alleging combinations in restraint of trade under Idaho's consumer protection law when that conduct affects consumers. *New Motor Vehicles*, 350 F. Supp. 2d at 184.

- **Maine:** Courts have permitted cases alleging combinations in restraint of trade to proceed under Maine's consumer protection law. *New Motor Vehicles*, 350 F. Supp. 2d at 187; *Mylan Laboratories, Inc.*, 99 F. Supp. 2d at 6 (permitting Maine to pursue antitrust claims under its consumer protection law).

- **Massachusetts:** Massachusetts courts have unequivocally held that "[p]rice-fixing of any sort is unquestionably a violation of G.L. c. 93A." *Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068, 1075 (Mass. App. 2006)

- **Montana:** Cases alleging combinations in restraint of trade can proceed under Montana's consumer protection act. *New Motor Vehicles*, 350 F. Supp. 2d at 193.

- **Nebraska:** Price fixing is actionable under Nebraska's consumer protection act. *LCD*, 586 F. Supp. 2d at 1127.

- **New Hampshire:** Courts permit cases alleging combinations in restraint of trade to proceed under New Hampshire's consumer protection act. *New Motor Vehicles*, 350 F. Supp. 2d at 193.

- **New Mexico:** Courts permit cases alleging combinations in restraint of trade to proceed under New Mexico's consumer protection act. *New Motor Vehicles*, 350 F. Supp. 2d at 193; *Chocolate*, 602 F. Supp. 2d at 586.

The consumer protection laws of the remaining states –Kansas, Oregon, and Wyoming – all prohibit unfair, unconscionable, and/or unlawful practices. *See* Kan. Stat. Ann. § 50-627 (a) (barring "unconscionable act or practice[s]"); Or. Rev. Stat. Ann. § 646.608 (u) (prohibiting all "unfair or deceptive conduct in trade or commerce"); Wyo. Stat. Ann. § 40-12-105 (xv) (barring "unfair . . . acts or practices"). Because horizontal price fixing in restraint of trade is undoubtedly an unfair, unconscionable, and/or unlawful practice, this Court should allow Plaintiff's claims to proceed. Indeed, one court has allowed claims that defendants fraudulently inflated the price of prescription drugs to proceed under the claims of each of these states. *In re Pharm. Industry Average Wholesale Price Litig.*, 233 F.R.D. 229, 231 (D.Mass.2006) (certifying Kansas, Oregon, and Wyoming classes). Such price manipulation is comparable to the horizontal conspiracy alleged here.

---

- **New York:** New York permits antitrust claims under its consumer protection law. *LCD*, 586 F. Supp. 2d at 1128; *DRAM*, 536 F.Supp.2d at 1143-44.

- **North Carolina:** North Carolina permits antitrust claims under its consumer protection law. *In re Digital Music Antitrust Litig*., 2011 WL 2848195, at * 14; *see also Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 419-20 (E.D. Pa. 2010) (Walker Process antitrust claims).

- **Rhode Island:** Rhode Island permits antitrust claims under its consumer protection law. *Chocolate*, 602 F. Supp. 2d at 587.

- **South Carolina:** South Carolina permits antitrust claims under its consumer protection laws. *In re Microsoft Corp. Antitrust Litig*., 127 F. Supp. 2d 702, 726 (D. Md. 2001); *Mylan Laboratories, Inc*., 99 F. Supp. 2d at 9 (permitting South Carolina to seek restitution for antitrust violations under South Carolina's consumer protection laws).

- **Utah:** Courts permit cases alleging combinations in restraint of trade to proceed under Utah's consumer protection act. *New Motor Vehicles*, 350 F. Supp. 2d at 204.

- **Vermont:** Vermont permits cases alleging combinations in restraint of trade to proceed under its consumer protection laws. *New Motor Vehicles*, 350 F. Supp. 2d at 206.

- **West Virginia:** Courts permit cases alleging combinations in restraint of trade to proceed under West Virginia's consumer protection law. *See Mylan Laboratories, Inc*., 99 F. Supp. 2d at 10 (permitting West Virginia to seek restitution for antitrust violations under West Virginia consumer protection act).

Plaintiff is aware that a handful of courts have found claims not actionable under the consumer protection laws of certain states (i.e. Kansas) in cases where those claims stemmed from price-fixing conspiracies aimed at large and sophisticated entities, but were brought by customers indirectly injured by those conspiracies. *See, e.g. In re Static Random Access Memory (SRAM) Antitrust Litig.*, 07-MD-01819 CW, 2010 WL 5094289, at *9 (N.D. Cal. Dec. 8, 2010) (indirect purchasers of products incorporating price-fixed computer memory could not bring claims under Kansas consumer protection laws). Even assuming those courts' conclusions that price fixing under those circumstances does not constitute unconscionable conduct directed at a consumer, those cases are plainly distinguishable from present circumstance, which involves a conspiracy directly intended to affect the price paid by Independent ATM Purchasers, thereby exploiting the unequal bargaining power between the two.

## VII. CONCLUSION

Plaintiff plausibly alleges an open combination in restraint of trade, and one that constitutes an illegal agreement under both *American Needle* and traditional hub-and-spoke principles. *See* §IV, *supra*. Plaintiff also properly alleges that the ATM Restraints limited competition, and that Plaintiff's injuries flow directly from that limitation. *See* § V, *supra*. And Plaintiff properly alleges violations of the various state-law claims alleged in her complaint. *See* §VI, *supra.* Defendants offer no basis for dismissing Plaintiff's well-pled complaint, and even the success of their arguments would require the type of factual inquiry that precludes dismissal at this stage. For these reasons, this Court should deny Defendants' Motion to Dismiss.

In the event the Court finds any deficiencies in the pleading of any of Plaintiff's claims, Plaintiff respectfully requests leave to amend.

DATED: February 29, 2012

Respectfully submitted,

By:

/s Douglas G. Thompson

Douglas G. Thompson (D.C. Bar # 172387)
dthompson@finkelsteinthompson.com
Richard M. Volin (D.C. Bar # 457292)
rvolin@finkelsteinthompson.com
Michael G. McLellan (D.C. Bar # 489217)
mmclellan@finkelsteinthompson.com
Thomas M. Gottschlich (D.C. Bar #1002378)
tgottschlich@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
James Place
1077 30th Street, N.W.
Suite 150
Washington, D.C. 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090