**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW MACKMIN, et al.,<br>Plaintiffs,<br>v.<br>VISA INC., et al.,<br>Defendants. | No. 1:11-cv-01831 (ABJ)<br>Electronically Filed<br>Oral Argument Requested |
| MARY STOUMBOS,<br>Plaintiff,<br>v.<br>VISA INC., et al.,<br>Defendants. | No. 1:11-cv-01882 (ABJ)<br>Electronically Filed<br>Oral Argument Requested |
| NATIONAL ATM COUNCIL, INC., et al.,<br>Plaintiffs,<br>v.<br>VISA INC., et al.,<br>Defendants. | No. 1:11-cv-01803 (ABJ)<br>Electronically Filed<br>Oral Argument Requested |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF VISA AND MASTERCARD DEFENDANTS' MOTION TO DISMISS**

March 21, 2012

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................ 1

ARGUMENT ........................................ 2

I. PLAINTIFFS IDENTIFY NO ALLEGED FACTS THAT COULD ESTABLISH AN UNLAWFUL AGREEMENT TO RESTRAIN TRADE IN VIOLATION OF SHERMAN ACT SECTION ONE ........................................ 2

A. The Former Ownership Structures of Visa and MasterCard Eliminated Years Ago Through IPOs Could Not Establish an Agreement to Restrain Trade ........................................ 3

B. Each Bank's Alleged Individual Agreement with Visa or MasterCard Could Not Establish That the Banks Agreed Horizontally with Each Other to Restrain Trade ........................................ 6

C. Plaintiffs Allege No Facts That Could Establish That the Banks Agreed Horizontally with Each Other to Restrain Trade in a "Hub and Spoke" Conspiracy ........................................ 7

D. Plaintiffs Allege No Facts That Could Establish a Horizontal Agreement Based on the *American Needle* Decision ........................................ 9

II. PLAINTIFFS IDENTIFY NO ALLEGED FACTS THAT COULD ESTABLISH THE ANTITRUST INJURY NEEDED TO OBTAIN RELIEF FOR A VIOLATION OF SHERMAN ACT SECTION ONE ........................................ 11

A. The Alleged Visa and MasterCard Rules Do Not Fix Prices or Require ATM Operators to Impose Higher Access Fees on Consumers ........................................ 11

B. Plaintiffs Allege No Facts That Could Show Injury Flowing from the Challenged Visa and MasterCard Rules ........................................ 13

III. PLAINTIFFS IDENTIFY NO ALLEGED FACTS THAT COULD ESTABLISH A VIOLATION OF DISTRICT OF COLUMBIA OR STATE STATUTES ........................................ 15

IV. PLAINTIFFS PROVIDE NO BASIS FOR LEAVE TO REPLEAD ........................................ 17

CONCLUSION ........................................ 18

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*American Airlines v. Christensen*,
967 F.2d 410 (10th Cir. 1992) ..................... 7

*American Needle, Inc. v. National Football League*,
130 S. Ct. 2201 (2010) ..................... 9-11

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ..................... 11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..................... 2-3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ..................... 11

*FTC v. Mylan Laboratories, Inc.*,
99 F. Supp. 2d 1 (D.D.C. 1999) ..................... 17

*Howell v. Gray*,
— F. Supp. 2d —, 2012 WL 456487 (D.D.C. Feb. 14, 2012) ..................... 18

*In re Chocolate Confectionary Antitrust Litigation*,
602 F. Supp. 2d 538 (M.D. Pa. 2009) ..................... 16, 17

*In re Digital Music Antitrust Litigation*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) ..................... 16, 17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ..................... 16, 17

*In re Insurance Brokerage Antitrust Litigation*,
618 F.3d 300 (3d Cir. 2010) ..................... 8

*In re Interbank Funding Corp. Securities Litigation*,
629 F.3d 213 (D.C. Cir. 2010) ..................... 18

*In re Microsoft Corp. Antitrust Litigation*,
127 F. Supp. 2d 702 (D. Md. 2001) ..................... 17

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
350 F. Supp. 2d 160 (D. Me. 2004) ..................... 17

Page

*In re Static Random Access Memory (SRAM) Antitrust Litigation*, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) .......... 16

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) .......... 17

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2011 WL 4387812 (N.D. Cal. Sept. 20, 2011) .......... 17

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) .......... 8-9

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) .......... 6-7

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) .......... 8

*Sheet Metal Workers Local 411 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010) .......... 17

*SouthTrust Corp. v. Plus System, Inc.*, 913 F. Supp. 1517 (N.D. Ala. 1995) .......... 13

*Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86 (6th Cir. 1989) .......... 13

*Toscano v. Professional Golfers' Association*, 258 F.3d 978 (9th Cir. 2001) .......... 8

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), *aff'g*, 126 F.T.C. 415 (1998) .......... 8-9

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), *aff'g*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001) .......... 4-5

*Visa U.S.A. Inc. v. First Data Corp.*, 2005 WL 3274105 (N.D. Cal. Aug. 16, 2005) .......... 5

**Federal Statutes and Rules**

Sherman Act Section 1, 15 U.S.C. § 1 .......... *passim*

Page

**State Cases**

*People v. National Association of Realtors*,
120 Cal. App. 3d 459 (1981) ........................................................................................ 17

*Richards v. Arteva Specialties S.A.R.L.*,
850 N.E.2d 1068 (Mass. App. Ct. 2006) ................................................................... 17

**PRELIMINARY STATEMENT**

Visa and MasterCard respectfully submit this reply memorandum in further support of their motion to dismiss, and to respond to plaintiffs' opposition memoranda filed in the *Mackmin* case ("*Mackmin* Bank Opp'n" and "*Mackmin* Visa & MC Opp'n"), the *Stoumbos* case ("*Stoumbos* Opp'n"), and the *National ATM Council* case ("*NAC* Opp'n"). Those oppositions confirm that plaintiffs' complaints allege no facts that could establish their antitrust claims under Section 1 of the Sherman Act or their claims under District of Columbia or state statutes.

First, plaintiffs identify no alleged facts that could establish the claimed horizontal conspiracy or agreement to restrain trade under Sherman Act Section 1. Plaintiffs do not dispute that banks' alleged membership and equity interests in Visa and MasterCard, and the alleged service of bank employees on the Visa and MasterCard boards, are insufficient to establish an unlawful agreement. Plaintiffs attempt to assert a horizontal agreement among the banks based on the former ownership structures of Visa and MasterCard. Yet plaintiffs concede, as they must, that those ownership structures ended years ago as a result of the Visa and MasterCard IPOs. Plaintiffs also point to each bank's individual agreement with Visa or MasterCard to adhere to its network rules since the IPOs. Those network membership agreements, however, could not establish that banks entered into agreements with each other "horizontally" as competitors, as plaintiffs claim. Plaintiffs likewise allege no facts that could establish that banks agreed with each other to restrain trade either in a "hub and spoke" conspiracy or under the *American Needle* decision.

Second, plaintiffs fail to state a claim under federal antitrust law for an independent reason: they identify no alleged facts that could establish antitrust injury. Plaintiffs assert that the challenged ATM access fee rules are price-fixing and result in higher prices for consumers. But those rules do not require that ATM access fees be fixed at any level, and on their face the

rules *prevent* ATM operators from charging consumers higher access fees for ATM transactions completed over the Visa or MasterCard ATM networks. In addition, plaintiffs do not and cannot allege that consumers have the power to choose the network over which their ATM transactions are completed. Plaintiffs thus allege no facts that could support their theory that the ATM access fee rules had an anticompetitive effect because they prevented ATM operators from persuading consumers to choose to complete their transactions over lower-cost ATM networks.

Third, because District of Columbia and state antitrust statutes follow federal antitrust law, plaintiffs fail to state a claim under those statutes for the same reasons. Moreover, since plaintiffs predicate their claims under consumer protection and unfair competition statutes solely on the conduct alleged to violate the antitrust laws, those claims also fail as a matter of law for the same reasons as plaintiffs' antitrust claims.

Finally, plaintiffs identify no basis for being permitted to replead their claims. Plaintiffs' complaints should therefore be dismissed with prejudice and without leave to replead.

## ARGUMENT

### I. PLAINTIFFS IDENTIFY NO ALLEGED FACTS THAT COULD ESTABLISH AN UNLAWFUL AGREEMENT TO RESTRAIN TRADE IN VIOLATION OF SHERMAN ACT SECTION ONE

Section 1 of the Sherman Act prohibits "only restraints effected by a contract, combination, or conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal quotation omitted). Regardless of whether a plaintiff claims that defendants "conspired," or "contracted" as the *NAC* plaintiffs assert (*NAC* Opp'n at 7-8), "[t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement." *Bell Atl.*, 550 U.S. at 553 (internal quotations omitted). Thus, to state a claim under Section 1, a plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made," and "that raises a suggestion of a preceding agreement, not merely

parallel conduct that could just as well be independent action." *Id.* at 556-57. Here, plaintiffs' oppositions identify no alleged facts that could establish the claimed agreement among the banks to restrain trade through the Visa or MasterCard ATM access fee rules.

The opening memorandum of Visa and MasterCard ("Visa & MC Mem.") demonstrated that the banks' alleged membership and equity interests in Visa and MasterCard, and the alleged service of bank employees on the Visa or MasterCard boards, are insufficient as a matter of law to establish the claimed unlawful agreement among the banks. *See* Visa & MC Mem. at 9-12. Plaintiffs do not dispute that showing. The *NAC* plaintiffs concede that those allegations simply "provide a fuller context in which to understand the restraints on ATM access fees," and that "plaintiffs are not claiming that there is an unlawful agreement merely because the banks have ownership and control interests in Visa and MasterCard." *NAC* Opp'n at 13. The consumer plaintiffs likewise do not argue that such allegations could establish an agreement to restrain trade. *See Mackmin* Bank Opp'n at 6-20; *Stoumbos* Opp'n at 7-9.

Instead, plaintiffs assert that they adequately plead an agreement among the banks on other grounds. But as demonstrated below, none of the alleged facts or law that plaintiffs identify could establish the claimed horizontal agreement among the banks.

### A. The Former Ownership Structures of Visa and MasterCard Eliminated Years Ago Through IPOs Could Not Establish an Agreement to Restrain Trade

First, plaintiffs assert that the Visa and MasterCard ATM access fee rules were adopted before the Visa and MasterCard IPOs, at a time when "the Network Defendants themselves were nothing more than an aggregation of the Bank Defendants and the bank Co-Conspirators." *Mackmin* Bank Opp'n at 8; *see also NAC* Opp'n at 10-11 (before the IPOs the banks were "not merely 'members' of Visa and MasterCard . . . they *were* Visa and MasterCard"). Plaintiffs then

argue that after the IPOs, neither Visa nor MasterCard "made any effort to eliminate" its ATM access fee rules. *Stoumbos* Opp'n at 8; *see also Mackmin* Bank Opp'n at 10.

As support for that argument, plaintiffs cite complaint allegations that Visa and MasterCard are descendants or successors "of bankcard associations formerly jointly owned and operated by a majority of the retail banks in the United States." *Mackmin* Compl. ¶¶ 44, 71; *NAC* Compl. ¶ 30 (same); *see also NAC* Compl. ¶ 31 (referring to "the rules of the former bankcard associations"). But that alleged *former* bank ownership structure could not establish that the banks unlawfully agreed with each other to restrain trade *after* Visa and MasterCard each eliminated that ownership structure through its IPO. Plaintiffs admit that since those IPOs in March 2008 and May 2006, Visa and MasterCard have been *publicly* held corporations. *Mackmin* Compl. ¶ 44; *Stoumbos* Compl. ¶ 20; *NAC* Compl. ¶ 30. The pre-IPO ownership structures thus could not support any inference of a post-IPO agreement among the banks and Visa or MasterCard. Nor could any agreement among the banks be inferred on the basis that the publicly owned Visa and MasterCard each decided to maintain, rather than eliminate, its ATM access fee rule. Plaintiffs identify no facts that could show the banks have controlled the post-IPO rules of Visa or MasterCard, much less that the banks agreed with one another to exercise any such control in connection with the ATM access fee rules. *See Mackmin* Bank Opp'n at 8-11; *NAC* Opp'n at 11.

Plaintiffs also cite the Second Circuit's pre-IPO statement in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), *aff'g*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), that Visa and MasterCard had acted as "consortiums of competitors." *See Mackmin* Bank Opp'n at 9; *Stoumbos* Opp'n at 7; *NAC* Opp'n at 11 n.3. But the Second Circuit based that statement on its observation that Visa and MasterCard were "owned and effectively operated by . . . banks, which compete with one another in the issuance of payment cards." 344 F.3d at 242. Because

plaintiffs admit that the Visa and MasterCard IPOs thereafter eliminated that bank ownership structure, no post-IPO agreement among the banks could be inferred from the Second Circuit's "consortium of competitors" statement.

Nor does *United States v. Visa* support plaintiffs' claim of a *pre-IPO* agreement among the banks and Visa or MasterCard regarding ATM access fees. The Second Circuit did not find that Visa or MasterCard had acted as a "consortium of competitors" with respect to the ATM network access fee rules challenged in this case. Instead, the Second Circuit made that statement only in connection with card-issuer exclusivity rules of the Visa and MasterCard payment card networks, which prevented banks that issued Visa or MasterCard payment cards from also "issuing cards of Amex or Discover." 344 F.3d at 242. Significantly, the Department of Justice in *United States v. Visa* also challenged different Visa and MasterCard payment card network "governance duality" rules. The district court *rejected* the claim that "dual governance is the result of separate conspiracies between each association and its members" — a decision that the Department of Justice did not appeal. 163 F. Supp. 2d at 347; *see* 344 F.3d at 234 & n.1. The district court and the Second Circuit thus did not find that Visa or MasterCard was a "consortium of competitors" with respect to all network rules, and instead made that determination on a rule-by-rule basis. Plaintiffs thus cannot rely on *United States v. Visa* to show any horizontal agreement among the banks — before or after the IPOs — regarding ATM access fee rules.[1]

---

[1] Plaintiffs likewise could not show a horizontal agreement among the banks based on the other decision that plaintiffs cite. That decision also predated the IPOs and addressed only Visa's payment card network rules regarding authorization, clearing, and settlement of transactions, rather than Visa's ATM network access fee rule. *See Visa U.S.A. Inc. v. First Data Corp.*, 2005 WL 3274105, at *1 (N.D. Cal. Aug. 16, 2005).

### B. Each Bank's Alleged Individual Agreement with Visa or MasterCard Could Not Establish That the Banks Agreed Horizontally with Each Other to Restrain Trade

Second, plaintiffs assert that they allege direct evidence of an agreement even after the IPOs because of "the written agreements entered into between the Network Defendants and each of the Bank Defendants and the Bank Co-Conspirators" to adhere to the network's rules. *Mackmin* Bank Opp'n at 7; *see also NAC* Opp'n at 9 (agreement consists of Visa and MasterCard "'contracts, agreements, rules and undertakings with member banks'" (quoting *NAC* Compl. ¶ 54)). As Visa and MasterCard have demonstrated, however, such agreements between each individual bank and Visa or MasterCard could not establish that the banks entered into agreements with each other "horizontally" as competitors, under the theory on which plaintiffs base their complaints. *See, e.g.*, Visa & MC Mem. at 9-10; *Mackmin* Compl. ¶ 72 (asserting "horizontal agreements *among* the Bank Defendants and Bank Co-Conspirators to adhere to rules" (emphasis added)); *NAC* Compl. ¶ 31 (asserting "a horizontal agreement among . . . practically every principal U.S. bank"). As the Ninth Circuit concluded in rejecting such a claim as to Visa and MasterCard network interchange fee rules, each bank's "adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see also* Visa & MC Mem. at 10 n.3 (discussing other circuit court cases).

Plaintiffs argue that the cases on which Visa and MasterCard rely do not address an "overt" or "express" agreement between an association and its members to follow the association's rules. *Mackmin* Bank Opp'n at 14-16; *NAC* Opp'n at 11-12. Plaintiffs are wrong. Those cases rejected claims of an unlawful agreement as a matter of law despite alleged overt or express agreements. *See, e.g.*, *Kendall*, 518 F.3d at 1048 (affirming dismissal where each bank allegedly agreed to "adopt the interchange fees set by" Visa or MasterCard under their respective

network rules); *Am. Airlines v. Christensen*, 967 F.2d 410, 413 (10th Cir. 1992) (affirming summary judgment where each member of the challenged American Airlines rewards program allegedly "accepted those terms" of the program). Even when a membership agreement between an association and each of its individual members is overt or express, it cannot establish that the members entered into agreements horizontally with each other in violation of Sherman Act § 1.

### C. Plaintiffs Allege No Facts That Could Establish That the Banks Agreed Horizontally with Each Other to Restrain Trade in a "Hub and Spoke" Conspiracy

Third, the *Mackmin* and *Stoumbos* plaintiffs argue that they allege facts from which a post-IPO horizontal "hub and spoke" agreement among the banks and Visa or MasterCard could be inferred. *See Mackmin* Bank Opp'n at 11-14; *Stoumbos* Opp'n at 9; *but see NAC* Opp'n at 11 ("[t]he hub-and-spoke analogy . . . has limited, if any, application to the Section 1 claim pleaded"). The *Mackmin* and *Stoumbos* plaintiffs argue that "the Bank Defendants' continued agreement to participate in a scheme with a hub or ringmaster — in this case, the Network Defendants — combined with the knowledge that their competitors would also participate, and the necessity of their participation to effectuate the conspiracy, are by themselves sufficient to establish a horizontal agreement." *Mackmin* Bank Opp'n at 11; *see Stoumbos* Opp'n at 9.

As Visa and MasterCard demonstrated in their opening memorandum, to plead a horizontal "hub and spoke" conspiracy, a plaintiff must allege facts that could establish an agreement *among the banks* to restrain trade — a "rim" — and not just "spoke" agreements between each individual bank and Visa or MasterCard. *See* Visa & MC Mem. at 9. Plaintiffs identify no alleged facts that could establish that every bank in Visa's or MasterCard's ATM network entered into an agreement with every other bank in that network to restrain trade through the network's ATM access fee rule, or even that *any* bank entered into such an agreement with any other bank. *See Mackmin* Bank Opp'n at 11-14; *Stoumbos* Opp'n at 9.

Nor could plaintiffs plead a "rim" by arguing that each bank "knew" the other banks also would follow the Visa or MasterCard ATM network rules. Even if true, that knowledge could not establish that a bank was entering into an agreement with other banks rather than acting independently. As the Third Circuit recently concluded in affirming the dismissal of claims that insurers had entered into a horizontal agreement because each insurer knew of the arrangements that the other insurers had with a broker: "allegations that each insurer knew about the competitive protections purchased by the other insurer-partners manifestly do not describe[ ] . . . a horizontal conspiracy to unreasonably restrain trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010) (internal quotations omitted); *see also, e.g.*, *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (fact that Coca Cola assured its independent distributors that its "loyalty policy would be uniformly enforced . . . was insufficient evidence of a horizontal agreement to withstand summary judgment"); *Toscano v. Prof'l Golfers' Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001) (fact that local PGA tour sponsors accepted "that the tournaments would be operated according to the PGA Tour's rules and regulations" could not show that "they agreed to use those rules to restrain trade").

Plaintiffs likewise fail in their argument that they allege facts akin to those found sufficient to prove a "rim" in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), *aff'g*, 126 F.T.C. 415 (1998). *See Mackmin* Bank Opp'n at 11-13; *Stoumbos* Opp'n at 9. The decisions in both of those cases turned on facts that plaintiffs do not allege in this case and that supported the inference of an agreement. In *Interstate Circuit*, the Supreme Court emphasized that the evidence showed, among other things, that "[c]ompliance with the proposals involved a radical departure from the previous business practices of the industry and a drastic increase in . . . prices," "negotiations which ensued and which in fact did result in modifications of the proposals," and "substantial

unanimity" in "far-reaching changes in their business methods." 306 U.S. at 222-23. In *Toys "R" Us*, the Seventh Circuit stressed that a toy store chain instigated "the manufacturers' decision to stop dealing with the warehouse clubs [in] an abrupt shift from the past," and that, among other things, there was "direct evidence of communications" among the manufacturers about their responses to that shift in policy. 221 F.3d at 935; *see also* 126 F.T.C. at 511. Unlike the plaintiffs in those cases, plaintiffs here do not allege facts establishing that Visa's or MasterCard's ATM access fee rule was a radical or abrupt change from past industry practices, and led to drastically increased ATM access fees, or that there were negotiations or communications among the banks regarding those rules. Accordingly, no horizontal agreement can be inferred here.

### D. Plaintiffs Allege No Facts That Could Establish a Horizontal Agreement Based on the *American Needle* Decision

Fourth, plaintiffs argue that they plead a horizontal agreement among the banks and Visa or MasterCard based on the decision in *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010). *See Mackmin* Bank Opp'n at 17-20; *Stoumbos* Opp'n at 8-9; *NAC* Opp'n at 14-17. In that case, the Supreme Court addressed whether an agreement by NFL teams to license their independently owned team trademarks under common, exclusive terms through the NFL constituted concerted action under Sherman Act Section 1. The Supreme Court found that because each NFL team was an independent competitor in a market for team trademark licenses, the teams' agreement could fall within Section 1 because it "depriv[es] the marketplace of independent centers of decisionmaking," and "therefore of actual or potential competition." *Am. Needle*, 130 S. Ct. at 2213 (internal quotation omitted).

Plaintiffs here cannot similarly allege that each bank had independent decision-making authority over the Visa or MasterCard ATM network access fee rules, which each bank ceded to

Visa or MasterCard. The Supreme Court found a potential for concerted action in *American Needle* because a team like the Pittsburgh Steelers ceded its independently owned "Pittsburgh Steelers" trademark to the NFL for the NFL to license, pursuant to an agreement with other teams to do the same — not because the Steelers agreed to allow the NFL to determine the rules for licensing "NFL" trademarks, over which the Steelers never had any independent control. *See Am. Needle*, 130 S. Ct. at 2212-15. Here, plaintiffs do not allege facts to establish that any bank independently controlled the Visa or MasterCard ATM network access fee rule, such that the bank could have ceded control over that rule to Visa or MasterCard.

Plaintiffs nevertheless argue that through the ATM access fee rules, bank ATM operators give up discretion "regarding pricing" of access fees and lose the ability to "offer[ ] discounts" on access fees to consumers who utilize "alternative networks." *Mackmin* Bank Opp'n at 18-19; *see also Stoumbos* Opp'n at 9 (same); *NAC* Opp'n at 15 ("the pricing decisions ATM operators make about access fees are directly analogous to the teams' discretion to set their own licensing terms"). But an agreement still cannot be established under *American Needle*, for the same reasons. In *American Needle*, each NFL team independently controlled the licensing of its *own* team trademark and ceded that control to the NFL. Here, by contrast, a bank ATM operator has no independent ability to complete a *Visa or MasterCard* ATM transaction, and thereby "price" such transactions, other than subject to the Visa or MasterCard ATM network rules, including each network's access fee rule. Thus, a bank ATM operator has no independent "pricing" or "discounting" discretion over Visa or MasterCard ATM network transactions that the bank could have ceded to Visa or MasterCard.[2]

---

[2] The same is true of a non-bank ATM operator. Moreover, no horizontal agreement among *banks*, including the bank defendants, could be established under *American Needle* on the ground that *non-bank*

*(footnote continued on next page)*

In addition, in *American Needle*, the Supreme Court found that the NFL's "licensing decisions" over the teams' individual trademarks were "made by" the teams, each of which "owns its share of the jointly managed assets." 130 S. Ct. at 2214. Plaintiffs in this case do not and cannot similarly allege that since the IPOs, when Visa and MasterCard have been publicly held, the banks have ownership interests in Visa or MasterCard that would allow the banks to make decisions concerning the Visa or MasterCard ATM access fee rules. *American Needle* is inapplicable here.

## II. PLAINTIFFS IDENTIFY NO ALLEGED FACTS THAT COULD ESTABLISH THE ANTITRUST INJURY NEEDED TO OBTAIN RELIEF FOR A VIOLATION OF SHERMAN ACT SECTION ONE

Plaintiffs also fail to state a claim for relief under federal antitrust law for an independent reason: plaintiffs allege no antitrust injury. Antitrust injury is injury of the type that "the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). It does not include an alleged injury from "[l]ow prices" that "benefit consumers." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). Plaintiffs identify no alleged facts that could establish antitrust injury from the challenged Visa or MasterCard ATM access fee rules.

### A. The Alleged Visa and MasterCard Rules Do Not Fix Prices or Require ATM Operators to Impose Higher Access Fees on Consumers

Plaintiffs claim that they allege antitrust injury because the Visa and MasterCard ATM access fee rules "work[ ] to fix the price of ATM-network access" and "[r]equir[e] consumers to pay a higher price." *Mackmin* Visa & MC Opp'n at 8; *see also Mackmin* Bank Opp'n at 21-24

---

*(footnote continued from previous page)*
ATM operator plaintiffs allegedly gave up any asserted pricing discretion, as the *NAC* plaintiffs seem to suggest. *See NAC* Opp'n at 15.

(same; rules set a price "floor" for ATM access fees); *Stoumbos* Opp'n at 10-11 (same). Those assertions ignore the plain language of the rules.

As plaintiffs allege, the Visa rule requires that the access fee that an ATM operator charges a consumer for completing a transaction through Visa's ATM network be "not greater than the Access Fee amount on . . . [t]ransactions through other shared networks at the same ATM." *Mackmin* Compl. ¶ 69; *Stoumbos* Compl. ¶ 31; *NAC* Compl. ¶ 41. Similarly, the MasterCard rule requires that an ATM operator "not charge an ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged . . . in connection with the transactions of any other network accepted at that terminal." *Mackmin* Compl. ¶ 70; *Stoumbos* Compl. ¶ 32; *NAC* Compl. ¶ 42. Those rules do not require that a bank or non-bank ATM operator "fix" its access fees to consumers at any particular level or establish a "floor" for such fees. The rules permit any ATM operator unilaterally to set access fees at any level, to set access fees differently at different ATMs, or to charge no access fees at all. Those rules likewise do not require any ATM operator to charge consumers higher ATM access fees — to the contrary, they *prevent* ATM operators from charging consumers a higher access fee for transactions completed over Visa's ATM network or MasterCard's ATM network.

As Visa and MasterCard demonstrated in their opening memorandum, courts repeatedly have rejected antitrust challenges to "most favored nations" rules of this type. *See* Visa & MC Mem. at 15-16. Plaintiffs argue that the rules upheld in other cases were "used to benefit a *purchaser*" through lower prices, whereas "Visa and MasterCard are *sellers*" who seek to "maximize access fees paid." *Mackmin* Visa & MC Opp'n at 15-16; *see also Stoumbos* Opp'n at 11-13; *NAC* Opp'n at 23-25. But the ATM access fee rules that plaintiffs challenge here do not address the price at which Visa and MasterCard purportedly "sell" their ATM network services to ATM operators. Rather, the rules address the ATM access fees that *consumers pay to ATM*

*operators* for ATM transaction services. In that context, Visa and MasterCard each act as a "buyer" in negotiating the lowest ATM access fee offered by the ATM operator, for the benefit of consumers who complete a transaction over its ATM network. That makes Visa and MasterCard just like the "buyer" defendants in the cases that have rejected antitrust challenges to "most favored nations" rules.

Moreover, courts have dismissed antitrust challenges to payment network rules that, like the Visa and MasterCard ATM access fee rules, prevent surcharges that would increase prices to consumers for using the network's services. *See* Visa & MC Mem. at 16-17. Those courts concluded that such rules do not result in antitrust injury. *See*, *e.g.*, *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90-91 (6th Cir. 1989) (affirming dismissal because credit card surcharge cap did not result in injury that the antitrust laws were designed to prevent); *SouthTrust Corp. v. Plus Sys., Inc.*, 913 F. Supp. 1517, 1522 (N.D. Ala. 1995) (granting summary judgment because ATM network's former ban on access fees did not result in an antitrust injury). Plaintiffs argue that unlike in those cases, the Visa and MasterCard ATM access fee rules "do not limit the access fees that ATM operators can charge consumers," *NAC* Opp'n at 27, or "benefit[ ] consumers," *Mackmin* Visa & MC Opp'n at 26. But the Visa and MasterCard rules plainly do benefit consumers by limiting the ability of ATM operators to charge consumers higher ATM access fees for completing a transaction over the Visa or MasterCard networks. *See Mackmin* Compl. ¶¶ 69-70; *Stoumbos* Compl. ¶¶ 31-32; *NAC* Compl. ¶¶ 41-42.

### B. Plaintiffs Identify No Alleged Facts That Could Show Injury Flowing from the Challenged Visa and MasterCard Rules

Plaintiffs also make clear that they can identify no alleged facts that could show injury flowing from the ATM access fee rules of Visa or MasterCard. Plaintiffs theorize that those

rules have an anticompetitive effect because they prevent ATM operators from offering discounted ATM access fees to persuade or "steer" consumers to complete their transactions over competing, lower cost ATM networks. *See Mackmin* Visa & MC Opp'n at 9-12; *Mackmin* Bank Opp'n at 21; *Stoumbos* Opp'n at 13-14; *NAC* Opp'n at 19-23. But plaintiffs' oppositions identify no alleged facts that could establish the predicate necessary to support that theory — *i.e.*, that consumers have the power to choose the network over which their ATM transactions are completed, such that offering consumers a lower access fee on a particular network could persuade them to complete their transactions over that network. *See Mackmin* Visa & MC Opp'n at 6-26; *Mackmin* Bank Opp'n at 20-37: *Stoumbos* Opp'n at 10-14; *NAC* Opp'n at 17-32.

To the contrary, the *NAC* plaintiffs — non-bank ATM operators — themselves assert that "[i]f a card inserted in an ATM is enabled for more than one network, *the ATM operator's processor can choose* which network to use to complete the transaction," and that the ATM operator's processor "customarily routes the transaction to *the network with the lowest cost* to the ATM operator." *NAC* Opp'n at 3 (emphases added). In other words, plaintiffs assert that ATM operators and their processors, not consumers, determine the ATM network over which a consumer's ATM transaction is completed.

Plaintiffs try to rely on challenges that other plaintiffs made in other cases to different so-called "anti-steering" rules. *See Mackmin* Visa & MC Opp'n at 12-14; *Mackmin* Bank Opp'n at 24-26. But those challenges to different rules could have no bearing on whether an anticompetitive effect is alleged from the ATM access fee rules in this case. The rules challenged here could not prevent ATM operators from "steering" consumers to choose to use a particular ATM network through lower access fees, since plaintiffs do not allege that consumers have the power to choose the network over which their ATM transaction will be completed.

Plaintiffs also suggest that an anticompetitive effect could be found in this case because "[c]ourts and commentators recognize that MFN clauses can have anticompetitive impacts and hence each must be evaluated on their unique facts." *Mackmin* Visa & MC Opp'n at 16; *see also id.* at 17-22; *Mackmin* Bank Opp'n at 30-37; *NAC* Opp'n at 25-26. In this case, however, for the reasons stated above, plaintiffs identify no alleged facts from which an anticompetitive impact could be found.

Finally, the *NAC* plaintiffs speculate that absent the challenged Visa and MasterCard ATM access fee rules, consumers would have asked issuers of ATM cards to enable their cards to complete transactions over additional, lower-cost ATM networks. *NAC* Opp'n at 30-31. But the *NAC* plaintiffs do not identify any alleged facts showing that consumers would have made those requests, when consumers do not have the power to choose the network over which their ATM transactions are completed. *See id.* Nor do the *NAC* plaintiffs point to any factual allegations that substantial numbers of consumers would have made such requests, that ATM card issuers in response would have enabled ATM cards to access additional networks, that ATM operators would have directed processors to complete consumers' ATM transactions over different networks, that ATM networks would have lowered prices to ATM operators as a result, or that all of those events would have resulted in ATM operators lowering the ATM access fees they charge to consumers. *See id.*

## III. PLAINTIFFS IDENTIFY NO ALLEGED FACTS THAT COULD ESTABLISH A VIOLATION OF DISTRICT OF COLUMBIA OR STATE STATUTES

The opening memorandum of Visa and MasterCard demonstrated that the District of Columbia and state antitrust statutes under which the *Mackmin* and *Stoumbos* plaintiffs assert claims are construed in accordance with federal law, except for the Tennessee antitrust statute. *See* Visa & MC Mem. at 19-21. Plaintiffs do not dispute that point, and concede that they allege

no claim under the Tennessee antitrust statute. *See Stoumbos* Opp'n at 15; *Mackmin* Visa & MC Opp'n at 27. Plaintiffs' claims under District of Columbia and state antitrust statutes should therefore be dismissed for the same reasons as plaintiffs' federal antitrust claims.

The opening memorandum of Visa and MasterCard also demonstrated that the consumer protection and unfair competition statutes under which the *Mackmin* and *Stoumbos* plaintiffs assert claims require that a defendant act "fraudulently," "deceptively," "unconscionably," "unfairly," or "unlawfully," which plaintiffs fail to allege in this case. *See* Visa & MC Mem. at 22-23. Plaintiffs do not dispute those statutory requirements. *See Stoumbos* Opp'n at 15-19; *Mackmin* Visa & MC Opp'n at 27. In response, plaintiffs argue only that the Visa and MasterCard ATM access fee rules constitute "horizontal price-fixing" under federal antitrust law, which plaintiffs say is also actionable under the consumer protection and unfair competition statutes. *Stoumbos* Opp'n at 15-16. That argument fails for two reasons.

First, courts applying the law of several of the states — including Arkansas, Idaho, Kansas, Maine, and New York — have concluded that price-fixing does not violate the state's consumer protection statutes.[3] Plaintiffs' claims under those state statutes should therefore be

[3] Those courts include the following: (1) Arkansas, *see In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289, at *9 (N.D. Cal. Dec. 8, 2010) ("[t]he Court has found no Arkansas case law indicating that the ADTPA reaches price-fixing conduct of the nature presented in this lawsuit"); (2) Idaho, *see In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1110-11 (N.D. Cal. 2007) ("allegations of antitrust price-fixing do not qualify as a type of prohibited conduct under the CPA"); (3) Kansas, *see In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 584 (M.D. Pa. 2009) ("[t]he statute [KCPA] is therefore inapplicable to price-fixing claims such as those at issue in the present case"); (4) Maine, *see In re Chocolate Confectionary*, 602 F. Supp. 2d at 584-85 ("[t]he MUTPA creates no remedy in a case involving collusive prices"); and (5) New York, *see In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 410 (S.D.N.Y. 2011) ("anticompetitive conduct that is not premised on consumer deception is not within the ambit of the statute" (internal quotations omitted)); *In re SRAM*, 2010 WL 5094289, at *9 (the "claim under [New York's consumer protection statute] fails because price fixing by manufacturers, without more, does not have a deceptive impact on consumers").

dismissed regardless of whether plaintiffs state an actionable price-fixing claim under federal antitrust law.

Second, and more importantly, no case on which plaintiffs rely that addressed an antitrust price-fixing claim allowed a consumer protection or unfair competition claim to proceed where the plaintiff failed to allege the required elements of the price-fixing claim.[4] Here, for the reasons described above, plaintiffs fail to allege facts that could establish required elements of their antitrust price-fixing claims. Thus, plaintiffs likewise state no claim under the consumer protection or unfair competition statutes.

## IV. <u>PLAINTIFFS PROVIDE NO BASIS FOR LEAVE TO REPLEAD</u>

Finally, plaintiffs seek leave to amend their complaints if this Court grants defendants' motions to dismiss. *See Mackmin* Visa and MC Opp'n at 27; *Mackmin* Bank Opp'n at 37; *Stoumbos* Opp'n at 19; *NAC* Opp'n at 32. The Court should deny those requests.

All of the plaintiffs already have amended their complaints. The facts that plaintiffs allege are insufficient to establish any horizontal agreement to restrain trade, or antitrust injury,

---

[4] *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 4387812, at *1 (N.D. Cal. Sept. 20, 2011) (antitrust claims not subject to defendants' motion for partial summary judgment and not dismissed); *In re Digital Music*, 812 F. Supp. 2d at 408 (denying motion to dismiss as to state law antitrust claims); *In re Chocolate Confectionary*, 602 F. Supp. 2d at 577-78 (finding Sherman Act allegations satisfy pleading standard and denying motion to dismiss antitrust claims); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1113 (N.D. Cal. 2008) (antitrust claims met pleading standard; motion to dismiss granted in part on other grounds); *In re DRAM*, 516 F. Supp. 2d at 1097 (denying defendants' motion for judgment on the pleadings for West Virginia state antitrust claim and dismissing other state antitrust claims only for lack of standing); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 168 (D. Me. 2004) (denying motion to dismiss for various state antitrust claims); *FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 7 (D.D.C. 1999) (antitrust claims dismissed only for lack of standing); *People v. Nat'l Ass'n of Realtors*, 120 Cal. App. 3d 459, 465 (1981) (holding that "certain group conduct constituted both an unlawful restraint of trade . . . and unlawful business activity"). The other cases that plaintiffs cite either did not address antitrust price-fixing claims or limit their analysis to unrelated demand letter requirements under state law. *See Sheet Metal Workers Local 411 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702 (D. Md. 2001); *Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068 (Mass. App. Ct. 2006).

as a matter of law. Moreover, plaintiffs identify no new facts that they could plead to cure those deficiencies in their complaints. *See Mackmin* Visa & MC Opp'n at 27; *Mackmin* Bank Opp'n at 37; *Stoumbos* Opp'n at 19; *NAC* Opp'n at 32. Where, as here, a plaintiff fails to show that any amendment to its complaint would not be futile, leave to replead should be denied. *See, e.g.*, *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010) ("a district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss"); *Howell v. Gray*, — F. Supp. 2d —, 2012 WL 456487, at *3 (D.D.C. Feb. 14, 2012) (Jackson, J.) (considering "whether the plaintiff has previously amended the complaint" and the "futility of the amendment" as factors supporting denial of leave to amend).

**CONCLUSION**

For the foregoing reasons, plaintiffs' complaints should be dismissed in their entirety with prejudice, and without leave to replead.

March 21, 2012

Respectfully submitted,

/s/ Mark R. Merley
Mark R. Merley (D.C. Bar No. 375866)
Matthew A. Eisenstein (D.C. Bar No. 476577)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Tel: 202-942-5000
Fax: 202-942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc.*

/s/ Kenneth A. Gallo
Kenneth A. Gallo (D.C. Bar No. 371253)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Tel: (202) 223-7400
Fax: (202) 223-7420

Andrew C. Finch (D.C. Bar No. 494992)
Gary R. Carney
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants MasterCard Incorporated and MasterCard International Incorporated*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 21, 2012, I caused the foregoing Reply Memorandum of Points and Authorities in Support of Visa and MasterCard Defendants' Motion to Dismiss to be filed using the Court's CM/ECF system, which will send e-mail notification of such filing to counsel of record.

/s/ Matthew A. Eisenstein
Matthew A. Eisenstein