# ATTACHMENT A

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARY STOUMBOS, on behalf of herself and all others similarly situated, 4208 Bardoz Ct., Antioch, CA 94531<br><br>Plaintiff,<br><br>vs.<br><br>VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, and PLUS SYSTEM, INC.<br>595 Market Street<br>San Francisco, CA 94105-2802<br><br>And<br><br>MASTERCARD INCORPORATED and MASTERCARD INTERNATIONAL INCORPORATED d/b/a Mastercard Worldwide<br>2000 Purchase Street<br>Purchase, NY 10577<br><br>Defendants. | Case No. 1:11-cv-01882-ABJ<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by her attorneys, brings this civil action on behalf of herself and others similarly situated against the above named Defendants and, demanding a trial by jury, complains and alleges as follows:

**<u>JURISDICTION AND VENUE</u>**

1. Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, and the costs of this suit, including reasonable attorneys' fees, for injuries sustained by Plaintiff and the Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. In the alternative,

Plaintiff also brings this action under California Bus. & Prof. Code §§ l6700 *et seq.* and Cal. Bus. & Prof. Code §§ 17200 *et seq.*, as well as the antitrust, unfair competition and/or consumer protection laws of the "Indirect Purchaser States," as that term is defined below.

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1337, and by the Clayton Act, 15 U.S.C. §§ 15(a) and 27. The Court also has diversity jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which *inter alia*, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, any member of a class of plaintiffs is a citizen of a state different from any defendant and the aggregated amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interests and costs. 28 U.S.C. §§ 1332(d)(2) and (6).

3. The interstate commerce described in this Complaint is carried on, in part, within this District. Venue is proper in this District pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391. Each of the Defendants resides in, transacts or transacted business in, maintains offices or is found within, and a substantial part of the acts or omissions complained of took place within, this District. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1367 and 1332.

## DEFINITIONS

4. "ATM" is an acronym for automated teller machine, which is an electronic banking outlet that allows customers to complete basic transactions with their banks, such as cash withdrawal, without the aid of a branch representative or teller.

5. "Independent ATM" refers to an ATM that is not owned by Visa, MasterCard or any of their member banks.

6. “PIN-debit card” refers to a card with a PIN number that may be used to effectuate transactions at ATMs.

7. “ATM Services” refers to services available to consumers at an ATM, including services such as withdrawing funds, depositing funds, ascertaining balances and other account information.

8. “ATM Access Fee” refers to the fee that is set by the ATM owner and charged at the point of sale to the ATM customer in conjunction with the provision of ATM Services, typically to fund withdrawal transactions. The fee is charged against the ATM customer’s PIN-debit card account and paid to the ATM operator.

9. “ATM Network(s)” refers to an electronic system whereby more than one ATM and more than one depository institution (or the deposit records of such depository institutions) are interconnected by electronic or telecommunications means, to one or more computers, processors or switches for the purpose of providing ATM Services to the retail customers of depository institutions. ATM Network(s) transmit ATM transactions and information between ATMs and the PIN-debit card customers’ banks.

10. “ATM Sponsoring Agreement” refers to the contract that an Independent ATM must enter into with a designated Visa or MasterCard sponsoring bank in order to qualify to use the Visa and MasterCard owned and operated ATM Networks and to accept Visa and MasterCard PIN-debit cards. The ATM sponsoring agreement contains operating terms and conditions that govern and restrict the horizontal pricing conduct of the Independent ATMs, including limitations on the pricing of the ATM Access Fees to customers at the point of sale of ATM Services.

11. "Rival ATM Network(s)" or "Rival Network(s)" refers to ATM Networks not owned or operated by Visa or MasterCard.

12. "Bug" or "Network Bug" refers to a logo on the back of a Pin-debit card that designates which of the competing ATM Networks are enabled for use in conjunction with the card.

13. "ATM Interchange" refers to a per-transaction amount that the ATM Network remits to the ATM operator as compensation for providing the ATM Services that facilitate the ATM customer's transactions with the customer's bank.

14. "ATM Network Fee" or "Network Fee" refers to a per-transaction amount that the ATM Network charges the ATM operator for providing the network service. The Network Fee is typically netted by the ATM Network against the ATM Interchange, before remittance of the interchange to the ATM operator. The Network Fee is economically equivalent to a cost per transaction imposed by the ATM Network upon the ATM operator.

15. "Net ATM Interchange" or "Net Interchange" refers to the net amount of interchange remitted to the ATM operator by the ATM Network after deduction of the ATM Network Fee. In the case of Independent ATMs, the Net ATM Interchange is not paid directly to the Independent ATM by the ATM Network but rather is paid through the ATM's processor, an independent service hired by the ATM and acting as intermediary on its behalf.

16. "Class Period" means October 1, 2007 to the present.

17. "Indirect Purchaser States" refers to states that allow recovery of damages by indirect purchasers pursuant to state antitrust, unfair competition and/or consumer protection laws, as set forth in the second and third claims for relief, *infra*.

## PARTIES

18. Plaintiff Mary Stoumbos is a resident of the State of California. Stoumbos has paid several ATM Access Fees in connection with transactions that occurred at Independent ATMs during the Class Period. Plaintiff owns a Visa branded PIN-debit card that she has used at Independent ATMs to conduct transactions, including withdrawals of cash, and for which she has paid ATM Access Fees. Plaintiff's PIN-debit card enables her ATM transactions to be routed through Rival ATM Networks in addition to the Visa and MasterCard ATM Networks. Bugs on the back of her card evidence these additional, Rival Networks. Her additional Rival Network Bugs are the CU Service Centers, Co-Op Network, and Star network Bugs. The Star network charges lower ATM Network Fees and remits higher Net Interchange to ATM operators than do either the Visa or the MasterCard ATM networks. During the Class Period, Plaintiff paid an ATM Access Fee that was not discounted in connection with a transaction through at least one Independent ATM with access to the Star network, as well as the Visa and MasterCard networks.

19. Defendant VISA INC. is a publicly traded Delaware corporation with its principal place of business in San Francisco, California.

20. Defendant VISA U.S.A. INC. is a Delaware corporation with its principal place of business in San Francisco, California and is owned and controlled by Visa Inc.

21. Defendant VISA INTERNATIONAL SERVICE ASSOCIATION is a Delaware corporation with its principal place of business in San Francisco, California and is owned and controlled by Visa Inc.

22. Defendant PLUS SYSTEM, INC. is a Delaware corporation with its principal place of business in San Francisco, California and is owned and controlled by Visa Inc.

23. Defendants VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, and PLUS SYSTEM, INC. are collectively referred to herein as "Visa."

24. Defendant MASTERCARD INCORPORATED is a publicly traded Delaware corporation with its principal place of business in Purchase, New York.

25. Defendant MASTERCARD INTERNATIONAL INCORPORATED is a Delaware non-stock (membership) corporation with its principal place of business in Purchase, New York and is owned and controlled by MasterCard Incorporated. MasterCard International Incorporated consists of more than 23,000 member banks worldwide and is the principal operating subsidiary of MasterCard Incorporated. MasterCard International Incorporated operates the MasterCard, Maestro and Cirrus ATM networks.

26. MASTERCARD INCORPORATED and MASTERCARD INTERNATIONAL INCORPORATED are collectively referred to herein as "MasterCard."

**NATURE OF THE ANTI-COMPETITIVE HORIZONTAL PRICING RESTRAINT**

27. The unreasonable restraints of trade in this case, the ATM Access Fee Restraints, are written Visa and MasterCard rules and corresponding provisions in bank-ATM sponsoring contracts directly aimed at restraining horizontal price competition in two relevant markets: (1) the ATM Services market and (2) the ATM Network market. ATM operators are horizontal competitors with each other in the market for the provision of ATM Services to consumers. Visa and MasterCard are horizontal competitors with other ATM Networks in the market for provision of ATM Network services to ATMs. The anti-competitive rules and contract provisions were adopted before Visa and MasterCard became public corporations and have continued in force and effect since that time to the present.

28. The Visa and MasterCard Defendants are descendants of bankcard associations formerly jointly owned and operated by a majority of the retail banks in the United States. Visa, Inc. became a publicly held corporation after an initial public offering ("IPO") of its stock began trading on the New York Stock Exchange on March 18, 2008. MasterCard, Inc. became a publicly held corporation after an IPO of its stock began trading on the exchange on May 24, 2006.

29. From the beginning of their existence until their IPOs, the Defendants and their predecessor entities' member banks elected a Board of Directors, composed exclusively or almost exclusively of competing member banks. That Board of Directors in turn established, approved, and agreed to adhere to rules and operating regulations that required all member banks to adhere to the ATM Access Fee Restraints.

30. Prior to the Defendants' IPOs, each bank that was a member of the Visa or MasterCard networks knew and understood that the ATM Access Fee Restraints would continue after the Network Defendants' respective IPOs.

31. In 1998, the Antitrust Division of the Department of Justice sued Visa and MasterCard alleging that the joint governance of the two networks and certain rules that prevented banks from issuing cards on competitive networks (the "exclusionary rules") violated Section 1 of the Sherman Act. After a 34-day trial the court found the exclusionary rules violated the antitrust laws and that decision was affirmed by the United States Court of Appeals for the Second Circuit. *United States v. Visa USA*, 163 Supp.2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003). The court found that the Visa and MasterCard networks, together with their member banks, implemented and enforced illegal exclusionary agreements requiring any

U.S. bank that issued Visa or MasterCard general purpose cards to refuse to issue American Express and Discover cards. 163 F. Supp. 2d at 405-406.

32. The court concluded that the "exclusionary rules undeniably reduce output and harm consumer welfare," that Visa and MasterCard had "offered no persuasive procompetitive justification for them," and that "the Member Banks agreed not to compete by means of offering American Express and Discover branded cards," that "[s]uch an agreement constitutes an unreasonable horizontal restraint [that] cannot be permitted," and that "these rules constitute agreements that unreasonably restrain interstate commerce in violation of Section 1 of the Sherman Act." *Id*. at 405-406.

33. In affirming the court's "comprehensive and careful opinion," 344 F.3d at 234, the United States Court of Appeals for the Second Circuit underscored the crucial role played by the member banks in agreeing to, and abiding by, the Visa and MasterCard versions of the exclusionary rules:

> Visa U.S.A. and MasterCard, however, are not single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which cooperate with one another in the issuance of Payment Cards and the acquiring of Merchant's transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard. These competitors have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of American Express or Discover. The restrictive provision is a horizontal restraint adopted by 20,000 competitors.

34. Similar to the exclusionary rules at issue in *United States v. Visa, U.S.A.*, the ATM Access Fee Restraints at issue in this case are horizontal restraints agreed to by the banks and the Defendants, and their members.

35. After being adjudicated "structural conspiracies" in the United States, the European Union, the United Kingdom, and several other jurisdictions, the Defendants took steps

to restructure themselves in an attempt to remove their conspiratorial conduct from Section 1 of the Sherman Act and equivalent laws in foreign jurisdictions that prohibit agreements among competitors.

36. For example, in May 2005, MasterCard's then-CEO Robert Selander noted in a presentation to the European banks that were then represented on MasterCard's Board of Directors that through an IPO, MasterCard wished to terminate the "structural conspiracy previously found to exist by courts in the United States."

37. Similarly, in January 2005, Christopher Rodrigues, the President and CEO of Visa International, acknowledged: "[T]he Regions now understand that: Old Visa's days are numbered. No one can stay as they are."

38. On May 22, 2006, MasterCard completed its IPO, which sold a partial interest in MasterCard to public investors. Through this IPO and related agreements, the surviving entity acquired certain of its member banks' ownership and control rights in MasterCard through the redemption and reclassification of stock that was previously held by the member banks. To date, the member banks retain a significant financial and equity interest in MasterCard.

39. Similarly, on March 19, 2008, Visa completed its own IPO. Under a series of transactions, Visa redeemed and reclassified approximately 270 million shares of Visa stock previously held by the member banks. To date, the member banks retain a significant financial and equity interest in Visa.

40. Following the IPOs, the Defendants continue to refer to their bank customers as "members" of Visa and MasterCard. The ATM Access Fee Restraints continued unchanged after the IPOs. By perpetuating the ATM Access Fee Restraints, the banks collectively have ceded power and authority to the Defendants, in whom they have a significant financial interest,

to continue to implement and enforce the same horizontal price-fixing restraint that had existed pre-IPOs and in which the banks were and remain knowing participants.

41. Prior to the Defendants' IPOs, each bank that was a member of the Visa or MasterCard Networks knew and understood that it and each and every other member of the network would agree to be bound by the ATM Access Fee Restraints. Following the IPOs, each bank that is a member of the Visa or MasterCard Networks, knew and understood that it and each and every other member of the applicable network would continue to agree to be bound by the ATM Access Fee Restraints. Indeed, as discussed *infra*, it was and continues to be in the member banks' best interests to agree to be bound by the ATM Access Fee Restraints.

42. In short, the violation in this case is an agreement, among Defendants and every bank that is a member of the Visa and/or MasterCard networks, that constitutes a horizontal restraint on the pricing of ATM Access Fees at the point of sale of ATM Services to customers. Visa and MasterCard impose the same horizontal restraints on ATM Access Fee pricing by Independent ATMs, who are competitors of bank-owned and operated ATMs. The horizontal restraints are imposed on Independent ATMs through the terms of the ATM Sponsoring Agreement with a member bank that is a prerequisite for Independent ATM access the dominant Visa and MasterCard ATM Networks.

43. The horizontal restraints at issue impose anti-competitive pricing restrictions upon ATM Access Fees charged at the point of sale of ATM Services to consumers. In order to conduct ATM transactions for customers who have Visa and MasterCard branded PIN-debit cards, ATMs must either be owned by a Visa or MasterCard member bank or sponsored by one. Both Visa and MasterCard by rule require member banks to adhere to certain horizontal pricing restraints regarding ATM Access Fees at both their bank-owned and their bank-sponsored

Independent ATMs. The horizontal restraints prohibit both bank-owned and Independent ATMs from engaging in an important kind of competitive pricing behavior. The horizontal ATM Access Fee Restraints impose exactly the same kind of pricing restraint on each and every ATM that is authorized to handle Visa and MasterCard ATM debit transactions. Specifically, ATM operators are prohibited from offering ATM customers a competitive, lower, or discounted Access Fee for transactions that are routed by the ATM operator over a competing Rival ATM Network that is not owned by Visa or MasterCard.

44. The ATM Access Fee Restraint substantially impedes horizontal price competition in two markets. First, the restraint impedes horizontal price competition among ATMs at the point of sale of ATM Services to the consumer by preventing ATMs from charging lower Access Fees to those consumers who have or can obtain PIN-debit Cards capable of transacting through ATM Networks that compete with the Visa and MasterCard ATM Networks.

45. Several competing, Rival ATM Networks, as detailed below, charge lower ATM Network Fees and remit higher Net ATM Interchange to ATM operators than do either the Visa or the MasterCard ATM Networks. If permitted to do so, ATM operators would have an economic incentive to pass on to customers the benefit of using the lower cost, higher net revenue Rival Networks in the form of lower, or discounted, Access Fees. Through careful setting of ATM Access Fee discounts, ATM operators will be able to attract more ATM traffic from customers who possess or choose to obtain PIN-debit cards with competing Rival Network Bugs, and will be able to route more transactions through those competing, rival networks, and thereby maximize the ATM operator’s revenue. Removal of the Access Fee restraint would result in greater Access Fee price competition among ATMs and the availability of lower, discount pricing to ATM customers.

46. Consumers have a choice of banks and debit card issuers. With the availability of discounted ATM Access Fees, consumers will seek out and demand debit cards with competing ATM Network capability, identified by Bugs on the back of the card. In response to the higher consumer demand for cards with competing ATM Network Bugs, banks will compete for consumer debit card account business by offering more cards with the rival Bugs. The end result of removal of the ATM Access Fee pricing restraint will be greater competition in ATM Access Fees at the point of sale to the customer, a shift in transaction volume to competing, rival ATM Networks, and generally lower ATM Access Fees.

47. Second, the ATM Access Fee Restraint substantially impedes horizontal competition in the ATM Network market, and inhibits the growth of ATM Networks that compete with Visa and MasterCard. The restraint suppresses competition between Visa and MasterCard and their rival ATM Networks by interfering with the normal give and take of the marketplace at the point of sale where ATMs interact directly with customers. Rival ATM Networks attempt to compete for, and expand their shares of, ATM debit transaction business by providing benefits to ATM operators in the form of lower fees and higher net interchange revenue to ATMs, than is provided by the Visa and MasterCard networks. The Access Fee Restraint, however, prevents ATMs from passing on those benefits to their customers. ATMs are prohibited from offering customers a discount or benefit for using a PIN-debit card that provides higher net revenue to the ATM operator (is less costly). ATMs cannot provide customers with incentives to encourage them to obtain and use cards embossed with rival network Bugs, even though the rival networks are a higher-revenue, lower-cost alternative for the ATMs, because they cannot reward the customers' card choices with lower Access Fees. In

short, ATMs are prohibited from fostering the competition that would otherwise arise between Visa and MasterCard and their rival networks at the point of sale to the customer.

48. The suppression of ATM Network competition results in higher ATM Access Fees to consumers and lower ATM terminal deployment and transaction output. If ATMs were allowed to discount Access Fees for us of rival ATM Networks, in order to compete effectively Visa and MasterCard would be forced to lower their fees and provide higher net interchange to ATMs. ATMs would pass on some or all of the benefit of the lower costs and higher net interchange to their customers in the form of lower ATM Access fees.

49. In effect, the horizontal restraint imposes a pricing floor on ATM Access Fees. ATMs have just two sources of revenue to offset their costs of operation and earn an economic profit. ATMs receive revenue per transaction from ATM Networks in the form of Net Interchange and from customers in the form of the ATM Access Fees. If transaction revenues from the ATM Networks are lower, ATM Access Fees must be correspondingly higher for ATMs to cover costs and earn the same level of profit. Visa and MasterCard ATM Networks are the dominant Bug networks on Visa and MasterCard cards, most of which are single Bug cards, or only have Bugs for Visa or MasterCard networks.

50. ATMs are already highly competitive with each other for point-of-sale customer business, and their ATM Access Fees reflect competitive pricing pressures. ATMs have already set their Access Fees to maximize revenue within the restrictive regime of the current Access Fee Restraints. ATMs have no current economic incentive to institute lower ATM Access Fees across the board because to do so would not serve to increase the number of customer transactions using PIN-debit cards that have rival network Bugs. ATMs are constrained from reducing ATM Access Fees, given the dominance of the Visa and MasterCard debit cards and

the lower net revenues received from them, without adversely affecting their own revenues and their ability to cover costs and earn a profit. The only way that ATMs can adjust their pricing to increase their revenues is to encourage customers to seek out and use debit cards with rival network Bugs and thereby shift transaction volume to the rival networks and away from the Visa and MasterCard networks.

51. Lowering Access Fees across-the-board, however, will not encourage and incentivize a shift of volume to rival networks, because customers will not perceive any benefit to using or obtaining cards with rival network Bugs – customers will be charged the same Access Fee either way. The only effect of reducing ATM Access Fees across-the-board currently will be to make ATM operators worse off economically. On the other hand, if ATMs were permitted to charge differential Access Fees based on the Bugs on the customers' cards, ATMs would be able to steer customers to card issuers offering the Bugs of rival networks, and by increasing the mix of transaction volume in favor of the rival networks, the ATMs would maximize their own revenue. By allowing ATMs to price according to the costs of their inputs, both ATMs and consumers of ATM services would benefit.

## NATURE OF THE HORIZONTAL COMBINATIONS

52. As alleged above, the horizontal pricing restraints at issue result from an agreement and combination among Visa, MasterCard and their member banks to adopt, adhere to, and enforce rules and operating regulations that require ATMs owned by the banks and Independent ATMs sponsored by the banks to set a "floor level" for ATM Access Fees at the level of the ATM Access Fees charged for Visa and MasterCard network transactions. ATM Operators cannot price ATM Access Fees below this floor level. In short, the violation in this case is an agreement and combination among Visa, MasterCard, and some or all of the banks that

issue Visa- or MasterCard-branded cards that results in a horizontal restraint on the pricing of ATM Services to customers at all ATMs throughout the country that accept Visa and MasterCard PIN-debit cards.

53. Alternatively, the horizontal pricing restraints at issue result from two hub and wheel agreements and combinations in which Visa and MasterCard are the two hubs and horizontally competing ATM owners are rims around the wheel. The ATM sponsoring banks are, in effect, the intermediaries and agents of Visa and MasterCard in imposing the ATM Access Fee Restraints directly upon the Independent ATMs through the written-contract, ATM Sponsoring Agreements. Independent ATMs are horizontal competitors who are prohibited by the written ATM Sponsoring Agreements from offering differential pricing discounts to their ATM Services customers. It would not be in the best interests of any individual ATM operator to choose to saddle himself or herself with a restrictive ATM Access Fee pricing restraint that required him or her to set a single, uniform fee for all transactions at that ATM, irrespective of the ATM Network used to complete the transaction. In his or her own economic self-interest, in order to maximize revenues, an ATM operator would instead choose to retain the flexibility to set discounted Access Fees for those transactions that can be routed through Rival ATM Networks that charge the ATM operator lower Network Fees and remit higher Net Interchange.

54. The setting of a single, uniform access fee, whether or not discounted in relation to access fees at other ATMs, would not incentivize ATM customers to obtain and use more cards possessing Rival ATM Network Bugs, and thus would not promote the ATM operator's economic self-interest in increasing the usage of Rival ATM Networks at his or her ATM, and thereby increasing the net revenue received from those rival networks.

55. The Independent ATM operators would not voluntarily agree either individually or among themselves to horizontal restraints that restrict the ability of each to freely set his or her own Access Fee price structure. Rather, they are compelled to adhere to the anti-competitive horizontal restraints by business and economic reality. Because Visa and MasterCard branded cards dominate the PIN-debit card market,[1] it would be impossible for an Independent ATM to survive economically without the ability to facilitate Visa and MasterCard PIN-debit transactions. Independent ATM operators perceive that they cannot successfully do business without access to those networks. In order to gain access to the Visa and MasterCard transaction networks, however, Independent ATMs are required to enter into the ATM Sponsoring Agreements. Thus, Visa and MasterCard, at the hubs of the two illegal combinations, abuse their dominant market positions to impose a horizontal pricing restraint upon the Independent ATMs that form the rim of the wheel.

**CLASS ACTION ALLEGATIONS**

56. Plaintiff brings this action on behalf of herself, and on behalf of all others similarly situated. Plaintiff seeks to represent the following class (the "Class") pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure:

All persons in the United States who were charged an ATM Access Fee at an Independent ATM during the relevant Class Period.

57. Subject to additional information obtained through further investigation and discovery, the foregoing Class definition may be expanded or narrowed by amendment or amended complaint.

[1] According to The Nilson Report, Visa, for example, held a 60.7 % share of the U.S. debit card market. According to Forbes, in 2012 MasterCard had more than 20% of the PIN debit card transactions in the U.S. The largest Pin debit network as of 2008, according to the Federal Reserve Bank of Kansas City is Interlink, operated by Visa, with a 40% market share.

58. This action has been brought and may properly be maintained as a class action, pursuant to the provisions of the Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class:

a. Numerosity: Members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains tens of thousands and perhaps millions of members. The precise number of Class members is unknown to Plaintiff. Throughout the period covered by this Complaint, Defendants and their co-conspirators participated in the ATM Services industry throughout the United States.

b. Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common factual and legal questions include:

i. whether Defendants formed and operated an illegal combination to fix, raise, maintain or stabilize the prices of, or allocate the market for, ATM Access Fees;

ii. whether the combination caused ATM Access Fees to be higher than they would have been in the absence of Defendants' conduct;

iii. the operative time period of Defendants' combination;

iv. whether Defendants' conduct caused antitrust injury to Plaintiff and the members of the Class;

v. the appropriate measure of the amount of damages suffered by the Class;

vi. whether Defendants' conduct violates Section 1 of the Sherman Act;

vii. whether Defendants' conduct violates the antitrust, unfair competition, and consumer protection laws of the states as alleged below; and

viii. the appropriate nature of class-wide equitable relief.

c. Typicality: Plaintiff's claims are typical of the claims of the Class because Plaintiff directly incurred a supra-competitive ATM Access Fee from Independent ATMs during the Class Period, as did each member of the Class. Furthermore, Plaintiff and all members of the Class sustained monetary injury arising out of Defendants' wrongful conduct.

d. Adequacy: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class that she seeks to represent; she has retained counsel competent and highly experienced in complex class action litigation; and intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately represent the interests of the Class.

e. Superiority: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for individual members of the Class to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the

complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## TRADE AND INTERSTATE COMMERCE

59. Defendants' branded PIN debit payment cards, issued by the nation's banks and other depository institutions, are utilized in an enormous volume of ATM transactions involving a substantial dollar amount of commerce and are marketed, sold and used in the flow of interstate commerce. Visa provides ATM network services for cards branded with the Visa, Visa Electron, Interlink, and PLUS service marks at ATMs and terminals connected to the Visa, PLUS, and Interlink networks. In 2007, U.S. cardholders used Visa's PIN-based platform to access $395 billion in cash. As of September 30, 2010, there were 397 million Visa debit cards in circulation.

60. MasterCard provides ATM network services for cards branded with the MasterCard, Maestro or Cirrus service marks at ATMs and terminals participating in the MasterCard Worldwide Network. Excluding Cirrus- and Maestro-branded cards, cardholders used MasterCard-branded cards to access $202 billion in cash in the U.S. in 2007. As of September 30, 2010, there were 123 million MasterCard debit cards in circulation.

## THE ATM INDUSTRY

### ATM Pin-debit Transactions and Access Fees

61. ATM transactions are initiated by use of a PIN-debit card. Holders of PIN-debit cards are able to use ATMs owned by banks as well as Independent ATMs. When a consumer uses a PIN-debit card at an ATM, the consumer is charged an ATM Access Fee for certain ATM Services, such as withdrawing cash from that ATM. The ATM Access Fee is set by the owner of

the ATM and the fee is added to the amount withdrawn by the customer and is charged directly to the customer's PIN-debit card bank account.[2]

62. The ATM Access Fee is a single, uniform amount for any given ATM. All ATMs are prohibited by the Visa and MasterCard Rules from charging a differential, lower Access for transactions routed over non- Visa or MasterCard, rival ATM Networks.

63. The vast majority of PIN-debit cards used for ATM transactions are Visa or MasterCard branded bank account-linked PIN-debit cards. As Visa states on page 17 of its Form 10-K filed with the U.S. Securities and Exchange Commission for the fiscal year ended September 30, 2010, "[i]n the debit card market segment, Visa and MasterCard are the primary global brands."

## Independent ATMs

64. Independent ATMs are ATMs not owned or operated by Visa, MasterCard or their member banks. Because Independent ATMs are not located at bank premises, they necessarily require access to one or more shared ATM Networks in order to complete ATM customer transactions.

65. In order to accept Visa and MasterCard PIN-debit cards and gain access to the Visa and MasterCard shared ATM Networks, Independent ATMs are required to enter into an ATM Sponsoring Agreement with a Visa or MasterCard designated sponsoring bank. The ATM Sponsoring Agreements contain the anti-competitive pricing restraints on ATM Access Fees at issue in this complaint.

66. Because of the market dominance of Visa and MasterCard PIN-debit cards and the Visa and MasterCard operated PIN-debit ATM Networks, no Independent ATM could

---

[2] An additional fee (a "foreign ATM fee") may also be assessed by the financial institution that issued the card, but this fee is not relevant to the allegations in this Complaint.

survive economically without entering into an ATM Sponsoring Agreement with a Visa or MasterCard sponsoring bank.

**ATM Networks**

67. ATM transactions are completed over ATM Networks, which are electronic networks that provide the communications link between the ATM and the customer's bank for the purpose of verifying account balances and authorizing withdrawals. Both Visa and MasterCard operate ATM Networks. All ATMs that accept Visa and MasterCard branded PIN-debit cards are required by Visa, MasterCard and their member banks to have access to the Visa and MasterCard ATM Networks.

68. There are also rival ATM Networks not owned or operated by Visa or MasterCard, which include Pulse Network, NYCE Network, Star Network, Exchange Network, Armed Forces Network and Credit Union 24 Network, and others. ATMs may also contract with these networks for shared ATM network services in addition to the required Visa and MasterCard networks and may route transactions over the rival networks when the customer's PIN-debit card is properly coded to permit use of a rival network.

69. A PIN-debit card must be specifically coded for each ATM Network that is authorized for use with that card. Authorized networks coded on the cards are reflected by logos on the backs of the cards, called network Bugs. An ATM cannot route a card transaction over a network that is not coded for that card. Most Visa and MasterCard member banks issue PIN-debit cards coded only for use with the Visa and MasterCard ATM Networks. Some banks and other financial depository institutions, however, issue cards coded for additional, rival networks, and evidenced by additional Bugs for the rival networks on the backs of the cards.

70. ATM transactions using Visa- and MasterCard-branded PIN-debit cards may be completed over alternative networks where the card bears the Bug service mark belonging to the alternative network, such as STAR, NYCE Payment Network LLC, ACCEL/Exchange Network, Credit Union 24, CO-OP Financial Services, Shazam Inc., Jeanie, or TransFund. Visa and MasterCard member banks, however, issue the bulk of Visa and MasterCard PIN-debit cards and most of these are coded only for the Visa and MasterCard ATM Networks. For that reason ATMs have no choice but to route the bulk of ATM transactions over the Visa and MasterCard networks.

**ATM Network Fees, Interchange and Net Interchange**

71. ATM Networks, on a per transaction basis, remit an ATM Interchange amount to the ATM. ATM Networks also charge the ATM a Network Fee per transaction. The Network Fee is normally deducted by the ATM Network from the ATM Interchange amount before remittance to the ATM. The resultant net revenue per transaction received by the ATM (Interchange minus Network Fee) is the Net Interchange.

72. Net Interchange is one of only two sources of revenue for ATMs from which the ATMs must cover all of their expenses of operation and earn a profit. The other source of ATM revenue is the ATM Access Fee charged by the ATM to the customer at the point of sale of an ATM transaction. The costs of ATM operation include equipment rental, lease or purchase expense, location rental or lease expense, maintenance and service of machines, wages and salaries and other normal business operating expenses.

73. If the ATM cannot cover its costs of operation and earn an economic profit from the Net Interchange alone, its only other revenue option is to charge customers an ATM Access Fee sufficient to make up the difference, or soon cease doing business. From the economic

viewpoint of the ATM operator, an ATM Network that pays lower Net Interchange to the ATM is the economic equivalent of a higher-cost ATM Network, since a reduction in Net Revenue is the economic equivalent of an increase in costs. Conversely, an ATM Network that pays higher Net Revenue is a lower cost ATM Network from the economic point of view of the ATM.

74. The amounts of the ATM Network Fee and ATM Net Interchange vary among the ATM Networks. The Visa and MasterCard ATM Networks, however, consistently charge ATMs the highest Network Fees in proportion to Interchange Fees and remit to ATMs the lowest Net Interchange. Data as to ATM Network Fees and ATM Net Interchange across the various ATM Networks is not publicly available. However, according to industry sources and based on transaction sampling, upon information and belief, the following is a reasonable approximation as of February 2013: Visa networks on average charged ATMs a Network Fee per transaction of $0.33 and paid Net Interchange to ATMs of $0.17, with the Network Fee constituting 66% of total Interchange; and MasterCard networks on average charged a Network Fee of $0.41 and paid Net Interchange of $0.05, with the Network Fee constituting 89% of total Interchange.

75. In contrast, rival networks charge ATMs either no Network Fee at all, or much lower Network Fees than Visa or MasterCard, and accordingly pay much higher Net Interchange. For example, upon information and belief, according to the same industry sources the following is a reasonable approximation as of February 2013: Pulse Network charged zero Network Fees and paid $0.28 Net Interchange; NYCE Network charged zero Network Fees and paid $0.38 Net Interchange; Star Network charged $0.07 Network Fees and paid $0.38 Net Interchange. Additional examples include Exchange Network, Armed Forces Network and Credit Union 24 Network – each charged zero Network Fees and paid net interchange of $0.42, $0.44, and $0.54, respectively. Although the exact amounts of Network Fees and Net

Interchange have varied over time, similar differences between Visa and MasterCard and their rival networks have prevailed in the past, with the rival networks consistently charging lower Network Fees and remitting higher Net Interchange per transaction than the Visa and MasterCard networks.

**THE ANTI-COMPETITIVE ACCESS FEE PRICING RESTRAINT**

76. As alleged above, all ATMs that accept Visa- or MasterCard-branded PIN-debit cards are required to have access to the Visa and MasterCard networks. Card-issuing U.S. banks have access to those networks by virtue of their membership with Visa and/or MasterCard. Independent ATM owners, however, must be sponsored by a "sponsoring financial institution," or must affiliate with a sponsored entity; i.e., Visa and/or MasterCard member banks that specialize in providing Independent ATM owners access to the Visa and MasterCard PIN-based networks.

77. Visa and MasterCard abuse their market dominance by forcing ATM operators, by rule in the case of member banks, and by terms that Visa and MasterCard require member banks to include in their sponsoring agreements for Independent ATMs, to charge an ATM Access Fee for each and every ATM transaction that is no less than the amount charged at that ATM for a Visa or MasterCard network transaction, irrespective of the ATM Network over which the transaction is routed. The Access Fee is a horizontal pricing restraint imposed at the point of sale of ATM Services to the public that, in effect, operates to set and maintain an anti-competitive floor price below which ATM operators cannot economically price and to prohibit ATM operators from providing differentially lower prices, or discounts, to customers who present PIN-debit cards enabled with rival ATM Network Bugs.

78. The Visa Plus System, Inc. Operating Regulations set forth the following restraint on the exercise of discretion by ATM operators to charge whatever ATM Access Fee they deem commercially and competitively appropriate:

> **4.10A Imposition of Access Fee**
>
> An ATM Acquirer may impose an Access Fee if:
>
> It imposes an Access Fee on all other Financial Transactions through other shared networks at the same ATM;
>
> The Access Fee is not greater than the Access Fee amount on all other Interchange Transactions through other shared networks at the same ATM
>
> . . . .

79. Similarly, MasterCard's Cirrus Worldwide Operating Rules (September 15, 2010) applicable to the United States Region (Chapter 20) set forth the same restraint on the exercise of discretion by ATM operators to set access fees as they deem commercially appropriate:

> **7.13.1.2 Non-Discrimination Regarding ATM Access Fees**
>
> An Acquirer must not charge an ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged by that Acquirer in connection with the transactions of any other network accepted at that terminal.

80. Visa, MasterCard and their co-conspirator banks have misused their market dominance to impose rules and sponsoring ATM contract terms that operate to fix the ATM Access Fee for any transaction at a given ATM or terminal to be no less than the amount charged at that ATM or terminal for a Visa or MasterCard transaction, irrespective of whether the

transaction is actually completed over Visa or MasterCard's PIN-debit network and without regard to any actual or potential cost saving, or revenue benefit, to the ATM operator from using one of the rival, alternative ATM Networks. Plaintiff and the Class are harmed by this practice, as they are forced to pay supra-competitive ATM Access Fees regardless of whether they are using a Visa, MasterCard, or other ATM Network to complete the transaction.

## **HARM TO COMPETITION AND ANTITRUST INJURY**

81. The foregoing provisions (hereinafter, the "ATM Access Fee restraints") harm competition in numerous ways that cause anti-competitive impact and injury to Independent ATM operators, rival ATM Networks (ATM Networks not operated by Visa or MasterCard), and ultimately the consumer of ATM Services.

### **Anti-competitive Harm in the ATM Services Market**

82. ATMs are horizontal competitors with each other in the provision of ATM Services to consumers. The ATM Access Fee restraints are imposed on all ATMs and accomplish a horizontal price fixing scheme across all ATMs that is unlawful *per se*.

83. The ATM Access Fee restraints prohibit ATMs from offering reduced, or discounted, ATM Access Fees for use of PIN-debit cards that are enabled with rival ATM network Bugs. In essence, the restraints set a floor price for the ATM Access Fee for All ATM transactions equal to the minimum price an ATM must charge in order to make transactions routed on the Visa and MasterCard ATM Networks economically viable, in light of the higher Network Fees and lower Net Interchange generated by transactions on those networks.

84. Because rival ATM Networks charge lower Network Fees and remit higher Net Interchange to ATMs, ATMs have an economic incentive to encourage and steer more ATM transactions to the rival ATM Networks. ATMs can maximize their revenues and profits by

carefully setting discounted Access Fees to customers for using cards with rival network Bugs, where the resulting increased transaction volume shifted from Visa and MasterCard to rival ATM Networks produces incremental Net Interchange sufficient to more than offset any lost revenue from the customer Access Fee discounts. When allowed to price free of the Access Fee restraints, ATMs that offer discounted Access Fees to consumers will be able to attract more overall transaction traffic to their ATMs and shift the composition of that traffic toward the higher Net Interchange rival ATM Networks. Both ATMs and customers of ATM Services will benefit from the lower, discounted Access Fees.

85. Current ATM technology and software is capable of identifying the PIN-debit card network Bugs and routing transactions through the lowest cost, highest net revenue ATM Network that is available for each card. The ATM software can also be programmed to show on the screen what discounted Access Fee the customer will receive for the rival network Bugs on his or her card, or can inform the customer that he or she will not receive an available discount because his or her card does not have a rival network Bug.

86. Consumers are sensitive to differences in ATM Access Fees and where possible will seek out ATMs with the lowest Access Fees. ATMs will have an incentive to prominently post and advertise the availability of discounted fees for cards with rival network Bugs. As consumers become knowledgeable and aware that ATMs offer discount Access Fees for cards with rival network Bugs, consumers will exercise their choice to seek out and use cards embossed with rival Bugs, and will no longer be indifferent and content to hold cards with only the Visa or MasterCard network Bug. Some card issuers already provide cards with rival Bugs, and Plaintiff possesses one of those cards. Once ATM discounts are available for rival Bug cards, other issuers will begin to offer such cards as a way to attract more PIN-debit banking

customers. Consumers who do not yet have the rival Bugs will demand that their banks provide new cards with those Bugs or they will open accounts at other banks that do provide them. Card-issuing Banks, in turn, will compete for customer account business by offering and advertise new cards with the additional rival Bugs.

87. The ATM Access Fee restraints prevent ATM operators from maximizing revenue by prohibiting them from implementing a revenue-maximizing Access Fee pricing structure that properly reflects the variability of ATM costs and revenues depending on which of the various competing ATM Networks is used for the transaction. By impeding the ability of ATMs to maximize revenue by selectively reducing ATM Access Fees to consumers possessing cards with rival Bugs, the Access Fee restraints decrease economic output, and limit growth, both in the deployment of additional ATM locations and in the number of ATM transactions initiated by consumers. As ATM Access Fee discounts begin to accomplish the goal of increasing transaction volume and shifting its composition to the higher net revenue ATM Networks, the higher revenues will enable ATMs to further reduce, or even eliminate, customer Access Fees, increase the output of customer ATM transactions and increase the deployment of additional ATM locations.

88. Ultimately, the ATM Access Fee Pricing restraints cause anti-competitive harm and injury to consumers, plaintiff and the Class, by raising the cost of transactions at ATMs. Initially, removal of the pricing restraint would result in the availability of discounted Access Fees for cardholders who, like the Plaintiff, already have cards embossed with rival network Bugs. Shortly thereafter, consumers who do not currently possess rival Bug cards would be able to take advantage of the discounts as they seek out, obtain, and use cards from issuers that

currently offer cards with the rival network Bugs, or from additional card issuers that soon will add such cards to their repertoires in response to the customer demand.

**Anti-competitive Harm in the ATM Network Market**

89. The ATM Access Fee restraints are imposed by Visa and MasterCard to insulate and protect themselves from competition in the ATM Network market, and to shield their disproportionately high Network Fees and low Net Interchange remittances from the competitive pressures of the much lower Network Fees and higher Net Interchange remittances of the rival ATM Networks.

90. The anti-competitive effects of the ATM Access Fee pricing restraints in the ATM Network market include suppression of competition among PIN-based ATM Networks that compete with Visa and MasterCard networks, hindrance of the growth of rival, more efficient ATM Networks, maintenance of Visa and MasterCard dominance together with their inefficient, non-competitive high Network Fees and low Net Interchange, and maintenance of overall higher Access Fee levels for customers of ATM Services. The relatively high Network Fees and low Net Interchange received by ATMs as a result of the continuing Visa and MasterCard dominance of the ATM Network Market, inhibits the profitability and growth of the ATM industry, and results in a restriction of output in the form of fewer ATMs and fewer ATM locations.

91. If ATMs were free of the Access Fee restraints and allowed to price competitively, Visa and MasterCard would lose market share to ATM Network rivals as a result of the Access Fee discounting for rival Bug cards, unless Visa and MasterCard reduced their Network Fees and increased their Net Interchange to ATMs to meet the competition of the rival networks. More competitive pricing by the Visa and MasterCard ATM Networks would in turn

lower the costs and increase the net revenues to ATMs, enable more growth in the deployment of ATM locations, and result in generally lower ATM Access Fees to consumers.

**Antitrust Injury to Plaintiff and the Class**

92. Plaintiff and the Class are direct purchasers under the federal antitrust laws, because the ATM Access Fees are assessed directly to the consumer at the level at which the prices are fixed, and because the ATM Sponsoring Agreements impose the horizontal pricing restraints directly upon the Independent ATM owners from whom Plaintiff and the Class directly purchased ATM Services. In the alternative, Plaintiff and the Class are indirect purchasers and have standing to pursue injunctive relief under the federal antitrust laws, and damages claims under the state antitrust laws alleged in this Complaint.

93. Plaintiff and the Class are, and have been, injured by the ATM Access Fee restraints by being forced to pay higher ATM Access Fees for ATM Services at Independent ATMs than they otherwise would have paid if the ATMs were free to price competitively, including the use of discount pricing for cards with rival Network Bugs.

94. Plaintiff, and other members of the Class who currently possess PIN-debit cards with rival network Bugs, have used, and continue to use, such cards to withdraw cash at Independent ATMs. They have been charged the full, uniform Access Fees applicable to all transactions at those ATMs denied the discounted Access Fees that would have been available for rival Bug cards in the absence of the Access Fee restraints.

95. Members of the class who currently possess PIN-debit cards without rival network Bugs have used, and continue to use, such cards to withdraw cash at Independent ATMs. They also have been charged the full, uniform Access Fees applicable to all transactions at those ATMs and denied the discounted fees that would have been available for rival Bug cards

in the absence of the Access Fee restraints. They could have taken advantage of the discounted Access Fees by replacing their PIN-debit cards with ones containing the rival Bugs.

96. Plaintiff and the entire Class also are, and have been, injured by being forced to pay ATM Access Fees at Independent ATMs that are generally higher for all PIN-debit card transactions, with our without rival Network Bugs, and whether or not routed through a rival network, as a result of the anti-competitive Access Fee pricing restraints.

97. The ATM restraints result in supra-competitive ATM Access Fees and artificially constrain growth in ATM deployment. But for the ATM restraints, retail prices for ATM Services would be lower, the quantity of ATM Services demanded would be greater, and economic output would increase.

98. In a competitive market free of pricing restraints, ATM operators would set ATM Access Fees at levels in reflecting the costs of obtaining the ATM Network services. ATM operators would set ATM Access Fees lower for transactions routed through lower-cost ATM networks relative to transactions routed through higher-cost networks. Competition between ATM operators would pass these lower costs on to Plaintiffs. However, the ATM restraints fix and maintain ATM Access Fees at the same level regardless of which network completes the transaction or the actual economic costs and benefits of those services to the ATM operator.

99. By preventing ATM operators from charging an ATM Access Fee that reflects the lower Network Fee cost and higher Net Interchange of the Rival ATM Networks, the ATM Access Fee Pricing restraints shelter the Defendants from natural and beneficial price competition that otherwise would be exerted by the other participants in the market. By preventing ATM operators from passing on cost savings to consumers in the form of lower prices, signaling the availability of more efficient, higher quality, or lower priced services, Visa

and MasterCard escape the competitive discipline that would otherwise be brought to bear on them by the rival, competing PIN-based networks.

100. Because the ATM restraints break the essential economic link that would exist in a competitive market between the price a consumer is charged for a service and the cost to the retailer of providing it, they extinguish the incentive of cardholders to demand, and ATMs to provide, lower-cost, more efficient ATM Services. By disrupting the ordinary give and take of the marketplace, the ATM Access Fee pricing restraints suppress competition among ATM Networks at the point of sale, where ATM operators and ATM pricing interact directly with consumers. As alleged above, rival PIN-debit ATM networks cost ATMs less and remit higher net revenue. The ATM Access Fee pricing restraints prevent ATMs from passing on to customers the lower costs and higher benefits as an inducement to drive more consumers and more transaction volume toward cards with the rival network Bugs. Consumers are prevented from realizing the savings that would come from shifting transaction volume to the lower cost, higher net revenue, and more efficient rival ATM Networks. The ability of the lower-cost, higher-net-revenue, rival ATM Networks to compete and grow is hindered, and the potential economic savings to consumers is denied, causing antitrust injury.

## RELEVANT MARKETS

101. Because this Complaint alleges *per se* violations of the antitrust laws in the form of horizontal pricing restraints, no relevant market definitions are necessary. In the alternative, the relevant market definitions are as follows:

### Relevant Product Markets

102. One relevant product market is the market for ATM Services. No cost-effective alternative to ATM Services exists and there are few substitutes. Accordingly, a sufficient

number of PIN-debit cardholders would not switch away from ATMs to make a small but significant price increase in those services unprofitable. The market for ATM Services is a separate and distinct relevant product market for the purposes of 15 U.S.C. § 1.

103. A second relevant product market is the market for ATM Networks. There is no cost-effective alternative to shared ATM Networks for purposes of facilitating ATM Services transactions between customers and their banks, and there are no substitutes. The market for ATM Networks is a separate and distinct relevant product market for the purposes of 15 U.S.C.

**Relevant Geographic Market**

104. The relevant geographic market is the United States and all its territories.

**DEFENDANTS' MARKET POWER**

105. Visa and MasterCard directly wield market power in the relevant markets because Visa and MasterCard PIN-debit cards account for the overwhelming majority of PIN-debit cards issued in the United States. Visa and MasterCard implement and enforce the horizontal ATM Access Fee pricing restraints upon all horizontal participants in the ATM Services market. The Defendants require compliance with ATM Access Fee pricing restraints their rules applicable to member bank ATMs, and by requiring the member banks to include those same pricing restraints in the ATM Sponsoring Agreements with Independent ATMs. Visa and MasterCard directly exercise their market power through these arrangements to suppress inter-brand competition from rival ATM Networks in the relevant ATM Network market.

106. Defendants' direct exercise of market power constrains all of the participants in the ATM industry, from member banks that own ATMs to Independent ATM owners, to processors and technology providers (including the administrators of ATM Access Fees), to sponsoring financial institutions and sponsored entities. Defendants actively monitor and

vigorously enforce the ATM restraints, and participants in the ATM Services market, including Independent ATMs, must accept and agree to the pricing restraints as a condition of transacting Visa and MasterCard Pin-debit business. Parties that do not adhere to the ATM Access Fee pricing restraints are denied access to the dominant Visa and MasterCard ATM Networks.

107. Visa and MasterCard maintain their market power in light of the insurmountable barriers to entry faced by a potential competitor that might seek to achieve comparable consumer acceptance of its PIN-debit card, while at the same time the ATM restraints effectively foreclose competitive, rival ATM Networks from competing to carry a larger share of ATM transactions.

## VIOLATIONS ALLEGED

## FIRST CLAIM FOR RELIEF

**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

108. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

109. The defendants have combined, conspired and/or contracted to restrain interstate trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, by engaging in contracts, combinations, and agreements that constitute horizontal restraints upon the competitive pricing of ATM Services.

110. In furtherance of the illegal combination, contracts and conspiracy, each of the defendants has committed overt acts, including, *inter alia*, implementing and enforcing contracts and rules that result in the horizontal fixing, maintaining and/or stabilizing of prices, namely ATM Access Fees, at ATMs in the United States.

111. Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and

are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and are entitled to an injunction preventing and restraining the violations alleged herein.

112. The conduct of the defendants constitutes a horizontal restraint of trade and a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

113. Alternatively, the conduct of the defendants constitutes a series of vertical restraints of trade and a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 under the Rule of Reason in that the restraints are not reasonably necessary to accomplish any pro-competitive goal and no pro-competitive benefits result from them. Any efficiency benefit is outweighed by anticompetitive harm and less restrictive alternatives exist by which the defendants could reasonably achieve the same or greater efficiency.

**SECOND CLAIM FOR RELIEF**

**(Violation of State Antitrust and Unfair Competition Laws)**

114. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

115. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Alabama Code §§ 8-10-1 *et seq.*

116. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401 *et seq.*

117. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§ l6700 *et seq.* and Cal. Bus. & Prof. Code §§ 17200 *et seq.*

118. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4502 *et seq.*

119. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 *et seq.*

120. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*

121. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10 §§ 1101 *et seq.*

122. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.772 *et seq.*

123. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.51 *et seq.*

124. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

125. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

126. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

127. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-l *et seq.*

128. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-l *et seq.*

129. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

130. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §§ 646.705 *et seq.*

131. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the Pennsylvania common law.

132. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1-3.1 *et seq.*

133. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*

134. By reason of the foregoing, defendants have entered into agreements in of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.*

135. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1 *et seq.*

136. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ l33.01 *et seq.*

137. As a direct and proximate result of Defendants' unlawful conduct, Class Members in each of the states listed above paid supra-competitive, inflated ATM Access Fees. Such members of the Class have been injured in their business and property in that they paid more ATM Access Fees than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## THIRD CLAIM FOR RELIEF

**(Violation of State Consumer Protection and Unfair Competition Laws)**

138. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

139. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

140. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. §§ 45.50.471 *et seq.*

141. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code §§ 4-88-101 *et seq.*

142. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Bus. & Prof. Code §§ 17200 *et seq.*

143. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*

144. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201 *et seq.*

145. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. §§ 480-1 *et seq.*

146. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code §§ 48-601 *et seq.*

147. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kansas Stat. §§ 50-623 *et seq.*

148. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Maine Rev. Stat. §§ 207 *et seq.*

149. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. ch. 93A, §§ 1 *et seq.*

150. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana Code §§ 30-14-101 *et seq.*

151. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Rev. Stat. §§ 59-1601 *et seq.*

152. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Stat. §§ 358-A:1 *et seq.*

153. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. §§ 57-12-1 *et seq.*

154. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen. Bus. Law §§ 349 *et seq.*

155. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.*

156. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Rev. Stat. §§ 646.605 *et seq.*

157. Defendants have engaged in unfair competition or unfair or deceptive acts or violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*

158. Defendants have engaged in unfair competition or unfair or deceptive acts or violation of South Carolina Code Laws §§ 39-5-10 *et seq.*

159. Defendants have engaged in unfair competition or unfair or deceptive acts or violation of Utah Code §§ 13-11-1 *et seq.*

160. Defendants have engaged in unfair competition or unfair or deceptive acts or violation of 9 Vermont §§ 2451 *et seq.*

161. Defendants have engaged in unfair competition or unfair or deceptive acts or violation of West Virginia Code §§ 46A-6-101 *et seq.*

162. Defendants have engaged in unfair competition or unfair or deceptive acts or violation of Wyoming Stat. § 40-12-105.

163. As a direct and proximate result of Defendants' unlawful conduct, Class Members in the states listed above paid supra-competitive, artificially high ATM Access Fees. Plaintiff and the members of the Class have been injured in their business and property in that they paid more ATM Access Fees than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1. That the Court determine that the Sherman Act, state antitrust law, and state consumer protection and/or unfair competition law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;
2. That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:
    i. A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;
    ii. An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws identified herein; and

iii. Violations of the state consumer protection and unfair competition laws identified herein.

3. That Plaintiff and the Class recover damages, as provided by federal and state antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

4. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose effect.

5. That Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

6. That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

7. That Plaintiff and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the members of the Class, hereby demands trial by jury on all issues so triable.

DATED: April 15, 2013

Respectfully submitted,

By: */s/ Michael G. McLellan* ____________

Michael G. McLellan (D.C. Bar # 489217)
mmclellan@finkelsteinthompson.com
Douglas G. Thompson (D.C. Bar # 172387)
dthompson@finkelsteinthompson.com

**FINKELSTEIN THOMPSON LLP**
1077 30th Street, N.W. Suite 150
Washington, D.C. 20007
Tel: (202) 337-8000
Fax: (202) 337-8090

*Counsel for Plaintiff and the Class*