**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ATM COUNCIL, INC., et al.,<br>Plaintiffs,<br>v.<br>VISA INC., et al.,<br>Defendants. | No. 1:11-cv-01803 (ABJ)<br>Electronically Filed<br>Oral Argument Requested |
| ANDREW MACKMIN, et al.,<br>Plaintiffs,<br>v.<br>VISA INC., et al.,<br>Defendants. | No. 1:11-cv-01831 (ABJ)<br>Electronically Filed<br>Oral Argument Requested |
| MARY STOUMBOS,<br>Plaintiff,<br>v.<br>VISA INC., et al.,<br>Defendants. | No. 1:11-cv-01882 (ABJ)<br>Electronically Filed<br>Oral Argument Requested |

**VISA AND MASTERCARD DEFENDANTS' MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' MOTIONS FOR LEAVE TO AMEND**

May 17, 2013

# TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT .................... 1

ARGUMENT .................... 3

I. PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS STILL FAIL TO PLEAD FACTS THAT COULD ESTABLISH INJURY IN FACT .................... 3

A. Plaintiffs Admit That ATM Operators Already Complete Consumers' ATM Transactions Over the "Lower Cost" Networks .................... 6

B. Plaintiffs Do Not Allege That Consumers Have the Ability to Choose the ATM Network Over Which Their ATM Transactions Are Completed .................... 7

II. PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS STILL FAIL TO PLEAD FACTS THAT COULD ESTABLISH AN ANTITRUST CONSPIRACY .................... 11

A. Plaintiffs Allege No Facts That Could Show a "Horizontal" Conspiracy Among Banks and Visa or Banks and MasterCard .................... 12

B. Plaintiffs Allege No Facts That Could Show "Vertical" Conspiracies Among Individual Banks and Visa or MasterCard .................... 16

III. PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS STILL FAIL TO PLEAD FACTS THAT COULD ESTABLISH A VIOLATION OF DISTRICT OF COLUMBIA OR STATE STATUTES .................... 18

CONCLUSION .................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**


** Am. Airlines v. Christensen*,
967 F.2d 410 (10th Cir. 1992) ....................18

**Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001) ....................3, 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................3, 4

**Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................11, 14

*Beutler Sheetmetal Works v. McMorgan & Co.*,
616 F. Supp. 453 (N.D. Cal. 1985) ....................18

** Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ....................17

*Dominguez v. UAL Corp.*,
666 F.3d 1359 (D.C. Cir. 2012) ....................3

** Federal Prescription Serv., Inc. v. American Pharm. Ass'n*,
663 F.2d 253 (D.C. Cir. 1981) ....................12

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
602 F.2d 1025 (2d Cir. 1979) ....................18

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2011) ....................3

**Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010) ....................17

** In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ....................14

*In re Interbank Funding Corp. Sec. Litig.*,
629 F.3d 213 (D.C. Cir. 2010) ....................3

**Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ....................12

*Klein v. Am. Land Title Ass'n*,
--- F. Supp. 2d ---, 2013 WL 765676 (D.D.C. Mar. 1, 2013) ....................................................9

* *Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)..........................................................................................13, 16, 18

**Nat'l ATM Council, Inc. v. Visa Inc.*,
--- F. Supp. 2d ---, 2013 WL 525463 (D.D.C. Feb. 13, 2013)........................................ passim

* *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-MD-1720 (JG)(JO), 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ...........................13

*PepsiCo v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002)..........................................................................................14

* *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) .........................................................................................14

*Serv. Emps. Int'l Union Health and Welfare Fund v. Philip Morris Inc.*,
249 F.3d 1068 (D.C. Cir. 2001) .......................................................................................9

*United States v. Visa U.S.A., Inc.*,
163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd* 344 F.3d 299 (2d Cir. 2003) ........................14, 15

**PRELIMINARY STATEMENT**

In a detailed Memorandum Opinion, this Court dismissed plaintiffs' prior complaints because they failed to allege facts that could show either injury in fact resulting from, or an antitrust conspiracy to impose, the challenged Visa and MasterCard ATM access fee rules. *See Nat'l ATM Council, Inc. v. Visa Inc.*, --- F. Supp. 2d ---, 2013 WL 525463 (D.D.C. Feb. 13, 2013). Plaintiffs subsequently moved for leave to file proposed second amended complaints, which are attached to their motion papers. *See Mackmin* Docket Entry ("DE") 65; *Stoumbos* DE 32; *NAC* DE 39.[1] This Court ordered defendants to respond in detail to plaintiffs' motions for leave to amend, "addressing futility in particular." Apr. 24, 2013 Minute Order. The Visa and MasterCard defendants respectfully submit this memorandum in opposition to plaintiffs' motions.

As demonstrated below, plaintiffs' motions for leave should be denied because their proposed amended complaints are futile. Plaintiffs continue to fail to plead facts that could establish either injury in fact or an antitrust conspiracy. Each of those failures provides an independent ground for dismissal of the proposed amended complaints.

Plaintiffs continue to assert that they were injured because the challenged rules prevented consumers from completing ATM transactions over alternative, "lower cost" ATM networks, which plaintiffs now concede means "higher paying" networks. But no matter how plaintiffs try to define "lower cost," they still cannot allege injury in fact, for the same reasons that this Court previously found. First, plaintiffs continue to admit that ATM operators *already* can and do complete ATM transactions over the "highest paying" network available to complete the

[1] Plaintiffs initially filed motions pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend the Court's judgment, which defendants opposed. *See Mackmin* DE 59 & 60; *Stoumbos* DE 29 & 30; *NAC* DE 36 & 37. While those motions were pending, plaintiffs filed their motions for leave to amend.

transaction, notwithstanding the challenged rules. Second, plaintiffs do not — and cannot — allege that consumers have the ability to choose the ATM network over which their ATM transactions are completed. At most, plaintiffs allege that in the absence of the challenged rules, consumers might have asked their banks for ATM cards that could be used to complete transactions over additional ATM networks. But that allegation could not demonstrate injury in fact without proof of an attenuated and speculative chain of events that plaintiffs do not even attempt to plead, much less allege facts to support.

Plaintiffs also have not remedied their failure to allege facts that could show an antitrust conspiracy to impose the challenged Visa and MasterCard access fee rules. Plaintiffs' proposed second amended complaints continue to rely on allegations that the Court previously held were inadequate to show a conspiracy among banks and Visa or MasterCard — i.e., that banks were former members and owners of Visa or MasterCard, formerly sat on their respective Boards of Directors, continue to have unspecified equity interests in Visa or MasterCard after each network's respective IPO, and follow Visa or MasterCard ATM network rules. Plaintiffs' proposed amended complaints still do not allege any inter-bank communications or other facts showing an agreement among the banks and Visa or MasterCard regarding the challenged ATM access fee rules, or that the banks each acted against self-interest when joining the networks, as the Court found necessary to allege an antitrust conspiracy. And although plaintiffs now attempt to characterize the same alleged conspiracy as "vertical" as well as "horizontal," plaintiffs still fail to allege facts that could show each bank and Visa or MasterCard had a conscious commitment to a common scheme to achieve an unlawful objective through the challenged rules.

Finally, the Court again should decline to address plaintiffs' various District of Columbia and state law claims due to the legal insufficiency of their federal antitrust claims. In any event, plaintiffs have not alleged any additional facts to bolster their District of Columbia and state law

claims, which therefore also could be dismissed on the merits for the same reasons that defendants set forth in the briefs in support of their prior motion to dismiss.

## ARGUMENT

"A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2011); *see also In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215-16 (D.C. Cir. 2010) ("Consequently our review in this instance is, for practical purposes, identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint.") (quotation and citation omitted). Accordingly, this Court should deny plaintiffs' motions to amend if the proposed second amended complaints do not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. at 218 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### I. PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS STILL FAIL TO PLEAD FACTS THAT COULD ESTABLISH INJURY IN FACT

This Court previously concluded that, to have standing to assert an antitrust claim, a plaintiff "must show two things: (1) that the defendant's alleged wrongdoing has caused him to suffer an injury in fact that affects his business or property; and (2) that the injury is the kind of injury the antitrust laws were intended to prevent." *Nat'l ATM Council*, 2013 WL 525463, at *6; *see also Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001). To satisfy the first showing of injury in fact, a "plaintiff must personally suffer the harm," a requirement that "in antitrust cases mirrors the Article III constitutional standing requirement that all plaintiffs in federal cases must satisfy." *Nat'l ATM Council*, 2013 WL 525463, at *6 (citing, *inter alia*, *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012)).

As this Court further concluded, "[i]njury in fact requires a plaintiff to allege an injury that is both concrete and particularized and actual or imminent, rather than speculative or generalized." *Id.* at *6 n.9. Thus, to survive dismissal, a plaintiff's complaint "must contain sufficient factual matter" to establish that the plaintiff suffered injury in fact. *Id.* at *5 (quoting *Iqbal*, 556 U.S. at 678). In assessing whether a complaint alleges such facts, "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Id.* at *5.

Plaintiffs' proposed second amended complaints continue to assert the same theory of injury in fact asserted in their prior dismissed complaints. Plaintiffs assert that the challenged Visa and MasterCard ATM access fee rules prevent ATM operators from offering "discounts or [some] other benefit or inducement to persuade consumers to complete their transactions over competing, lower-cost PIN-based networks." *Mackmin* Prop. Compl. ¶ 95; *see also Stoumbos* Prop. Compl. ¶¶ 45, 51; *NAC* Prop. Compl. ¶ 1 ("[T]he rule . . . prevents ATM operators from steering consumers by way of lower access fees toward using ATM cards attached to . . . networks that are more efficient and less costly than either Visa's or MasterCard's."). That allegedly results in consumers paying higher ATM access fees and ATM operators completing fewer "lower-cost" ATM transactions. *See Mackmin* Prop. Compl. ¶¶ 8, 102-104; *Stoumbos* Prop. Compl. ¶¶ 45, 80; *NAC* Prop. Compl. ¶¶ 4, 109.

This Court previously dismissed those claims because plaintiffs failed to allege facts that could show injury in fact. *See Nat'l ATM Council*, 2013 WL 525463, at **8-15. Plaintiffs' allegations, the Court noted, were "highly conclusory," "speculati[ve]," "fuzzy," "schizophrenic," and "something of an oxymoron." *Id.* at **12-13 and n.14. All plaintiffs failed to bridge the "factual or logical gap between the complained-of conduct and the alleged harm." *Id.* at *9. Specifically, the Court concluded that plaintiffs failed to allege (1) that there are

"lower cost" ATM networks, (2) that ATM operators do not already complete ATM transactions over "lower cost" networks, or (3) that consumers have the ability to choose the ATM network over which their transactions were completed. *See id.* at **8-15.

Plaintiffs now admit in their proposed pleadings what they explained at oral argument: that by "lower cost," they actually mean a "higher paying" ATM network. *See*, *e.g.*, *NAC* Prop. Compl. ¶ 41 ("the 'least costly' network [is] the network that deducts the lowest network services fee and remits the greatest net interchange" to the ATM operator); *Mackmin* Prop. Compl. ¶ 91 (equating "the relative costs of ATM transactions" with "the variation in net-per-transaction interchange revenue received by a typical ATM [operator] after deduction for network service fees"); *Stoumbos* Prop. Compl. ¶ 47 (defining "lower-cost" to mean "higher-revenue"). But regardless of how plaintiffs try to invent new English-language definitions, plaintiffs continue to concede that ATM operators already can and do complete ATM transactions over the "highest paying" ATM network, notwithstanding the challenged Visa and MasterCard ATM access fee rules. And plaintiffs continue to allege no facts that could show consumers have the ability to "choose" the ATM network to complete their ATM transactions — either by selecting among alternative networks at the ATM machine or by soliciting their banks for different ATM cards with "bugs" of alternative ATM networks — such that consumers could have been injured by an inability to choose an ATM network with a lower access fee allegedly prohibited by the challenged rules. For these same reasons on which the Court relied in dismissing the previous complaints, plaintiffs' proposed amended complaints still fail to allege injury in fact to ATM operators or consumers from the challenged rules.

### A. **Plaintiffs Admit That ATM Operators Already Complete Consumers' ATM Transactions Over the "Lower Cost" Networks**

The Court previously found that plaintiffs did not allege injury in fact because plaintiffs failed to allege that "there is anything barring ATM operators from using the so-called lower cost networks." *Nat'l ATM Council*, 2013 WL 525463, at *12. As the Court recognized, the ATM operator plaintiffs conceded that "it is the ATM operators, and not the consumers, who select which network to utilize for a given transaction," and "the ATM operators *already automatically* route transactions over the 'lower cost' networks." *Id.* at *14 (citing Sept. 5, 2012 Hr'g Tr. at 54-58) (emphasis in original); *see also NAC* DE 26, *NAC* Opp'n at 3, Feb. 29, 2012 ("If a card inserted in an ATM is enabled for more than one network, the ATM operator's processor can choose which network to use to complete the transaction and customarily routes the transaction to the network with the lower cost to the ATM Operator.").

Nothing has changed. In their proposed second amended complaint, the ATM operator plaintiffs again admit that "[w]hen an ATM has access to multiple networks that match the bug(s) on the customer's card, the ATM operator's processor can choose which network over which to route the transaction and customarily routes the transaction through the 'least costly' network, that is, the network that deducts the lowest network services fee and remits the greatest net interchange." *NAC* Prop. Compl. ¶ 41. The consumer plaintiffs similarly admit that "[w]hen an ATM has access to multiple networks that match the bugs on the customer's card, the ATM operator's processor can and will choose the Network over which to route the transaction. The ATM operator can and will automatically choose the network that it expects will pay the ATM the highest net interchange fee." *Mackmin* Prop. Compl. ¶ 59; *see also id.* ¶ 97 ("ATMs already route the transaction over the network that best offsets their costs."); *Stoumbos* Prop. Compl. ¶ 43 (stating, without elaboration, that ATM transactions "are routed by the ATM operator").

As in the prior complaints, these admissions mean that plaintiffs fail to allege injury in fact. As plaintiffs concede, when an ATM customer's card has multiple bugs, the ATM operator is *already* routing the customer's transaction to the ATM operator's preferred, highest paying network, regardless of the Visa or MasterCard ATM access fee rules. And when an ATM customer's card has only a Visa or MasterCard bug, there likewise is no injury in fact because there is no other, "higher paying" ATM network over which the customer's transaction hypothetically could be completed. In these circumstances, neither the ATM operator plaintiffs nor the ATM customer plaintiffs have alleged injury in fact.

### B. Plaintiffs Do Not Allege That Consumers Have the Ability to Choose the ATM Network Over Which Their ATM Transactions Are Completed

The Court found that plaintiffs also failed to plead injury in fact because they did not allege "that a consumer has any opportunity to choose which network will carry his transaction . . . ." *Nat'l ATM Council*, 2013 WL 525463, at *13 n.15 (discussing *NAC* complaint); *see also id.* at *10 (*Mackmin* complaint contained no "factual detail that would indicate that consumers have any ability to 'use' competing networks"); *id.* at *12 (*Stoumbos* complaint made no allegations that a "consumer would have any ability to affect which network the operator is using"). As the Court stated, plaintiffs' theory of injury "depends on a huge number of assumptions — most notably, that ATM operators would realize some savings if they used other networks — but also that there would be some mechanism whereby they could pass that savings onto consumers by incorporating some sort of consumer network choice into the transaction." *Id.* at *12. As the Court recognized, unless plaintiffs can allege that consumers have the ability to choose the ATM network over which a transaction is completed, a consumer could not be persuaded to choose a "lower cost" (or "higher paying") ATM network by any hypothetical discount that ATM operators might provide "but for" the challenged Visa and MasterCard rules.

Plaintiffs' proposed second amended complaints do not remedy this failure. The ATM operator plaintiffs offer the conclusory allegation that "consumers respond to lower prices for a fungible service by switching." *NAC* Prop. Compl. ¶ 79. The consumer plaintiffs in *Mackmin* likewise allege in conclusory fashion that rules preventing differential pricing among networks "extinguish the incentive of cardholders to demand, and providers of ATM services to provide, lower-cost, more efficient services." *Mackmin* Prop. Compl. ¶ 96. But neither proposed complaint alleges any facts showing that a consumer could choose an alternative network at the ATM to complete a transaction.

The consumer plaintiff in *Stoumbos* alleges that ATM technology is capable of identifying the particular ATM network bug, and that software "can also be programmed to show on the screen what discounted Access Fee the cardholder will receive for the rival network Bugs on his or her card, or can inform the customer that he or she will not receive an available discount because his or her card does not have a rival network Bug." *Stoumbos* Prop. Compl. ¶ 85. But the fact that such information might be made available on an ATM screen does not establish that the consumer can *choose* between networks based on hypothetical differential access fees at the ATM. Those allegations cannot overcome the problems that the Court identified in dismissing plaintiffs' prior complaints.[2]

---

[2] As the Court noted, the consumer plaintiffs also failed to allege that "the named plaintiffs actually carry PIN cards in their wallets that can be used on alternative networks, or whether those particular networks, if any, were offered at the ATMs where plaintiffs conducted their transactions and paid their fees." *Nat'l ATM Council*, 2013 WL 525463, at *11 (discussing *Mackmin* complaint); *see also id.* (*Stoumbos* complaint contained "no indication of whether she used [a card] that was connected to any alternative network, or whether she used an ATM that could have accessed whatever particular alternative network may have been available to her"). While one of the three *Mackmin* plaintiffs now alleges that her ATM card can be used at alternative networks, all of the *Mackmin* plaintiffs still do not allege that any particular alternative networks were offered at the ATMs where those plaintiffs allegedly paid access fees. *See Mackmin* Prop. Compl. ¶¶ 15-17. The proposed second amended *Mackmin* complaint thus fails to plead injury in fact for this reason as well.

Echoing arguments made at the motion to dismiss hearing, the plaintiff in *Stoumbos* also alleges that, but for the challenged Visa and MasterCard ATM access fee rules, as "consumers become knowledgeable and aware that ATMs offer discount Access Fees for cards with rival network Bugs, consumers will exercise their choice *to seek out and use cards embossed with rival Bugs*." *Stoumbos* Prop. Compl. ¶ 86 (emphasis added); *see also id.* ¶ 46 ("With the availability of discounted ATM Access Fees, consumers will seek out and demand debit cards with competing ATM Network capability, identified by Bugs on the back of the card."). The consumer plaintiffs in *Mackmin* similarly allege, without elaboration, that "ATM networks could advertise to customers to demand that banks add their 'bug' to their debit cards in order to pay lower transaction fees." *Mackmin* Prop. Compl. ¶ 24.

However, as the Court previously recognized, "not every party affected by [an alleged] antitrust violator's 'ripples of harm' is allowed to sue." *Nat'l ATM Council*, 2013 WL 525463, at *6 (quoting *Andrx*, 256 F.3d at 806). As a result, a plaintiff must plead facts to establish that "the alleged injury possesses a sufficiently direct causal relationship to the alleged wrongdoing." *Serv. Emps. Int'l Union Health and Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1072 (D.C. Cir. 2001). Plaintiffs do not adequately plead injury in fact when "the[ir] alleged injuries . . . are too remote to have been proximately caused by the defendants' alleged conduct." *Id.* at 1069; *see also Andrx*, 256 F.3d at 816 n.19 (requiring "proximity between the alleged cause and the alleged injury"); *Klein v. Am. Land Title Ass'n*, --- F. Supp. 2d ---, 2013 WL 765676, at *5 (D.D.C. Mar. 1, 2013) (dismissing antitrust conspiracy claims brought under Clayton Act Section 4 because "the link between the challenged anticompetitive behavior and [alleged] injuries is too remote").

By merely asserting that consumers could choose a "lower cost" network by demanding ATM cards with more network bugs, plaintiffs fail to plead a basis for injury in fact under this

standard. The consumer plaintiffs' purported injury is based on an attenuated and speculative chain of events in a "but for" world without the challenged Visa and MasterCard rules. Specifically, their alleged injury could materialize only if all of the following events occur: (a) a consumer undertakes the cost and effort of soliciting his or her card-issuing bank for a new ATM card with alternative bugs (in order to receive a small discount on an access fee for a foreign ATM transaction); (b) sufficient numbers of consumers approach the card-issuing bank to make it worthwhile for the bank to consider adding the bugs of ATM networks that will require the bank to pay higher interchange fees than those charged by Visa or MasterCard — which, as plaintiffs concede (*Mackmin* Prop. Compl. ¶¶ 88-90), compete for bank ATM card issuance by offering banks the ability to pay lower interchange fees; (c) the card-issuing bank does not recoup that higher interchange by imposing new or higher fees on the cardholder that offset any savings to the cardholder from a possible lower access fee on foreign ATM transactions; (d) the consumer then uses an ATM that accepts the alternative bugs; and (e) the ATM operator for that machine actually lowers the access fee for transactions using the alternative bugs from the levels currently existing (as opposed to raising the access fee on transactions over the Visa and MasterCard networks). As was true in the dismissed complaints, this theory of injury "depends on a huge number of assumptions" and is highly attenuated and speculative. *Nat'l ATM Council*, 2013 WL 525463, at *12. And plaintiffs fail to allege facts that could support any of those assumptions.

Any injury to the ATM operator plaintiffs would be even more speculative. It would depend on a showing that, but for the challenged Visa and MasterCard rules, consumers would successfully pressure banks to add alternative bugs to their ATM cards in the manner described above. The ATM operator plaintiffs then also would have to show that the addition of alternative network bugs would lead to greater profits for ATM operators, by either

(a) increasing the number of ATM transactions over more profitable alternative networks, or (b) causing Visa and MasterCard to raise the net interchange fee paid to ATM operators. Any assertion that these events would occur is pure guesswork — and, again, is not even alleged.

In short, plaintiffs' theories of injury in fact are speculative and unsupported by factual allegations in their proposed second amended complaints. Plaintiffs' motions to amend their complaints should therefore be denied.

## II. PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS STILL FAIL TO PLEAD FACTS THAT COULD ESTABLISH AN ANTITRUST CONSPIRACY

This Court previously concluded that "the existence of an agreement or conspiracy is an essential element of a Sherman Act violation," such as plaintiffs assert. *Nat'l ATM Council*, 2013 WL 525463, at *7 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007)). Such a claim requires proof that "'the challenged anticompetitive conduct stems from . . . an agreement, tacit or express.'" *Id.* (quoting *Twombly*, 550 U.S. at 553). Thus, to avoid dismissal, "plaintiffs must allege . . . the existence of an agreement or conspiracy, or facts sufficient to support the inference of an agreement or conspiracy." *Id.* at *7.

In assessing whether a plaintiff has satisfied that requirement, a "statement of parallel conduct alone, without factual allegations to plausibly suggest an illegal agreement, is not enough." *Id.* at *18 (citing *Twombly*, 550 U.S. at 567-70). Nor is it sufficient to allege conduct that would be "in each [defendant]'s independent self-interest." *Id.* at *19.

Plaintiffs' proposed second amended complaints continue to assert that banks and Visa, and banks and MasterCard, conspired to restrain trade through each network's respective ATM access fee rule. *See Mackmin* Prop. Compl. ¶¶ 47-48; *Stoumbos* Prop. Compl. ¶¶ 52-53, 112; *NAC* Prop. Compl. ¶¶ 103, 119. This Court previously dismissed those claims because plaintiffs failed to allege any facts that could show the rules were the product of an agreement to restrain

trade, rather than parallel conduct by each individual bank acting in its own independent self-interest in agreeing to follow network rules when joining Visa or MasterCard. *Nat'l ATM Council*, 2013 WL 525463, at *15-20. Specifically, the Court recognized that plaintiffs' claim "of a horizontal conspiracy arises from the prior existence of the bankcard associations," *id.* at *16, rather than from any "facts to suggest the existence of either an actual or tacit agreement among banks to restrain trade by individually agreeing to the Visa and MasterCard agreements." *Id*. at *18. Plaintiffs' proposed amended complaints fail to allege any antitrust conspiracy for the same reasons.

### A. Plaintiffs Allege No Facts That Could Show a "Horizontal" Conspiracy Among Banks and Visa or Banks and MasterCard

This Court previously concluded that plaintiffs failed to allege facts that could show a "horizontal" antitrust conspiracy based on "the allegation that before Visa and MasterCard became publicly held corporations, their member banks created the associations' rules and regulations containing the access fee rules that remain in place today." *Nat'l ATM Council*, 2013 WL 525463, at *16. Plaintiffs' allegations did not suffice because mere "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association." *Id.* at *17 (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008)); *see also Fed. Prescription Serv., Inc. v. American Pharm. Ass'n*, 663 F.2d 253, 265 (D.C. Cir. 1981) ("Mere membership in associations is not enough to establish participation in a conspiracy with other members of those associations . . . .").

This Court further concluded that allegations that the banks are members of the post-IPO Visa or MasterCard networks and that some "banks today have some equity interest in and hold some seats on the boards of Visa and MasterCard also do not provide factual support for the conclusion that banks are engaged in a horizontal conspiracy to restrain trade," because such

"general allegations are not enough to support the theory that banks control Visa and MasterCard today such that the companies are simply a vehicle by which the banks exercise a horizontal agreement." *Nat'l ATM Council*, 2013 WL 525463, at *17 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2008 WL 5082872, at *10 (E.D.N.Y. Nov. 25, 2008)).

In their proposed amended complaints, plaintiffs have not alleged any new facts that can cure these defects. The plaintiffs once again allege that the challenged rules were adopted in the period before the networks' respective initial public offerings, when Visa and MasterCard were associations owned and operated by their member banks. *See Mackmin* Prop. Compl. ¶¶ 46, 79; *Stoumbos* Prop. Compl. ¶¶ 28-29; *NAC* Prop. Compl. ¶¶ 89-90. Plaintiffs likewise repeat the allegations that in the post-IPO period, the networks operate principally for the benefit of their member banks, that banks hold membership interests in the Visa and MasterCard networks, that certain banks hold equity interests in Visa or MasterCard, and that certain banks' employees sit on the boards of either Visa or MasterCard. *See Mackmin* Prop. Compl. ¶¶ 46, 47, 79, 116, 117; *Stoumbos* Prop. Compl. ¶¶ 38-40; *NAC* Prop. Compl. ¶¶ 89-90, 101.

As in the prior pleadings, none of those complaints "allege[s] that the banks agreed among themselves to do anything." *Nat'l ATM Council*, 2013 WL 525463, at *16. Plaintiffs must allege the "conscious commitment to a common scheme designed to achieve an unlawful objective" that is the hallmark of any conspiracy. *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 768 (1984). Here, there are no facts pleaded to demonstrate direct evidence of any horizontal agreement among the banks and Visa or among the banks and MasterCard to impose anticompetitive rules.

At bottom, plaintiffs still rest their conspiracy allegations on the contention that "[b]oth prior to, and after the Network Defendants' IPOs, each bank which was a member of the Visa or

MasterCard Networks, knew and understood that it and each and every other member of the applicable network would agree or continue to agree to be bound by the ATM Access Fee Restraints." *Mackmin* Prop. Compl. ¶ 119; *NAC* Prop. Compl. ¶ 102; *see also Stoumbos* Prop. Compl. ¶ 41. As the Court previously concluded, however, allegations that purported bank co-conspirators made independent business decisions to participate in the Visa and MasterCard networks amount to nothing more than parallel conduct that is "not enough" plausibly to suggest an unlawful agreement. *Nat'l ATM Council*, 2013 WL 525463, at *18 (citing *Twombly*, 550 U.S. at 567-70)).

Plaintiffs still allege no facts that could establish an agreement among competing bank members of each respective network, and thus no "rim" to support any hub-and-spoke conspiracy. *See*, *e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.,* 615 F.3d 412, 420 (5th Cir. 2010) (affirming dismissal of Section 1 claim because plaintiffs alleged "no wheel and therefore no hub-and-spoke conspiracy"); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) (affirming dismissal of Section 1 claim because "one cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker"). There is not a single allegation that the banks ever discussed with each other whether they would abide by the challenged network rules. *See*, *e.g.*, *PepsiCo v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (affirming summary judgment where plaintiffs failed to proffer evidence of direct communications between the spokes of the alleged hub-and-spoke conspiracy).

Plaintiffs' citation in their proposed amended complaints to *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd* 344 F.3d 299 (2d Cir. 2003), which they previously cited to the Court, also cannot show a conspiracy to restrain trade through Visa or MasterCard ATM access fee rules. And for good reason: The Second Circuit in *U.S. v. Visa* did

not find that Visa or MasterCard had acted as a "consortium of competitors" with respect to the ATM network access fee rules challenged in this case. Instead, the Second Circuit made that statement only in connection with card-issuer exclusivity rules of the Visa and MasterCard payment card networks, which prevented banks that issued Visa or MasterCard payment cards from also "issuing cards of Amex or Discover." 344 F.3d at 242. Significantly, the Department of Justice in *U.S. v. Visa* also challenged different Visa and MasterCard payment card network "governance duality" rules. The district court *rejected* the claim that "dual governance is the result of separate conspiracies between each association and its members" — a decision that the Department of Justice did not appeal. 163 F. Supp. 2d at 347; *see* 344 F.3d at 234 & n.1. The district court and the Second Circuit thus did not find that Visa or MasterCard was a "consortium of competitors" with respect to all network rules, and instead made that determination on a rule-by-rule basis. Plaintiffs' allegations regarding *U.S. v. Visa* cannot show any express horizontal agreement among the banks — before or after the IPOs — regarding ATM access fee rules.

In addition to their inability to plead facts showing an express agreement, plaintiffs also continue to fail to allege any facts from which a conspiracy could be inferred. As this Court recognized, each of the cases on which plaintiffs previously relied involved evidence that suggested an unlawful agreement was reached, or the factual allegations of parallel conduct were supported by evidence that reflected that any one alleged co-conspirator would not have engaged in the conduct independently because it would have been against its self-interest. *Nat'l ATM Council*, 2013 WL 525463, at *18-19. Turning to plaintiffs' prior allegations, this Court asked: "Why would it not be in each bank's independent self-interest to adopt the rules proffered by Visa or MasterCard to be able to handle the vast majority of ATM transactions?" *Id.* at *19.

The Court found no such explanations in the prior pleadings, and plaintiffs have offered nothing in the proposed amended complaints that could answer that question.

The *Stoumbos* plaintiff's proposed amended complaint alleges that it would not be in the self-interest of any *ATM operator* to agree to the network rules because the rules do not allow ATM operators to maximize profits. *See Stoumbos* Prop. Compl. ¶ 53. But plaintiffs do not and cannot allege any "conscious commitment" on the part of ATM operators to "consent to a scheme to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768. ATM operators are not alleged to be participants in any conspiracy, as the *Stoumbos* plaintiffs seem to suggest; rather, they are alleged to be the victims of the purported conspiracy among networks and banks. Accordingly, plaintiffs can offer no legitimate basis for an inference of a conspiracy.

### B. Plaintiffs Allege No Facts That Could Show "Vertical" Conspiracies Among Individual Banks and Visa or MasterCard

Plaintiffs' proposed second amended complaints attempt to salvage their conspiracy claims by recasting them as "vertical" conspiracies. *See Mackmin* Prop. Compl. ¶¶ 155-170; *Stoumbos* Prop. Compl. ¶ 113; *NAC* Prop. Compl. ¶¶ 125-134. But that characterization merely attaches a different label to plaintiffs' claim of horizontal conspiracy. The *NAC* plaintiffs candidly admit that the post-IPO agreements "have precisely the same horizontal, pre-IPO interbrand effects on competition," and that the "only 'vertical' element in this arrangement, therefore, is an artifice of the formation of separate entities . . . which creates the appearance of a 'vertical' agreement between the banks and the network defendants." *See NAC* Prop. Compl. ¶ 103.

Plaintiffs cannot cure defects in their conspiracy allegations by recasting them as a series of several "*unconnected separate*" vertical agreements between each bank and Visa or MasterCard. *See*, *e.g.*, *Mackmin* Prop. Compl. ¶ 156 (emphasis added); *Stoumbos* Prop. Compl.

¶ 125; *NAC* Prop. Compl. ¶¶ 113, 130. Plaintiffs do not plead any facts that could demonstrate any unlawful foreclosure of competition or other anticompetitive effects arising from any one network/bank agreement or even a series of similar individual agreements, which they must do to state a vertical claim under Section 1. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (holding that plaintiff "was required to allege facts, which if proven true, would demonstrate that . . . individual agreements . . . were likely to result in an anticompetitive effect"). Rather, throughout the proposed complaints, plaintiffs allege that the "unreasonable restraints of trade in this case are horizontal agreements among the Bank Defendants and the Bank Co-Conspirators . . . ." *Mackmin* Prop. Compl. ¶ 81; *see also id.* ¶¶ 79, 82, 98, 110, 114, 118, 120, 149-54 (alleging horizontal conspiracy); *NAC* Prop. Compl. ¶ 103 ("The only 'vertical' element in this arrangement . . . is an artifice . . . . But, every effect of the restraint . . . is 'horizontal.'").

The Third Circuit recently rejected the same pleading tactic in *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010). There, the Third Circuit held that the alternative pleading of horizontal conspiracy allegations between an artificial tooth manufacturer and its dealers as "several bilateral vertical conspiracies" was no more than an "effort to circumvent a motion to dismiss." From the pleadings in that case, the court saw "no indication of the Plaintiffs' intention to allege that every single agreement between Dentsply and each Dealer had competitive effects." *Id.* at 256. "[B]ecause the amended complaint cannot be fairly understood to allege the existence of several unconnected, bilateral, vertical conspiracies . . . ," the plaintiffs were bound to the horizontal conspiracy theory alleged in the complaint, which the Court found was legally insufficient. *Id*. The same is true here.

Moreover, even if plaintiffs' vertical allegations were taken at face value, they cannot stand under this Court's prior ruling. If no Section 1 conspiracy can be predicated on allegations

that banks imposed and followed the rules of the networks when they owned and controlled those networks (*see Nat'l ATM Council*, 2013 WL 525463, at *17), it follows, *a fortiori*, that no conspiracy to restrain trade can be pleaded based on allegations that banks agreed individually to follow the rules set by the new independent, post-IPO networks. Courts have refused to hold that purported co-conspirators' mere individual acceptance of the rules of an organization constitutes a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co.,* 465 U.S. at 764; *see*, *e.g.*, *Am. Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (mere acceptance by members of terms of airline's rewards program does not result in concerted action sufficient to support a Section 1 violation).[3]

In short, plaintiffs have failed to cure the pleading defects that led this Court previously to dismiss plaintiffs' claims because no actionable Section 1 conspiracy was pleaded. For this reason as well, leave to file plaintiffs' proposed amended complaints should be denied as futile.

## III. PLAINTIFFS' PROPOSED SECOND AMENDED COMPLAINTS STILL FAIL TO PLEAD FACTS THAT COULD ESTABLISH A VIOLATION OF DISTRICT OF COLUMBIA OR STATE STATUTES

In its opinion, the Court declined to address plaintiffs' claims under District of Columbia or state statutes because the federal claims were being dismissed. *Nat'l ATM Council*, 2013 WL 525463, at *20. The Court should apply the same discretion here. In any event, plaintiffs have

[3] Taken to its logical conclusion, plaintiffs' vertical conspiracy theory would lead to the incorrect result of imposing antitrust liability on any distributor who adhered to a manufacturer's pro-competitive territorial or customer restrictions if the distributor believed that the same restrictions were being imposed on other distributors. *See Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030 (2d Cir. 1979) (Sherman Act "does not condemn every business decision as a § 1 conspiracy merely because it is the product of an agreement between two persons or entities legally capable of conspiring. A manufacturer may announce the terms under which he will market his product and deal only with those customers who agree to abide by the terms." (citation omitted)); *see also Beutler Sheetmetal Works v. McMorgan & Co.,* 616 F. Supp. 453, 456 (N.D. Cal. 1985) (acquiescence by contractors in trust fund's demands that contractors use union-only subcontractors was not an actionable conspiracy under Section 1).

not bolstered the District of Columbia or state claims with any additional facts in their proposed amended complaints. Those claims therefore remain subject to the same legal deficiencies that defendants previously identified, and thus would not survive a motion to dismiss for all of the reasons set out in defendants' brief on their prior motion to dismiss. *See NAC* DE 24, Jan. 30, 2012 Memo. of Pts. and Auths. in Supp. of Visa and MasterCard Defs.' Mot. to Dismiss at 19-24.

## CONCLUSION

For the foregoing reasons, plaintiffs' motions for leave to file amended pleadings should be denied as futile and the actions dismissed with prejudice without leave to replead.

May 17, 2013

Respectfully submitted,

/s/ Kenneth A. Gallo

Kenneth A. Gallo (D.C. Bar No. 371253)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7400
Facsimile: (202) 223-7420

Andrew C. Finch (D.C. Bar No. 494992)
Gary R. Carney
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Defendants MasterCard Incorporated and MasterCard International Incorporated*

/s/ Mark R. Merley
Mark R. Merley (D.C. Bar No. 375866)
Matthew A. Eisenstein (D.C. Bar No. 476577)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 17, 2013, I caused the foregoing Visa and MasterCard Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motions for Leave to Amend to be filed using the Court's CM/ECF system, which will send e-mail notification of such filing to counsel of record.

/s/ Kenneth A. Gallo
Kenneth A. Gallo