**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARY STOUMBOS, on behalf of herself and all others similarly situated, 4208 Bardoz Ct., Antioch, CA 94531<br><br>Plaintiff,<br><br>vs.<br><br>VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, and PLUS SYSTEM, INC.<br>595 Market Street<br>San Francisco, CA 94105-2802<br><br>And<br><br>MASTERCARD INCORPORATED and MASTERCARD INTERNATIONAL INCORPORATED d/b/a Mastercard Worldwide<br>2000 Purchase Street<br>Purchase, NY 10577<br><br>Defendants. | Case No. 1:11-cv-01882-ABJ |

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF MOTION FOR LEAVE TO AMEND**

# TABLE OF CONTENTS


**I. DEFENDANTS FAIL TO MEET THE HEAVY BURDEN ON THEM TO SHOW THAT AMENDMENT WOULD BE FUTILE** .......... 1

**II. THE SECOND AMENDED STOUMBOS COMPLAINT SUFFICIENTLY ALLEGES THAT PLAINTIFF SUFFERED AN INJURY-IN-FACT** .......... 2

a. Plaintiff's PIN-Debit Card ATM Transactions .......... 2

b. How ATM Operator Costs and Revenues Vary According to the Competing ATM Network Used .......... 3

c. How the ATM Access Fee Restraints Prevent Discounting and Raise Consumer Prices .......... 5

d. How Consumer Choice Will Be Exercised .......... 6

e. Why Lowering Prices Across the Board Is Not A Solution .......... 7

f. How the Access Fee Restraints Cause Anti-Competitive Harm in Two Related Markets- the ATM Services Market and the ATM Network Market .......... 9

**III. THE SAC SUFFICIENTLY ALLEGES PLAUSIBLE THEORIES OF HORIZONTAL COMBINATION, CONTRACT, OR CONSPIRACY** .......... 10

a. How Visa, MasterCard, and Their Member Banks Agree to the Restraints Initially and Have Affirmed Allegiance to that Agreement Currently .......... 12

b. How the Restraints Constitute Hub and Wheel Contracts and Combinations .......... 14

c. Plaintiffs Properly Allege Vertical Agreements in Restraint of Trade .......... 17

**IV. DEFENDANTS' ARGUMENTS ON FUTILITY ARE WITHOUT MERIT** .......... 19

a. Defendants Mischaracterize Plaintiff's Complaint .......... 19

b. It is Irrelevant Whether Consumers Have The Ability to Choose Their Network .......... 21

c. Defendants' Argument Against Plaintiffs Vertical Claims is Insufficient .......... 24

d. Defendants' Arguments Against Plaintiff's State Law Claims Fail .......... 24

**V. CONCLUSION** .......... 25

# TABLE OF AUTHORITIES

## Cases

*Alliant Energy Corp. v. Bie*, 277 F.3d 916 (7th Cir. 2002)........................................................ 22

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001).................... 23

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983)....................................................................................................... 23

*Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006) ............................................................ 1

*In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir.1997)................. 19

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988).................................................. 11

*Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)............................................. 11

* *Dickson v. Microsoft Corp*., 309 F.3d 193 (4th Cir. 2002).................................................. 18, 19

*Hines v. City of Albany*, No. 1:06-CV-01517, 2008 WL 366020 (N.D.N.Y. Feb. 8, 2008)........... 1

*Hourani v. Mirtchev*, 282 F.R.D. 278 (D.D.C. 2012)............................................................. 2, 3

*Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc*., 602 F.3d 237 (3d Cir. 2010)...... 24

* *In re. Elec. Books Antitrust Litig*., 859 F. Supp. 2d 671, 683 (S.D.N.Y. 2012) .......................... 16

*In re Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1 (D.D.C. 2012) ............................... 23

*In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 331 (3d Cir. 2010).......................... 14, 16, 17

* *Interstate Circuit v. United States*, 306 U.S. 208, 221 (1938)............................................. 11, 15

* *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ..................................................... 15, 17

*Kelly v. Barreto*, No. 05-0900, 2006 WL 2568443 (D.D.C. Sep. 5, 2006) .................................. 2

*Klein v. Am. Land Title Ass'n,* 2013 WL 7657676 (D.D.C. Mat 1, 2013)). ................................ 24

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ................................... 23

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)............................ 11, 19

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs*., 62 F.3d 967 (7th Cir.1995)....................... 19

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985) ........ 11

*Ross v. Bank of Am.*, 524 F.3d 217, 225 (2d Cir. 2008)........ 22

*Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc*........ 23

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ........ 16

*U.S. Futures Exch. LLC v. Bd. of Trade of City of Chicago*, 04 C 6756, 2012 WL 3155150 (N.D. Ill. Aug. 3, 2012)........ 22

*United States v. Microsoft Corp*., 253 F.3d 34 (D.C. Cir. 2001)........ 18

*United States v. Topco Assoc., Inc.*, 405 U.S. 596 (1972)........ 11

*United States v. Visa USA*, 163 Supp.2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) ........ 12

*Whitehead v. Deutch*, No. 96-420, 1997 U.S. Dist. LEXIS 22793 (D.D.C. 1997)........ 1

**Other Authorities**

*Resale Price Maintenance: Per Se Treatment Alive in the States* (2012)........ 25

**Regulations**

Maryland Commercial Law Code 11-204 ........ 25

This Court dismissed the ATM consumer complaints without prejudice on two grounds: (1) failure to allege facts sufficient to support the allegations that plaintiffs suffered any injury-in-fact, and (2) failure to allege facts sufficient to support the claims of horizontal agreement. Plaintiff Stoumbos has now amended the Independent ATM Consumer complaint to cure both deficiencies. *See* Proposed Seconded Amended Complaint ("SAC"), attached as Exhibit A to Plaintiff's opening brief, cited to herein in the form "¶ __."

Despite the Court's dismissal "without prejudice" and in the face of the Court's explicit statement that "[t]he Court has not concluded that plaintiffs could never make factual allegations to support their claims," Memorandum Opinion ("Mem. Op.") at 38, Defendants nevertheless have asserted that amendment would be futile. The specific allegations Defendants' challenge are Plaintiffs' allegations of injury-in-fact and conspiracy; unlike their initial motion to dismiss in this case, Defendants make no challenge to Plaintiff's allegations of antitrust injury.[1]

## I. <u>DEFENDANTS FAIL TO MEET THE HEAVY BURDEN ON THEM TO SHOW THAT AMENDMENT WOULD BE FUTILE</u>

Plaintiff's opening brief described how the Federal Rules create a presumption in favor of granting a request to file an amended pleading, *Whitehead v. Deutch*, No. 96-420, 1997 U.S. Dist. LEXIS 22793 *9 (D.D.C. 1997), in the interests of ensuring the "'maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.'" *Belizan v. Hershon*, 434 F.3d 579, 584 (D.C. Cir. 2006) (citations omitted). That brief also described how Defendants here bear the "burden of establishing that leave to amend would be futile." *Hines v. City of Albany*, No. 1:06-CV-01517, 2008 WL 366020, at *2 (N.D.N.Y. Feb. 8, 2008); *see also*

[1] Plaintiff incorporates by reference arguments made in the briefs contemporaneously filed by the plaintiffs in *Mackmin, et al. v. Visa Inc., et al.*, No. 1:11-cv-1831, and in *National ATM Council, Inc. et al. v. Visa, Inc., et al.*, No. 1:11-cv-01803.

*Kelly v. Barreto*, No. 05-0900, 2006 WL 2568443, at *3 (D.D.C. Sep. 5, 2006) (granting leave to amend in light of "the defendant's failure to demonstrate that . . . amendment would be futile.").

Here, because the Stoumbos SAC specifically addresses and cures each of the deficiencies the Court identified in its Memorandum Opinion dismissing the complaint without prejudice, Defendants have failed to carry their burden of demonstrating futility and the complaints warrant acceptance for filing. *Hourani v. Mirtchev*, 282 F.R.D. 278, 280 (D.D.C. 2012).

## II. <u>THE SECOND AMENDED *STOUMBOS* COMPLAINT SUFFICIENTLY ALLEGES THAT PLAINTIFF SUFFERED AN INJURY-IN-FACT</u>.

In its initial opinion, this Court found the allegations of the *Stoumbos* complaint deficient because Plaintiff had not alleged an injury-in-fact. The Court essentially ruled that Plaintiff Stoumbos had failed to fill in the detailed allegations required to make the "link between the alleged harm to competition and the plaintiff's pocketbook." Mem. Op. at 21.

The gravamen of plaintiff's injury allegations are that she paid anti-competitive, inflated ATM Access Fees for her PIN debit card transactions at an Independent ATM. She alleges that, in the absence of the ATM Access Fee price restraint imposed by Visa and MasterCard, Independent ATM operators would have charged her lower, or discounted, Access Fees because they could route her transactions over competing ATM networks that provide more revenue and charge lower costs to the ATM operator, than do the Visa or MasterCard networks, and pass the savings on to consumers to increase the demand for and usage of PIN debit cards with access to the competing networks. *See* ¶¶ 18, 92-100.

### a. <u>Plaintiff's PIN-Debit Card ATM Transactions</u>

This Court's Memorandum Option acknowledged that Plaintiff's original complaint alleged that "'[s]ome ATM transactions using Visa- and MasterCard-branded PIN-debit cards

may be completed over alternate networks' and that the PIN cards that offer this access bear the other service marks on the back of the card." Mem. Op. 20. But the Court noted three deficiencies as to Stoumbos' individual allegations of injury in fact.

> *[1]* [T]here is no allegation in the complaint that Stoumbos herself had such a card. She does allege that she used an independent ATM, but *[2]* there is no indication of whether she used one that was connected to any alternative network, or *[3]* whether she used an ATM that could have accessed whatever particular alternative network may have been available to her. Mem.Op. at 20-21 (*Numbering added for ease of reference*).

The SAC cures each of these three deficiencies by filling in the factual details. It alleges (1) that Stoumbos' Visa PIN-debit card has network "Bugs" on the back signaling that it enables routing through rival, alternate networks, ¶18, (2) that at least one of those alternate networks is the Star network and that "the Star network charges lower ATM Switch Fees and remits higher Net ATM Interchange to ATM operators than do either the Visa or the MasterCard ATM networks," *id.*, and (3) that she "paid an ATM Access Fee that was not discounted in connection with a transaction through at least one Independent ATM with access to the Star network." *Id.*

**b. <u>How ATM Operator Costs and Revenues Vary According to the Competing ATM Network Used</u>**

In its Memorandum Opinion, this Court stated,

> The complaint *[1]* does not allege any facts to indicate that alternate networks actually provide the service at a lower cost or that completing an ATM transaction over an alternate network would give rise to *any* savings for the ATM operator. So, the sentence in paragraph 33 stating that plaintiffs are harmed because "they are forced to pay supra-competitive ATM Access Fees" is an unsupported conclusion. So is: "The ATM restraints operate to prohibit discounting by competing ATM operators to reflect the variability of costs of using competing networks." *Id.* ¶ 34. The problem with that statement is that *[2]* there are no facts alleged that show that there *is* any "variability of costs of using competing networks." Mem.Op. at 21 (*Numbering added for ease of reference*).

The *Stoumbos* SAC cures these deficiencies, first by explaining in much greater detail how Interchange revenues and Network fees flow in ATM transactions. *See* ¶¶ 43-49. As the

SAC alleges, ATM operators rely on two sources of revenue to support their operations: (1) the ATM Access Fee charged to the consumer at the point of sale of an ATM PIN-debit card transaction, and (2) the Net Interchange Revenue per transaction, which is remitted in variable amounts based upon which of the alternate ATM Networks is utilized for the transaction. ¶¶ 49, 72-74. Net Interchange Revenue per transaction is the net of an ATM Interchange amount remitted to the ATM operator minus an ATM Network Fee charged to the ATM operator. ¶ 71. The resultant Net Interchange Revenue is an economic benefit to the ATM operator. An ATM Network that results in higher Net Interchange Revenue to the ATM operator is the economic equivalent of a lower cost network, and, conversely, "an ATM Network that pays lower Net Interchange to the ATM is the economic equivalent of a higher-cost ATM Network, since a reduction in Net Revenue is the economic equivalent of an increase in costs." ¶73. "If the ATM operator cannot cover its costs of operation and earn an economic profit from the Net Interchange alone, its only other revenue option is to charge ATM customers and ATM Access Fee sufficient to make up the difference." ¶73.

The SAC incorporates detailed factual allegations as to how the ATM Network Fee and the ATM Net Interchange vary depending on which of the alternative competing ATM Networks complete the transactions. ¶¶74-75. Stoumbos alleges that the Visa and MasterCard ATM Networks consistently charge ATM operators for use of their networks the highest ATM Network Fees and remit the lowest Net Interchange revenue. ¶¶74-75. The SAC alleges that, as of February 2013,

> Visa networks on average charged ATMs a Network Fee per transaction of $0.33 and paid Net Interchange to ATMs of $0.17, with the Network Fee constituting 66% of total Interchange; and MasterCard networks on average charged a Network Fee of $0.41 and paid Net Interchange of $0.05, with the Network Fee constituting 89% of total Interchange. ¶74

With regard to rival ATM Networks, the SAC alleges that they "charge ATMs either no Network Fee at all, or much lower Network Fees than Visa or MasterCard, and accordingly pay much higher Net Interchange." ¶75. For example, the Star network, accessible by Plaintiff's Visa PIN-debit card, charged $.07 in ATM Network Fees and paid $0.38 in Net Interchange to ATM operators. *Id*. In other words, the Star network charged ATMs Network Fees that were nearly five times lower than Visa network charges and nearly six times lower than MasterCard. Accordingly, Star remitted to ATM operators more than double the Net Interchange remitted by Visa networks and more than seven time the amount remitted by MasterCard networks, on average. As such, the SAC clearly supplies a sufficient factual basis for the conclusion that alternative, rival ATM networks exist and that they are significantly less costly to ATM operators and provide significantly more net revenue benefit to ATM operators than do the Visa or MasterCard networks.[2]

### c. **<u>How the ATM Access Fee Restraints Prevent Discounting and Raise Consumer Prices</u>**

Having supplied the underlying factual predicate of variable ATM Network Fees and variable Net Interchange Revenue to the ATM operator depending on the ATM Network employed, the *Stoumbos* SAC then explains, in detail and based on well-understood economic principles, how the Visa and MasterCard ATM Access Fee restraints foreclose discounting for

---

[2] By the same token, the *Stoumbos* SAC cures the following defects noted by the Court in connection with the *Mackmin* complaint:

> The complaint asserts that "[i]n a reasonably competitive market, ATM Operators would set ATM Access Fees at a level reflecting the cost of obtaining the network services and other inputs necessary to complete the transaction," *id.* ¶ 77, and that by requiring that access fees be the same regardless of the network utilized, the "restraints break the essential economic link that would exist in a reasonably competitive market between the price a consumer is charged for a service and the cost to the seller of providing it," *id.* ¶ 79. What is missing is any discussion of what the ATM operator's costs are, and whether they change if the operator uses a Visa or MasterCard network or an alternative network. Those missing facts are fundamental, and without them, there is no basis for the conclusions in paragraph 87 that the access fees are "inflated" or "supra-competitive." Mem.Op. at 19.

transactions routed over the rival, less-costly networks and thereby raise ATM Access Fees to inflated, anticompetitive levels for all consumers of ATM services. ¶¶ 82-88.

As noted, ATM operators have only two sources of revenue, Net Interchange remitted through the ATM networks and ATM Access Fees charged to the consumer at the point of sale. ¶¶ 71-73. The ATM operator has an economic incentive to increase revenue by increasing the volume and mix of transactions routed over the rival, alternate ATM Networks that cost the ATM operator less and remit higher Net Interchange. ¶ 45, 84. In the absence of the Visa and MasterCard price restraints, the ATM operator could steer more ATM transaction volume to the alternative ATM Networks by offering incentives to consumers, in the form of selective Access Fee discounts, for the use of cards enabled with the alternate network Bugs. *Id.* ATM operators would offer the selective Access Fee discounts up to the point where the incremental revenue from increased Net Interchange just offsets any revenue lost because of the discounts. *Id.* The selective ATM Fee discounts would attract more consumers whose cards have the alternate Bugs, shift the composition of transaction traffic toward the lower-cost, higher Net Interchange ATM Networks, and at the same time increase overall ATM transaction volume. *Id.*

Stated another way, the ATM operator has an economic incentive to encourage a change in the mix of ATM revenue sources in favor of Net Interchange revenue and away from ATM Access Fee revenue. By selective discounting, the ATM operator can both attract more customers and earn more revenue because of the resultant shift in the mix of traffic, increasing the volume that it can route over the higher net-revenue generating networks.

#### d. <u>How Consumer Choice Will Be Exercised</u>

As the SAC alleges, current ATM technology can identify the network Bugs on customer cards, route transactions to the higher-Net Interchange, lower-cost networks, and apply a

discounted Access Fee to the customer's transaction – all automatically. ¶ 85. The ATM screen can be programmed to inform the customer of the available discounts, and which of those, if any, will be applied to his or her transaction. *Id.* Customers need not ask for the discount or select any option on the screen to secure it. It can all be done automatically. Customers will exercise their choice in selecting the types of PIN-debit cards to obtain and use and which ATMs to frequent, gravitating to cards and ATMs that give them the discounted fees. ¶ 86.

ATM customers are sensitive to the costs of using the machines, and they will seek out machines with the lowest Access Fees. ¶86. As ATMs advertise the availability of discounted Access Fees, and as consumers become more aware of the discounts, consumers whose cards already have the rival Bugs will choose to increase their usage of ATMs that offer the discounts. *Id.* But consumer choice will not stop there. Consumers whose cards do not yet have the rival Bugs will begin to demand new cards from their financial institutions or seek out other financial institutions that already offer such cards. ¶46. Financial institutions, in order to attract new customers and new accounts, or retain existing ones, will also respond competitively by offering cards enabled with alternative, discount-eligible ATM networks. ¶¶ 46, 86.[3]

**e. Why Lowering Prices Across The Board Is Not A Solution**

As the SAC alleges, Visa and MasterCard PIN-debit cards account for the overwhelming majority of PIN-debit cards issued in the United States. ¶¶ 63,105. Currently, most Visa and MasterCard PIN-debit cards are coded only for use with Visa and MasterCard ATM Networks. ¶¶ 49, 69-70. Because these cards currently dominate the PIN-debit card market, ATM

[3] These allegations of the SAC address the Court's questions about the "mechanism whereby [ATMs] could pass that savings onto consumers by incorporating some sort of consumer network choice into the transaction." Mem. Op. at 23. Consumers will choose lower cost networks by going to ATMs that offer the discounts and by using their existing cards (or obtaining new ones) that have the network Bugs needed to qualify for the discounts. In other words, by offering selective discounts, the ATM operator can steer customers to exercise their choice toward greater usage of lower-cost network cards.

operators have no choice but to route the bulk of their transactions over the lowest-Net Interchange, highest-cost Visa and MasterCard networks. And, to earn an economic profit, they must set their Access Fees charged to consumers correspondingly higher to compensate for the lower Net Interchange revenue remitted on the Visa/MasterCard majority of their transactions. ¶ 49.

Because the ATM Access Fee Restraint prohibits ATMs from charging a lower fee to a consumer whose transaction can be routed over an alternative network, ATMs set a uniform Access Fee,[4] ¶ 62, and that fee must be set at sufficiently high floor level for <u>all</u> card transactions, without regard to the ATM network used, in order to compensate for the low Net Interchange and high cost of the majority of the transactions that are necessarily routed over the Visa and MasterCard networks. ¶ 49.

The Court asked the question, "What is stopping ATM operators from offering customers who use their machines a discount?" Mem. Op. at 19. The answer rests in economic reality. ATM operators are highly competitive for point-of-sale customer business and set their Access Fees competitively. ¶ 50. Accordingly, ATM Access Fees are already set at an optimal level from the point of view of attracting customers and maximizing the ATM operator's revenue. *Id.* Lowering the uniform Access Fee across the board would not attract enough new customers to offset the loss in Access Fee revenue, without the offsetting benefit of incentivizing customers to shift to, or increase, usage of alternative network cards that would produce correspondingly higher Net Interchange Revenue. *Id.* ATM operators thus have no economic incentive to discount Access Fees across the board given the current reality that the Visa and MasterCard

[4] It would make no economic sense whatsoever for ATMs to charge consumers more for use of a rival lower-cost, higher Net Interchange network. Therefore, the setting of a uniform ATM Access Fee, at a level sufficient to compensate for the higher cost and lower revenue of the bulk of transactions that can only be routed through a Visa or MasterCard network, is a natural economic consequence of the ATM Access Fee pricing restraints.

single network Bug cards make up the bulk of their transaction volume. Because of the lower Net Interchange revenue that ATMs earn on Visa and MasterCard network transactions, across-the-board discounting would adversely impact the ability of ATMs to cover costs and earn a profit. ¶51.[5] The only way that ATMs can lower their prices to customers and at the same time increase revenues is to steer more of their transaction volume to the higher-paying, lower-cost alternative networks. ¶ 49.

**f. <u>How the Access Fee Restraints Cause Anti-competitive Harm in Two Related Markets -- the ATM Services Market and the ATM Network Market</u>**

The SAC also adds allegations to clarify that the ATM Access Fee restraints cause anti-competitive harm in two, related markets, the ATM Services Market, ¶¶ 82-88, 102, and the ATM Network Market, ¶¶ 89-91, 103. It further alleges that the anti-competitive harm in each of those markets translates directly into injury to consumers, who, like Plaintiff, pay increased prices for access to ATM transactions, than they would pay in the absence of the restraints. ¶¶ 92-100. The SAC thus cures the deficiency identified by the Court in footnote 14 of the Mem.Op. (at 23) that the complaints are "fuzzy" as to what markets are being restrained. The

[5] The Court stated:

> Plaintiff does not allege that there is anything barring ATM operators from using the so-called lower cost networks and lowering their prices across the board to attract consumers to their machines. (Mem.Op. at 22.)

The SAC, however, now makes clear (1) that ATM's cannot freely choose to use the lower cost networks for all of their transaction, but only where the customers' PIN-debit cards enable them; (2) that the bulk of ATM transactions are with Visa or MasterCard PIN-debit cards that do not enable lower cost networks; and (3) that lower prices across the board will not attract any greater proportion of customers whose PIN-debit cards enable lower cost networks or incentivize those customers to obtain such cards, and their financial institutions to offer them. Just like a gas station desiring to reduce its merchant fee costs associated with credit card usage, lowering gasoline prices generally may increase sales overall but it will not encourage customers to pay with cash. Only offering a discount for cash will do so. The critical aspect for an ATM is not the ability to lower prices uniformly to all customers, but rather the ability to charge a selective, lower price to those consumers who have or seek to obtain the lower-cost network cards. It is only by such selective discounting that ATMs can both attract more consumers to their machines <u>and</u> influence a paradigm shift in the mix of transactions, so that a higher proportion can be routed to lower-cost networks and increase ATM net revenue.

rules that prohibit ATMs from selective price discounting are a direct restraint upon horizontal, point-of-sale, price competition in the ATM Services Market, where there is horizontal competition among ATMs for consumer ATM transaction business. ¶¶ 42-46. The point-of-sale, anti-discount restraint in the ATM Services Market also has a direct anticompetitive impact in the ATM Network Market, where there is horizontal competition among Visa, MasterCard and other rival networks for the network transmission of ATM transactions. ¶¶ 47-48, 89-91. The anticompetitive impacts in each market lead directly to higher network costs (lower interchange revenues) to ATM operators and higher ATM Access fees to consumers. In the absence of the restraints, ATM operators would immediately be able to offer selective discounts on the ATM Access Fees, benefitting consumers in the ATM Services Market with lower prices. ¶¶ 44-46, 88, 93-99. The discounting at point of sale favoring consumers with lower-cost network cards would in turn increase competition among ATM Networks to lower their network charges and raise their payment of Net Interchange to ATMs – benefits that ATMs would in turn pass on to consumers as further price reductions for ATM access. ¶¶ 47-48, 91, 88-100.

## III. THE SAC SUFFICIENTLY ALLEGES PLAUSIBLE THEORIES OF HORIZONTAL COMBINATION, CONTRACT OR CONSPIRACY

As a threshold matter, it must be emphasized that the ATM Access Fee restraints in this case arise from written Visa and MasterCard rules applicable to Visa and MasterCard member bank ATMs and imposed on Independent ATMs by incorporation into written contracts between the Independent ATMs and their sponsoring banks. ¶¶ 76-80. This is not a case in which agreement must be inferred from parallel conduct. The existence of written agreements restricting the pricing freedom of ATMs is not merely plausible but beyond dispute. A written contract or a written set of rules followed by all members of the ATM service industry falls squarely within the ambit of Sherman Act Section 1 as a “combination, contract or conspiracy.”

*Interstate Circuit v. United States*, 306 U.S. 208, 221 (1938). Whether such a set of rules or contracts constitutes an actionable restraint of trade under Section 1, was an issue not addressed in the Court's Memorandum Opinion.

The issue the Court addressed is whether the complaints sufficiently allege horizontal conduct so as to invoke the *per se* rule of illegality.[6] In this respect, it is critical to observe at the outset that all ATMs adhere to the pricing rules and contracts at issue, that the pricing freedom of all ATMs is restricted in precisely the same terms, and that all ATMs are horizontal competitors of each other. ¶¶ 42-43. For this reason, the ATM Access Fee restraints invoke the very same dangers to free and open price competition among competitors that gave rise to the horizontal *per se* rule in the first place and that the Supreme Court has condemned as "manifestly anticompetitive" and lacking "any redeeming virtue." *See*, *e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (quoting *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50 (1977); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)).

The SAC proceeds under two, alternative frames of reference for analysis of the issue of horizontal combination, contract or conspiracy. The first takes the view point of Visa, MasterCard and their member banks together, and the agreements and rules adopted jointly by them historically and never repudiated since by any of them, but followed unabated, and without exception, to the present time. The second takes the view point of Visa and MasterCard separately and focuses on their respective roles as hubs, who impose the restrictive pricing rules

[6] As the Court noted,

Horizontal agreements are agreements among competitors, and vertical agreements are those among firms at different levels of distribution. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). Horizontal price fixing agreements are *per se* illegal under the Sherman Act. *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 607–08 (1972). Mem.Op. at 30 n.17.

and contracts onto a wheel consisting of all horizontal ATM competitors.

**a. How Visa, MasterCard and Their Member Banks Agreed to the Restraints Initially and Have Affirmed Allegiance to that Agreement Currently**

This Court asked the question whether "the allegation that the access fee rules originated with the bankcard associations and that the rules still exist is enough to allege a current agreement among banks to restrain trade?" Mem.Op. at 32. The SAC makes multiple new allegations aimed at answering this question in the affirmative.

The SAC fleshes out the allegations that the rules are not mere artifacts of only historical importance. The rules remain written rules and remain applicable to all banks that are members of the Visa and MasterCard networks. ¶ 29-30. Following the Visa and MasterCard IPOs, member banks knew and understood that the pre-existing rules, including the ATM Access Fee Restraints, would continue in full force and effect, unchanged, after completion of the IPOs. ¶30. The SAC also alleges that the rules could not have been adopted prior to the IPOs, at a time when Visa and MasterCard were "consortiums of competitors," without the agreement of the member banks. ¶¶ 31-33; *United States v. Visa USA*, 163 Supp.2d 322, 405-06 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229, 234 (2d Cir. 2003).

The SAC then alleges that the IPOs were designed by Visa and MasterCard to restructure themselves in order to terminate the "structural conspiracy" found by courts in the United States and Europe. ¶¶35-37. But following the IPOs, the pre-existing rules simply remained in force. ¶¶ 40-41. To be sure, there was no vote by the banks to re-enact the rules on a clean slate. But what actually happened was the substantive equivalent of re-enactment. The prior rules survived the "restructuring" in the same form as before, inextricably tying Visa, MasterCard and the member banks to precisely the same restrictive ATM pricing conduct as before. This is not a case where, following the cosmetic restructuring, each bank decided on a clean slate and on its

own not to differentially price, or discount, ATM Access Fees.[7] Each bank had a choice after the IPOs, to continue to agree with the ATM pricing rules or not. And each bank affirmed its agreement with the rules by continuing to remain a member of the networks and abide by the network's rules, knowing that each other member bank would also continue to be bound by the same rules. ¶¶ 40-41. Moreover, it was in the best interests of each bank to adhere to the rules, but only so long as the other banks would also go along. ¶ 41.

To say that the restructuring of the card associations through the IPO device in order to permit them to side-step findings of "structural conspiracies" somehow also vitiates the evidence of an actual agreement among competitors to adhere to a written set of price restraints would surely exalt form over substance. Here, there is a written set of restrictive pricing rules that each member bank currently "agrees to" as evidenced by its continuing decision to remain a member of the Visa and MasterCard networks.

The SAC does not rely solely on allegations of bank membership in the card associations prior to the IPO restructuring, or on vague allegations of current equity interests in the restructured companies in order to hold members vicariously liable for antitrust violations by the association or the companies. *See also* Mem. Op. at 33. Rather, the SAC alleges direct participation by the banks in the anti-competitive pricing practices compelled by the Visa and MasterCard rules that prohibit discounting of ATM Access Fees. The banks evidence their

---

[7] These same SAC allegations also address the Court's concern that,

> A statement of parallel conduct alone, without factual allegations to plausibly suggest an illegal agreement, is not enough. *Twombly*, 550 U.S. at 567–70 (dismissing antitrust complaint because allegations of parallel conduct without more did not plausibly suggest an unlawful agreement).

Mem. Op. at 34. The allegations here are not limited to circumstantial evidence of parallel conduct in that competing banks are not observed to be engaging in competitive price discounting in their own ATM operations. To the contrary, the conduct alleged here is that all banks have agreed to be bound by a set of written rules that prohibit discounting, not just for their own, but for all Visa and MasterCard network transactions.

current agreement to the rules by choosing to remain members of the Visa and MasterCard networks with knowledge that in doing so they are agreeing to be bound by each network's rules, and by applying and enforcing those rules not only in their own ATM operations but also in their sponsoring agreements with Independent ATMs. These allegations are more than enough to make out a plausible case of horizontal agreement.

This Court also asked "why it would not be in each bank's independent self-interest to adopt the rules proffered by Visa and MasterCard," and "what alleged facts suggest that any individual bank would only want to do it as long as other banks did it?" Mem. Op. at 36.[8] In response, the SAC explains how an ATM operator, bank or Independent, can increase its ATM usage and revenues by adopting a selective discount pricing structure to align fees charged to consumers with the variable costs of competing ATM networks. *See, e.g.,* ¶¶53, 84, 87. For that reason, no ATM operator would independently adopt the Visa or MasterCard restrictions to govern its own ATM operations.[9] ¶55. The SAC also alleges that ATMs would not enter into the restrictions without knowledge that other ATMs were also doing it, because to do so would be to place the ATM at a competitive disadvantage as compared to other ATMs that were permitted to price more flexibly. ¶ 53.

**b. <u>How the Restraints Constitute Hub and Wheel Contracts and Combinations</u>**

Alternatively, the complaint alleges horizontal conduct in the form of two hub and wheel combinations and agreements, with Visa and MasterCard as the respective hubs and horizontally

---

[8] Plaintiff respectfully disagrees with the Court's characterization of the allegations of agreement as "purely circumstantial." Mem. Op. at 36. As noted above, the allegations of agreement here rely primarily on express written rules and contracts, not on an agreement implied by parallel conduct.

[9] Plaintiff does not dispute that ATMs are pressured by the market dominance currently of the Visa and MasterCard ATM networks to enter into the restrictive agreements in order to handle the bulk of transactions. That knowing participants in the agreements may be acting under economic duress or pressure, however, does not render the agreements any the less cognizable under Section 1 as agreements in restraint of trade among competitors. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 334-5 (3d Cir. 2010) (fact that conspirators economically coerced to conspire irrelevant to antitrust liability).

competing ATMs spread around the wheel. ¶53. The restraints are imposed by Visa and MasterCard on ATMs in two ways. First, banks who are members of Visa and MasterCard must agree to the rules governing members and one of those rules is the ATM Access Fee Restraint. Second, ATMs that are not owned by member banks (Independent ATMs) must have a member bank as a sponsor to access the Visa and MasterCard ATM payment networks. Sponsoring member banks are in turn required by Visa and MasterCard to include in the Sponsoring agreements with ATMs, the Access Fee Restraints. Thus, the sponsoring banks act, in effect, as the agents of Visa and MasterCard in extending the ATM Access Fee Restraints to the Independent ATMs. ¶ 53.

Counter to Defendants' argument that Plaintiffs' allegations fail for lack of a "rim," the Hub and Wheel agreements constitute horizontal combinations and/or contracts in restraint of trade because the operative impact of the price restraint occurs around the rim of a wheel composed of all ATMs that are in horizontal competition with each other. ¶¶ 53-55. In other words, Visa and MasterCard are the ringmasters, abusing their dominant market position in the ATM Network Market to impose a series of identical vertical agreements that prohibit price discounting around a ring consisting of the entire group of ATMs that compete in the ATM Services Market. Such a Hub and Wheel (or Spoke) combination can constitute a horizontal combination in restraint of trade that is a *per se* violation of Section 1. *Interstate Circuit*, 306 U.S. at 208; *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000).

For the reasons stated above, the pricing restraints orchestrated by Visa and MasterCard are not in any ATM's own best interests; no ATM would independently adopt those restraints for its own operations; and no ATM would employ them without assurance that all ATMs would do the same. ¶ 53. This plausibly suggests conspiracy: "[k]ey to *Interstate Circuit's* conspiracy

finding was its determination that each distributor's decision to accede to Interstate's demands would have been economically self-defeating unless the other distributors did the same: 'Each was aware that . . . without substantially unanimous action . . . there was risk of a substantial loss of the business and good will.'" *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 331 (3d Cir. 2010) (quoting *Interstate Circuit*, 306 U.S. at 222).

Judge Cote of the Southern District of New York recently addressed a similar "hub and spoke" conspiracy in the electronic books market. *In re Elec. Books Antitrust Litig*., 859 F. Supp. 2d 671, 683 (S.D.N.Y. 2012) ("*eBooks*"). There, as here, "to understand why [Plaintiff's complaint] states a plausible claim, it is useful to imagine a 'counterfactual' universe in which each [spoke] would have acted without any assurance of 'similar behavior by rivals.'" *Id.* (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010)). "In this hypothetical universe," each ATM Operator would need to assume that if it agreed to the access fee restraints, "it would be doing so on its own." *Id.* Were that to occur in this case, the unilaterally acting ATM operator would be charging ATM Access Fees "at a higher price than its competitors and would therefore be losing market share." *Id.*; *see also* II(c), *infra* (describing higher pricing caused by access fee restraints).

Thus, as in *eBooks*, the facts pled in Plaintiff's complaint have "the hallmarks of a classic collective action problem." *eBooks*, 859 F. Supp. 2d at 684. Whereas many of the benefits of the fee restraints are "shared across the . . . industry and not susceptible to capture by any single" operator, most of its costs (like decreased volume) would be borne by ATM operators moving independently. *Id.* For those reasons, "it is at least plausible" that no ATM Operator would have agreed to the restraints "absent a firm understanding with its rivals that they would do the same." *Id.* (denying motion to dismiss). Similarly, Visa and MasterCard "had a strong incentive to

encourage the [ATM Operators] to act collectively: If a critical mass of [operators] had not agreed to these terms," both networks would face greater competition from competing networks. *Id.* In short, Visa and MasterCard did not seek to increase profitability and market share by competing with other network operators in the open market. Rather, they "'accomplished this goal by [helping] the [ATM Operators] to collude, rather than to compete independently.'" *Id.* at 685 (*quoting Toys "R" Us,* 221 F.3d at 936).

That ATMs agree to limit their pricing discretion only reluctantly, and under economic duress and pressure from the Visa and MasterCard dominant market positions, merely underscores that the pricing restraints are not something an ATM would voluntarily and independently adopt in its own competitive self-interest, but only as a means of economic survival. This reluctance does not preclude *per se* condemnation. *Ins. Brokerage*, 618 F.3d at 344-45 ("As we have noted, plaintiffs' allegations paint a conspiracy in which the hub . . . held an unusual amount of power and may even have been able economically to 'coerce' the [spokes] into the non-competition agreement. Defendants have failed, however, to show why this feature would preclude *per se* condemnation of the horizontal agreement.").

**c. Plaintiffs Properly Allege Vertical Agreements in Restraint of Trade**

Finally, it must be kept in mind that Section 1 prohibits any "contract, combination or conspiracy in restraint of trade" and that its reach is not limited to restraints that can be viewed as horizontal for purposes of the *per se* rules. Even if the Court were to conclude that the complaint fails to allege a horizontal restraint in this case, the complaint would not be subject to dismissal. The ATM Access Fee Restraints, embodied in the MasterCard and Visa network membership rules for member banks and incorporated into the written Sponsoring Agreements with Independent ATMs, even if viewed as entirely vertical in character, are nevertheless

combinations and contracts within the purview of Section 1, the legality of which should be tested under the rule of reason. *United States v. Microsoft Corp*., 253 F.3d 34, 59 (D.C. Cir. 2001) (applying rule of reason analysis to vertical licensing agreements).

Plaintiff's Complaint alleges Defendants' contract terms are anticompetitive even without horizontal conspiracy, noting the agreements "operate to fix the ATM Access Fee for any transaction at a given ATM or terminal to be no less than the amount charged at that ATM or terminal for a Visa or MasterCard transaction, irrespective of whether the transaction is actually completed over Visa or MasterCard's PIN-debit network and without regard to any actual or potential cost saving, or revenue benefit, to the ATM operator from using one of the rival, alternative ATM Networks." ¶ 80. The anticompetitive effects of such a vertical price restraint are settled: as the Supreme Court recently observed:

> A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs. A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network. A manufacturer with market power, by comparison, might use resale price maintenance to give retailers an incentive not to sell the products of smaller rivals or new entrants. As should be evident, the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated.

*Leegin*, 551 U.S. at 893-94.

Accordingly, because Plaintiff properly pleads vertical claims in the alternative, ¶ 113, if this Court disallows Plaintiff's horizontal allegations it should permit her rule of reason claims. *Microsoft Corp*., 253 F.3d at 92 (remanding for rule of reason analysis following finding *per se* treatment inapplicable). Indeed, in many respects, the vertical agreements resemble the "rimless wheel" found sufficient in *Dickson v. Microsoft Corp*., 309 F.3d 193 (4th Cir. 2002),[10] a case

---

[10] Defendants rely on *Dickson* for the proposition that plaintiffs must allege each individual agreement had anticompetitive effects. D's Mem. at 17. But Plaintiff's allegations of anticompetitive effects are consistent those

arising out of computer software manufacturer Microsoft's licensing agreements with computer manufacturers. Such a conspiracy is one "in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Id.*[11] In that case, while the Court rejected the plaintiffs' efforts to plead a "single, rimless wheel conspiracy" consisting of the "hub" and all the "spokes," it accepted separate vertical conspiracies between Microsoft and each manufacturer based on the licensing agreements. *Id.* In coming to that conclusion, it explicitly noted that "the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *Id.* (*quoting MCM Partners, Inc. v. Andrews-Bartlett & Assocs*., 62 F.3d 967, 973 (7th Cir.1995)); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 615 (7th Cir.1997) (conspirator's participation actionable even if they were "were tools of the manufacturers-reluctant accomplices, yet not the less liable for that.")

## IV. <u>DEFENDANTS' ARGUMENTS ON FUTILITY ARE WITHOUT MERIT</u>

Defendants' challenges to Plaintiff's complaint take two forms: first, that Plaintiff fails to allege the necessary "injury-in-fact" to give her Article III standing to bring her case and, second, that she fails to properly allege a combination in restraint of trade. In contrast to their original Motion to Dismiss, Defendants do not address the prudential "antitrust injury" standing requirements.

---

described in *Leegin*. *See Leegin* discussion in § III(c); *see also* 551 U.S. at 897 (indicating that vertical restraints, such as resale price maintenance, "should be subject to more careful scrutiny" if the practice is adopted by many competitors).

[11] It is irrelevant that Plaintiffs chose not to name as defendants each participant in the vertical arrangements.

**a. <u>Defendants Mischaracterize Plaintiff's Complaint</u>**

Defendants grossly mischaracterize Plaintiff Stoumbos' allegations of injury-in-fact when they state "[p]laintiffs continue to assert that they were injured because the challenged rules prevented consumers from completing ATM transactions over alternative, 'lower cost' ATM networks." D's Mem.. at 1. Plaintiff does not, and never has, alleged that the ATM Access Fee restraints prevent ATM operators from completing her transactions over the higher-revenue, lower-cost networks where the debit card Bugs enable such routing. Indeed, Plaintiff Stoumbos explicitly acknowledges that ATMs can and do complete her transactions over, e.g., the Starr network, ¶ 18, which is less costly and provides higher net revenue to the ATM operator. ¶75. Rather, Plaintiff claims injury by virtue of the fact that the Access Fee Restraints prevent ATM operators from rewarding her with a discounted Access Fee for use of a Starr-enabled card, in order to encourage her, and others, to obtain and use alternate network cards. In the companion case to this one, the ATM operators have sued to be allowed to offer those very discounts.

Defendants also mischaracterize the nature of the consumer choice that is involved here. The issue is not whether consumers have any meaningful economic choice under the present anti-competitive regime, where the Access Fee Restraints totally alienate the consumer from any perceived benefit or reason to make a choice. Defendants do not dispute that, as pure matter of fact, consumers have choices – in what kinds of debit cards they solicit from banks and in what ATMs they frequent. But the restrictive Access Fee Restraints deprive those choices of any economic benefit, render them meaningless, and leave consumers indifferent to whether their debit cards have alternate network bugs, or whether ATMs offer discounts for those bugs. In the alternative, competitive regime, consumers will finally have the meaningful economic choice to seek out and use more debit cards with rival network Bugs at more ATMs that offer them the economic benefits

of doing so. Under basic economic principles, if consumer ATM Access Fees come down for those cards, consumer usage of them will go up.

**b. <u>It Is Irrelevant Whether Consumers Have The Ability to Choose Their Network</u>**

Whether consumers have the "ability to 'choose' the ATM network to complete their ATM transactions," D's Mem.. at 5, by selecting among available networks on an ATM screen, is a red-herring. Many financial institutions already offer debit cards with the rival Bugs, as evidenced by Plaintiff Stoumbos' own card, and as evidenced by the fact that rival networks have been able to garner a small share of the ATM Network market. Consumers, once incentivized to do so, will exercise their choice by getting cards with rival Bugs, if they do not already have one, from the financial institutions that offer them, and taking those cards to ATMs that offer discounts for using them.

As an example, suppose the manufacturer of the most popular, best selling brand of hats, #1 Hats, were to require all hat stores selling #1 Hats to sell no other brand of hats at less than the price of the #1 Hats, even though other brands were less costly to the hat store, and the hat store could sell them for less while maintaining the same margin on the sales. A hat consumer could still go into the store and choose any brand of hat he or she prefers. But the injury is not in the choice of hats, it is in the prices of the hats. The consumer is deprived of the full economic choice that competition is designed to ensure, a choice based not only on appearance and fit, but also on price and value. Consumers are denied the choice to buy the less-costly brand of hat at a lower price. Here, Plaintiff Stoumbos has chosen for some of her ATM transactions to use a card with a rival Bug at an ATM that accepts such cards, but she has been deprived of the lower price that would have been charged by the ATM in the absence of the ATM Access Fee Restraints. Defendants' challenge to those allegations are properly viewed as challenges to

Plaintiff's ability to ***prove*** those claims, not whether she has properly pled them. Such a challenge is inappropriate at this stage, as "[s]kepticism about a plaintiff's ability to prove its claims is not a reason to dismiss a pleading." *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 920 (7th Cir. 2002); *see also Ross v. Bank of Am.*, 524 F.3d 217, 225 (2d Cir. 2008) ("There is no heightened standard for pleading an injury in fact sufficient to satisfy Article III standing simply because the alleged injury is caused by an antitrust violation.").

Defendants' argument that injury-in-fact depends a number of assumptions that are still not supported in the amended complaints is wrong. The injured party at this stage of proceedings, the one who must demonstrate injury-in-fact for standing purposes is Plaintiff Stoumbos. She possesses a debit card with an alternate network, the Star Network, and has used it an ATM that has that network. The only assumption in her injury claim is the assumption that basic economic theory would prevail in accordance with the allegations in her complaint. That is just the kind of assumption routinely made in antitrust cases– namely, that in the absence of the pricing restraint, prices would have been lower. "Basic economic principles concerning the downward pressure on price created by competition are so well established that . . . this issue is effectively off the table." *U.S. Futures Exch. LLC v. Bd. of Trade of City of Chicago*, 04 C 6756, 2012 WL 3155150 (N.D. Ill. Aug. 3, 2012).

Nor are Defendants aided by calling the injury "speculative." D's Mem. At 10-11. In any case where an anti-competitive price restraint has prevailed for an extended period of time, the nature of the emerging competitive environment once the restraint is lifted will require analysis and testimony from economic experts. The question at the motion to dismiss stage is whether plaintiff has alleged a set of facts, supported by sound economic reasoning, that price competition at the ATM access point of sale has been suppressed, and that prices would have

been lower absent the restraints. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000) ("Whether experts will be able to measure the difference between the allegedly restrained price . . . and the price that would have prevailed but for the antitrust violation remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative."). The Stoumbos complaint makes such allegations, and *Twombly* and *Iqbal* merely require Plaintiff to allege a plausible theory of injury-in-fact to proceed. *Id.* This is why one court in this Circuit recently rejected a defendants' argument at the class certification stage that a plaintiff "has not clearly identified a but-for world" for injury-in-fact. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 69 (D.D.C. 2012) (class certification proceeding).

Defendants' arguments to the contrary largely rely on cases involving prudential standing requirements more demanding than Article III standing, which is of course the sole element Defendants challenge. For example, Defendants assert *Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc.* stands for the proposition that plaintiffs "do not adequately plead injury in fact," D's Mem. at 23 when their injuries are remote from the alleged wrongdoing. 249 F.3d 1068, 1072 (D.C. Cir. 2001). But that case did not even mention Article III injury-in-fact, instead focusing on the prudential standing requirements of *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("AGC"). *See id.* at 1070, *passim*, (citing 459 U.S. 519 (1983)).[12] *AGC* itself notes that the focus of the "antitrust standing" doctrine it articulated is "somewhat different from that of standing as a constitutional doctrine," and went on to note that "[h]arm to the antitrust plaintiff is sufficient to

[12] The quotation from the Memorandum Opinion Defendants rely on – "not every party affected by [an alleged] antitrust violator's 'ripples of harm' is allowed to sue," D's Mem. at 9 (quoting D's Mem. at 11) is drawn from a portion of the memorandum opinion addressing antitrust injury, not from any discussion of injury-in-fact. Defendants' citations to *Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l* suffer from the same error. *See id.* at 9 (discussing 256 F.3d 799 at 806 & 816 n.19 (D.C. Cir. 2001)).

satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action" by analyzing the *AGC* standards. *AGC*, 459 U.S. 535 n.31. Indeed, *Klein v. Am. Land Title Ass'n* – a case Defendants rely on – properly articulates the distinction Defendants ignore. *See* D's Mem. at 9 (citing 2013 WL 7657676, at *5 (D.D.C. Mat 1, 2013)). In *Klein*, the Court found allegations of "an injury caused (albeit indirectly) by the defendants' challenged conduct" sufficient to allege standing for Article III purposes, but nevertheless found those allegations too remote to satisfy the "more demanding" requirements of antitrust standing. *Id.*[13] Because Defendants failed to raise the "more demanding" issue of antitrust standing in their briefs, *Klein* and the other cases they rely on are inapposite.

**c. Defendants' Argument Against Plaintiffs Vertical Claims is Insufficient**

Defendants respond to Plaintiff's vertical claims not on the merits, but by arguing Plaintiff's complaint cannot be read to encompass vertical claims. D's Mem. at 17. As set forth in III(c), *supra*, this is wrong. Defendants' reliance on *Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc*., 602 F.3d 237, 256 (3d Cir. 2010) is misplaced. In that case, the plaintiffs "simply did not draft their amended complaint to encompass their alternative legal theory," instead inserting their vertical arguments later in the game to "recast their allegations in an effort to circumvent a motion to dismiss." *Id.* This did not happen here. As explained above, Plaintiff's brief fairly explained, in accordance with FRCP 8, the nature and scope of the alternative vertical conspiracy. *See* § III(c). This is all that is required.

**d. Defendants' Arguments Against Plaintiff's State Law Claims Fail**

Defendant's sole argument in favor of dismissal of Plaintiff's state law claims is that

[13] Plaintiff has properly alleged antitrust standing, as evidenced by Defendants' failure to challenge the SAC on those grounds.

those claims are derivative of the federal claims and should be dismissed alongside those claims. This is wrong for the reasons stated above. Moreover, as to Plaintiff's alternative vertical allegations, it is well worth noting that Maryland has enacted legislation rendering resale price maintenance per se illegal, Maryland Commercial Law Code 11-204(b), and that several other states' attorneys general (including California, Michigan, and Illinois) appear to have taken the same position. *See* Foote & Russell: *Resale Price Maintenance: Per Se Treatment Alive in the States* (2012).[14]

## V. CONCLUSION

As set forth herein, Plaintiff's SAC directly addresses, and cures, the specific deficiencies in Plaintiff's initial Complaint related to her injury-in-fact and conspiracy allegations. None of the arguments Defendants make rebut those new allegations, and this Court should accordingly grant Plaintiff's motion for leave to amend and permit this case to proceed.

By: *[/s/ Michael G. McLellan]*
Michael G. McLellan (D.C. Bar # 489217)
mmclellan@finkelsteinthompson.com
Douglas G. Thompson (D.C. Bar # 172387)
dthompson@finkelsteinthompson.com
FINKELSTEIN THOMPSON LLP
James Place
1077 30th Street, N.W., Suite 150
Washington, D.C. 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090

*Counsel for Plaintiff Stoumbos*

[14] http://www.wlf.org/upload/legalstudies/legalbackgrounder/10-19-12Foote_LegalBackgrounder.pdf

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2013 I electronically filed the foregoing with the Clerk of the Court through the CM/ECF service, which will send notification of this filing to all counsel of record in this matter who are registered with the CM/ECF system

By: *__/s/ Michael G. McLellan__________*

Michael G. McLellan (D.C. Bar # 489217)
mmclellan@finkelsteinthompson.com
FINKELSTEIN THOMPSON LLP
James Place
1077 30th Street, N.W., Suite 150
Washington, D.C. 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090

*Counsel for Plaintiff Stoumbos*