APPEAL,CLOSED,JURY,TYPE−A

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:11−cv−01882−ABJ

STOUMBOS v. VISA INC. et al
Assigned to: Judge Amy Berman Jackson
Case: 1:11−cv−01803−ABJ
Cause: 15:1 Antitrust Litigation

Date Filed: 10/24/2011
Date Terminated: 02/13/2013
Jury Demand: Plaintiff
Nature of Suit: 410 Anti−Trust
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **MARY STOUMBOS**<br>*on behalf of herself and all others similarly situated* | represented by | **Michael G McLellan**<br>FINKELSTEIN THOMPSON LLP<br>1077 30th Street, NW<br>Suite 150<br>Washington, DC 20007<br>(202) 337−8000<br>Fax: (202) 337−8090<br>Email: mmclellan@finkelsteinthompson.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard M. Volin**<br>REZVANI VOLIN &ROTBERT P.C.<br>1050 Connecticut Ave, NW<br>10th Floor<br>Washington, DC 20036<br>(202) 350−4270<br>Fax: (202) 351−0544<br>Email: rvolin@rvrlegal.com<br>*TERMINATED: 10/18/2012* |

V.

**Defendant**

| | | |
|---|---|---|
| **VISA INC.** | represented by | **Mark R. Merley**<br>ARNOLD &PORTER LLP<br>555 12th Street, NW<br>Washington, DC 20004<br>(202) 942−5321<br>Fax: (202) 942−5999<br>Email: mark.merley@aporter.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Matthew A. Eisenstein**<br>ARNOLD &PORTER LLP<br>555 12th Street, NW |

Washington, DC 20004
(202) 942−6606
Fax: (202) 942−5999
Email: matthew_eisenstein@aporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**VISA U.S.A. INC.** represented by **Mark R. Merley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew A. Eisenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**VISA INTERNATIONAL SERVICE ASSOCIATION** represented by **Mark R. Merley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew A. Eisenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PLUS SYSTEM, INC.** represented by **Mark R. Merley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew A. Eisenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MASTERCARD INCORPORATED** represented by **Kenneth Anthony Gallo**
PAUL WEISS RIFKIND WHARTON &GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223−7356
Fax: (202) 204−7356
Email: kgallo@paulweiss.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Andrew C. Finch**
PAUL, WEISS, RIFKIND, WHARTON &GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019−6064
(212) 373−3460
Fax: (212) 492−0460
Email: afinch@paulweiss.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gary R. Carney**
PAUL, WEISS, RIFKIND, WHARTON &GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019−6064
(212) 373−3051
Fax: (212) 492−0051
Email: gcarney@paulweiss.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MASTERCARD INTERNATIONAL INCORPORATED**
*doing business as*
MASTERCARD WORLDWIDE

represented by **Kenneth Anthony Gallo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew C. Finch**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gary R. Carney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 10/24/2011 | 1 | | COMPLAINT against MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC. ( Filing fee $ 350, receipt number 4616043269) filed by MARY STOUMBOS. (Attachments: # 1 Civil Cover Sheet)(jf, ) (Entered: 10/27/2011) |
| 10/24/2011 | | | Summons (2) Issued as to MASTERCARD INCORPORATED, VISA INC.. (jf, ) (Entered: 10/27/2011) |
| 10/24/2011 | 2 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE OF RELATED CASE by MARY STOUMBOS. Case related to Case No. 11−1803. (jf, ) (Entered: 10/27/2011) |
| 11/22/2011 | | | MINUTE ORDER. Four cases filed in this Court, National ATM Council, Inc. v. Visa Inc., No. 11−cv−1803; Barton v. Visa Inc., No. 11−cv−1831; Genese v. Visa Inc., No. 11−cv−1838; Stoumbos v. Visa Inc., No. 11−cv−1882, arise from allegations that Visa Inc. and MasterCard Inc., among others, maintain an unlawful horizontal price fixing agreement which has the effect of forcing ATM operators to charge a fee for all ATM transactions that is no less than the fee for a Visa or MasterCard transaction. All four cases allege that this agreement violates Section 1 of the Sherman Act, 15 U.S.C. § 1. In light of the common questions of law and fact in these four cases, the Court intends to consolidate them under Fed. R. Civ. Proc. 42(a). The Court directs any party who is of the view that consolidation would be improper to inform the Court of the grounds for its objection by December 2, 2011 at 5:00 pm. Signed by Judge Amy Berman Jackson on 11/22/11. (lcabj1) (Entered: 11/22/2011) |
| 11/29/2011 | | | Set/Reset Deadlines: The Court directs any party who is of the view that consolidation of case Nos. 11−1803, 11−1831, 11−1838, and 11−1882 would be improper to inform the Court of the grounds for its objection by 12/2/2011 at 5:00 PM. (jth) (Entered: 11/29/2011) |
| 12/01/2011 | 3 | | AMENDED CLASS ACTION COMPLAINT against MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC. filed by MARY STOUMBOS.(znmw, ) (Entered: 12/02/2011) |
| 12/02/2011 | 4 | | RESPONSE TO ORDER OF THE COURT re Order,,, filed by MARY STOUMBOS. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(McLellan, Michael) (Entered: 12/02/2011) |
| 12/07/2011 | 5 | | NOTICE of Appearance by Matthew A. Eisenstein on behalf of PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC. (Eisenstein, Matthew) (Entered: 12/07/2011) |
| 12/07/2011 | 6 | | NOTICE of Appearance by Mark R. Merley on behalf of PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC. (Merley, Mark) (Entered: 12/07/2011) |
| 12/07/2011 | 7 | | Unopposed MOTION for Extension of Time to *Respond to Complaint* by PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC. (Attachments: # 1 Text of Proposed Order)(Eisenstein, Matthew) (Entered: 12/07/2011) |
| 12/07/2011 | 8 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by VISA INC. (Eisenstein, Matthew) (Entered: 12/07/2011) |
| 12/07/2011 | 9 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by VISA U.S.A. INC. (Eisenstein, Matthew) (Entered: 12/07/2011) |
| 12/07/2011 | 10 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by VISA INTERNATIONAL SERVICE ASSOCIATION |

| | | | |
|---|---|---|---|
| | | | (Eisenstein, Matthew) (Entered: 12/07/2011) |
| 12/07/2011 | 11 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by PLUS SYSTEM, INC. (Eisenstein, Matthew) (Entered: 12/07/2011) |
| 12/08/2011 | 12 | | NOTICE of Appearance by Kenneth Anthony Gallo on behalf of MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED (Gallo, Kenneth) (Entered: 12/08/2011) |
| 12/08/2011 | 13 | | Corporate Disclosure Statement by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED. (Gallo, Kenneth) (Entered: 12/08/2011) |
| 12/08/2011 | 14 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Gary R. Carney, :Firm− Paul, Weiss, Rifkind, Wharton &Garrison LLP, :Address− 1285 Avenue of the Americas, New York, NY 10019−6040. Phone No. − 212−373−3000. by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED (Attachments: # 1 Declaration of Gary R. Carney, # 2 Text of Proposed Order)(Gallo, Kenneth) (Entered: 12/08/2011) |
| 12/09/2011 | | | MINUTE ORDER granting 7 Motion for Extension of Time to Respond to Complaint. The answer/response will be due 1/11/2012 or 20 days after the filing of an amended complaint. Signed by Judge Amy Berman Jackson on 12/9/2011. (MT) (Entered: 12/09/2011) |
| 12/09/2011 | | | Set/Reset Deadlines: Answer/Response will be due either on 1/11/2012 or 20 days after the filing of an amended complaint. (jth) (Entered: 12/09/2011) |
| 12/13/2011 | | | MINUTE ORDER granting 14 Motion for Leave of Gary R. Carney to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. Signed by Judge Amy Berman Jackson on 12/13/2011. (MT) (Entered: 12/13/2011) |
| 01/13/2012 | 15 | | Unopposed MOTION for Extension of Time to *Move For Class Certification Pursuant to Local Rule 23.1(b)* by MARY STOUMBOS (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(McLellan, Michael) (Entered: 01/13/2012) |
| 01/18/2012 | | | MINUTE ORDER granting 15 Unopposed Motion for Extension of Time to Move for Class Certification. Plaintiff's obligation, pursuant to Local Civil Rule 23.1(b), to file a class certification motion within 90 days of the filing of their complaints, is suspended until further order of the Court. Signed by Judge Amy Berman Jackson on 1/18/2012. (MT) (Entered: 01/18/2012) |
| 01/23/2012 | 16 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Andrew C. Finch, :Firm− Paul, Weiss, Rifkind, Wharton &Garrison, LLP, :Address− 1285 Avenue of the Americas, New York, NY 10019−6040. Phone No. − 212−373−3000. by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED (Attachments: # 1 Declaration of Andrew C. Finch, # 2 Text of Proposed Order)(Gallo, Kenneth) (Entered: 01/23/2012) |

| | | | |
|---|---|---|---|
| 01/24/2012 | | | MINUTE ORDER granting 16 Motion for Leave of Andrew C. Finch to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. Signed by Judge Amy Berman Jackson on 1/24/2012. (MT) (Entered: 01/24/2012) |
| 01/25/2012 | | | MINUTE ORDER. Plaintiff is ORDERED to inform the Court by February 3, 2012 whether he intends to voluntarily dismiss this action in light of the representations made on December 7, 2011 [Dkt. # 7] and the fact that an amended complaint has now been filed in case number 11−1831. Signed by Judge Amy Berman Jackson on 1/25/12. (lcabj1) (Entered: 01/25/2012) |
| 01/26/2012 | | | Set/Reset Deadlines: Plaintiff to inform the Court whether he intends to voluntarily dismiss this action in light of the representations made to the Court (ECF #7 on 12/7/11). Plaintiff's notification is due by 2/3/2012. (jth) (Entered: 01/26/2012) |
| 01/27/2012 | | | NOTICE of Hearing: A Status Conference is scheduled for 4/4/2012 at 10:00 AM in Courtroom 3 before Judge Amy Berman Jackson. (jth) (Entered: 01/27/2012) |
| 01/30/2012 | 17 | | MOTION to Dismiss *Corrected Class Action Complaint* by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC. (Attachments: # 1 Text of Proposed Order)(Merley, Mark) (Entered: 01/30/2012) |
| 01/31/2012 | 18 | | RESPONSE TO ORDER TO SHOW CAUSE by MARY STOUMBOS re Order,. (Attachments: # 1 Certificate of Service)(McLellan, Michael) (Entered: 01/31/2012) |
| 02/01/2012 | | | MINUTE ORDER that the Status Conference scheduled for 4/4/2012 at 10:00 AM is cancelled. Signed by Judge Amy Berman Jackson on 2/1/2012. (jth) (Entered: 02/01/2012) |
| 02/07/2012 | 19 | | Joint MOTION for Briefing Schedule *Regarding the Motions to Dismiss* by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED (Attachments: # 1 Text of Proposed Order)(Gallo, Kenneth) (Entered: 02/07/2012) |
| 02/08/2012 | | | MINUTE ORDER granting 19 Joint Motion for Briefing Schedule re 17 Motion to Dismiss. The opposition to the motion to dismiss will be due 2/29/2012 and the reply will be due 3/21/2012. Signed by Judge Amy Berman Jackson on 2/8/2012. (MT) (Entered: 02/08/2012) |
| 02/08/2012 | | | Set/Reset Deadlines: Opposition to the motion to dismiss is due by 2/29/2012; Reply is due by 3/21/2012. (jth) (Entered: 02/08/2012) |
| 02/29/2012 | 20 | | Memorandum in opposition to re 17 MOTION to Dismiss *Corrected Class Action Complaint Independent ATM Customers' Opposition to Visa and MasterCard Defendants' Motion to Dismiss* filed by MARY STOUMBOS. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(McLellan, Michael) (Entered: 02/29/2012) |

| | | | |
|---|---|---|---|
| 03/21/2012 | 21 | | REPLY to opposition to motion re 17 MOTION to Dismiss *Corrected Class Action Complaint* filed by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC.. (Eisenstein, Matthew) (Entered: 03/21/2012) |
| 03/21/2012 | 22 | | REPLY to opposition to motion re 17 MOTION to Dismiss *Corrected Class Action Complaint (CORRECTED)* filed by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC.. (Eisenstein, Matthew) (Entered: 03/21/2012) |
| 04/30/2012 | | | NOTICE of Hearing on Motion: 17 MOTION to Dismiss *Corrected Class Action Complaint*. Motions Hearing set for 9/5/2012 at 10:00 AM in Courtroom 3 before Judge Amy Berman Jackson. (jth) (Entered: 04/30/2012) |
| 08/29/2012 | | | MINUTE ORDER The parties are directed to submit supplemental briefs, which may not exceed 8 pages each, setting forth the controlling authorities on the following issues: what must plaintiffs in a private antitrust action allege to establish standing to bring the action? In particular, is there a requirement that the plaintiff allege sufficient facts that would support a finding that the plaintiff has suffered an injury in fact? Even if a complaint properly alleges anticompetitive conduct that restrains competition in violation of the antitrust laws, is there also a requirement that the plaintiff must have suffered an actual, economic injury? Or is an allegation that consumer choice has been restricted enough? In other words, what is the test for the sufficiency of the standing/injury−in−fact allegations, and how do these particular complaints satisfy or fall short of that test? Given the upcoming holiday, the submissions will be due on September 11. But if it is possible, the Court would greatly appreciate receiving them prior to the oral argument scheduled on September 5. In any event, the parties should be prepared to address the issue at the hearing. No replies will be permitted, and the submissions should not reargue matters already addressed in previous filings, including: the sufficiency of the allegations of horizontal or hub and spoke conspiracies; whether the practice challenged in this case is actually procompetitive (i.e., that it prevents higher prices, and not lower prices) and therefore could not give rise to an antitrust injury; and/or whether the practice is a most favored nations clause which does not give rise to an antitrust injury. Signed by Judge Amy Berman Jackson on 8/29/12. (DMK) (Entered: 08/29/2012) |
| 08/29/2012 | | | Set/Reset Deadlines: Supplemental Briefs are due by 9/11/2012. (jth) (Entered: 08/29/2012) |
| 09/04/2012 | 23 | | SUPPLEMENTAL MEMORANDUM to re 17 MOTION to Dismiss *Corrected Class Action Complaint* filed by PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC.. (Merley, Mark) (Entered: 09/04/2012) |
| 09/04/2012 | 24 | | RESPONSE TO ORDER OF THE COURT re Order,,,,,, filed by MARY STOUMBOS. (McLellan, Michael) (Entered: 09/04/2012) |
| 09/05/2012 | | | Minute Entry for Proceedings held before Judge Amy Berman Jackson: Motion Hearing held on 9/5/2012 re: Defendants' 17 MOTION to Dismiss |

| | | | |
|---|---|---|---|
| | | | *Corrected Class Action Complaint*. The 17 Motion was Heard and Taken Under Advisement. (Court Reporter Kellie Humiston) (jth) (Entered: 09/05/2012) |
| 10/18/2012 | 25 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to MARY STOUMBOS. Attorney Richard M. Volin terminated. (McLellan, Michael) (Entered: 10/18/2012) |
| 02/13/2013 | 26 | 12 | ORDER granting (24) Motion to Dismiss in case 1:11−cv−01803−ABJ; granting (39) Motion to Dismiss; granting (40) Motion to Dismiss in case 1:11−cv−01831−ABJ; granting (17) Motion to Dismiss in case 1:11−cv−01882−ABJ. Signed by Judge Amy Berman Jackson on 2/13/13. (DMK) (Entered: 02/13/2013) |
| 02/13/2013 | 27 | 14 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 2/13/13. (DMK) (Entered: 02/13/2013) |
| 03/12/2013 | 28 | | ENTERED IN ERROR.....MOTION to Alter Judgment as to 26 Order on Motion to Dismiss,,,,,,, by MARY STOUMBOS (Attachments: # 1 Text of Proposed Order)(McLellan, Michael) Modified on 3/13/2013 (jf, ). (Entered: 03/12/2013) |
| 03/12/2013 | | | NOTICE OF ERROR re 28 Motion to Alter Judgment; emailed to mmclellan@finkelsteinthompson.com, cc'd 10 associated attorneys −− The PDF file you docketed contained errors: 1. Invalid attorney signature (jf, ) (Entered: 03/12/2013) |
| 03/12/2013 | 29 | | MOTION to Alter Judgment as to 26 Order on Motion to Dismiss,,,,,,, *Corrected* by MARY STOUMBOS (Attachments: # 1 Text of Proposed Order)(McLellan, Michael) (Entered: 03/12/2013) |
| 03/13/2013 | | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 28 MOTION to Alter Judgment as to 26 Order on Motion to Dismiss,,,,,,, was entered in error and refiled by counsel. (See Docket Entry 29 to view document)(jf, ) (Entered: 03/13/2013) |
| 03/22/2013 | 30 | | Memorandum in opposition to re 29 MOTION to Alter Judgment as to 26 Order on Motion to Dismiss,,,,,,, *Corrected* filed by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC.. (Attachments: # 1 Text of Proposed Order)(Merley, Mark) (Entered: 03/22/2013) |
| 04/01/2013 | 31 | | REPLY to opposition to motion re 29 MOTION to Alter Judgment as to 26 Order on Motion to Dismiss,,,,,,, *Corrected* filed by MARY STOUMBOS. (McLellan, Michael) (Entered: 04/01/2013) |
| 04/15/2013 | 32 | | MOTION for Leave to File *Second Amended Class Action Complaint* by MARY STOUMBOS (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit)(McLellan, Michael) (Entered: 04/15/2013) |
| 04/17/2013 | 33 | | SUPPLEMENTAL MEMORANDUM to re 30 Memorandum in Opposition, filed by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC.. |

| | | | |
|---|---|---|---|
| | | | (Merley, Mark) (Entered: 04/17/2013) |
| 04/24/2013 | | | MINUTE ORDER. In light of plaintiffs' motion for leave to amend their complaint and defendants' response, the Court orders defendants to respond in detail to plaintiffs' motion, addressing futility in particular, by May 17, 2013. Plaintiffs' reply is due by May 28, 2013. Signed by Judge Amy Berman Jackson on 4/24/13. (DMK) (Entered: 04/24/2013) |
| 04/26/2013 | | | Set/Reset Deadlines: Defendants Response to Plaintiffs' motion for leave to amend their complaint, directing them to address in particular futility, is due by 5/17/2013. Plaintiffs' reply is due by 5/28/2013. (jth) (Entered: 04/26/2013) |
| 05/17/2013 | 34 | | Memorandum in opposition to re 32 MOTION for Leave to File *Second Amended Class Action Complaint* filed by MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, PLUS SYSTEM, INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A. INC.. (Attachments: # 1 Text of Proposed Order)(Gallo, Kenneth) (Entered: 05/17/2013) |
| 05/28/2013 | 35 | | REPLY to opposition to motion re 32 MOTION for Leave to File *Second Amended Class Action Complaint* filed by MARY STOUMBOS. (McLellan, Michael) (Entered: 05/28/2013) |
| 12/19/2013 | 36 | 53 | ORDER finding as moot (36) Motion to Alter Judgment; denying (39) Motion to Amend/Correct in case 1:11−cv−01803−ABJ; finding as moot (59) Motion to Alter Judgment; denying (65) Motion for Leave to File in case 1:11−cv−01831−ABJ; finding as moot (29) Motion to Alter Judgment; denying (32) Motion for Leave to File in case 1:11−cv−01882−ABJ. Signed by Judge Amy Berman Jackson on 12/19/13. (DMK) (Entered: 12/19/2013) |
| 12/19/2013 | 37 | 55 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 12/19/13. (DMK) (Entered: 12/19/2013) |
| 01/10/2014 | 38 | 10 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 27 Memorandum &Opinion, 36 Order on Motion to Alter Judgment,, Order on Motion to Amend/Correct, Order on Motion for Leave to File,,,,,,,, 37 Memorandum &Opinion, 26 Order on Motion to Dismiss,,,,,, by MARY STOUMBOS. Filing fee $ 505, receipt number 0090−3588483. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 Certificate of Service)(McLellan, Michael) (Entered: 01/10/2014) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARY STOUMBOS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, PLUS SYSTEM, INC., MASTERCARD INCORPORATED and MASTERCARD INTERNATIONAL INCORPORATED d/b/a Mastercard Worldwide<br><br>Defendants. | C.A. No.: 1:11-cv-01882-ABJ<br>Assigned to: Amy Berman Jackson<br>Assign Date: 10/24/2011<br>Description: Antitrust<br><br>**NOTICE OF APPEAL** |

Notice is hereby given this 10th day of January, 2014, that Plaintiff Mary Stoumbos hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the Order [Dkt. No. 26] and Memorandum Opinion [Dkt. No. 27] of this Court entered on February 13, 2013, and from the Order [Dkt. No. 36] and Memorandum Opinion [Dkt. No. 37] of this Court entered on the December 19, 2013, in favor of Defendants against said Plaintiff.

Dated: January 10, 2014

Respectfully submitted,

**FINKELSTEIN THOMPSON LLP**

By: /s Michael G. McLellan

Douglas G. Thompson
Michael G. McLellan
1055 30TH Street, Suite 150
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (206) 337-8090
dthompson@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com

*Counsel for Plaintiff Mary Stoumbos and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARY STOUMBOS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, PLUS SYSTEM, INC., MASTERCARD INCORPORATED and MASTERCARD INTERNATIONAL INCORPORATED d/b/a Mastercard Worldwide<br><br>Defendants. | C.A. No.: 1:11-cv-01882-ABJ<br>Assigned to: Amy Berman Jackson<br>Assign Date: 10/24/2011<br>Description: Antitrust<br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that, on January 10, 2014, I caused the foregoing Notice of Appeal to be filed using the Court's CM/ECF system, which will send e-mail notification of such filing to counsel of record.

/s/ Michael G. McLellan
Michael G. McLellan

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ATM COUNCIL, INC., *et al.*,<br><br>Plaintiffs,<br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | CA No. 1:11-cv-01803 (ABJ) |
| ANDREW MACKMIN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | CA No. 1:11-cv-01831 (ABJ) |
| MARY STOUMBOS,<br><br>Plaintiff,<br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | CA No. 1:11-cv-01882 (ABJ) |

**ORDER**

Pursuant to Fed. R. Civ. P. 58 and for the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that defendants' motion to dismiss, *National ATM Council, Inc. v. Visa, Inc.* [Dkt. # 24], *Mackmin v. Visa, Inc.* [Dkt. ## 39, 40], *Stoumbos v.*

*Visa, Inc.* [Dkt. # 17], are GRANTED for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The above-captioned cases are DISMISSED without prejudice.

AMY BERMAN JACKSON
United States District Judge

DATE: February 13, 2013

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL ATM COUNCIL, INC., *et al.*, Plaintiffs, v. VISA INC., *et al.*, Defendants. | ) | CA No. 1:11-cv-01803 (ABJ) |
| ANDREW MACKMIN, *et al.*, Plaintiffs, v. VISA INC., *et al.*, Defendants. | ) | CA No. 1:11-cv-01831 (ABJ) |
| MARY STOUMBOS, Plaintiff, v. VISA INC., *et al.*, Defendants. | ) | CA No. 1:11-cv-01882 (ABJ) |

**MEMORANDUM OPINION**

Sometimes the bank is just too far away. So customers in need of cash will avail themselves of automatic teller machines ("ATMs") at banks other than their own, or at convenience stores, gas stations, nail salons, and numerous other places. When they do, they will be advised: "This ATM will charge a fee of $2.50 for this transaction. This fee is in

addition to any fees which may be charged by your financial institution. If you agree to this fee, press YES. If you wish to cancel this transaction, press NO." And they will be required to accept the fee before the machine will execute the transaction. This case involves those fees.[1]

Plaintiffs in three separate actions claim that the ATM access fee pricing requirements that Visa and MasterCard have imposed on banks and ATM operators violate Section 1 of the Sherman Antitrust Act. 15 U.S.C. § 1 (2006). Specifically, plaintiffs complain about contract provisions that prohibit ATM operators from charging fees for transactions processed over Visa and MasterCard networks that are higher than the lowest access fees charged for transactions processed over other payment networks. Plaintiffs claim that through these provisions, Visa and MasterCard suppress competition from other ATM networks, force ATM operators to charge consumers supra-competitive access fees, and harm competition in the market for ATM networks. Plaintiffs in *National ATM Council v. Visa* ("*NAC*"), No. 1:11-cv-01803 (ABJ), and *Stoumbos v. Visa*, No. 1:11-cv-01882 (ABJ), claim that Visa and MasterCard conspired with unnamed banks to execute the scheme, while plaintiffs in *Mackmin v. Visa*, No. 1:11-cv-01831 (ABJ), have brought conspiracy claims against Bank of America, Wells Fargo, and J.P. Morgan Chase, as well as Visa and MasterCard.[2]

1 Readers hoping for an opinion outlawing the fees entirely can stop here; this case has nothing to do with the legality of the fees in general, but rather, the manner in which they are calculated.

2 Consumer plaintiffs also allege violations of various state antitrust and unfair competition laws and of state consumer protection laws. *Mackmin* Compl. ¶¶ 112–52; *Stoumbos* Compl. ¶¶ 53–102.

Defendants in all three cases have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[3]

It is well-established that when considering a 12(b)(6) motion, the Court must accept the facts set out in the complaint as true. But the Court is not bound to assume the truth of a party's conclusions. In this case, the complaints bristle with indignation, but when one strips away the conclusory assertions and the inferences proffered without factual support, there is very little left to consider. The Court will therefore grant the motions to dismiss – without prejudice – on two grounds. First, the complaints allege insufficient facts to support the allegations that plaintiffs suffered any injury, and the law does not support their argument that such allegations are unnecessary in an antitrust case. Second, plaintiffs have not set forth sufficient facts to support their claim that there was a horizontal conspiracy. Notably absent from each of the complaints are facts showing the existence of an agreement, the essential element of any conspiracy. Given the insufficiency of the federal claims, the Court declines to consider the state law claims, and the complaints will be dismissed.

**BACKGROUND**

All three complaints raise the same general claim: that Visa and MasterCard include provisions in their contracts with banks and ATM operators that require ATM operators using the Visa or MasterCard ATM networks to set consumer access fees for transactions on those networks that are no higher than the lowest access fees charged for transactions processed over

---

3 Visa and MasterCard filed a single joint motion to dismiss all three cases. *See* Visa and MasterCard Defs.' Mot. to Dismiss, *NAC v. Visa* [Dkt. # 24], *Mackmin v. Visa* [Dkt. # 40], *Stoumbos v. Visa* [Dkt. # 17] (collectively "Visa/MC Mot."). The bank defendants filed a joint motion to dismiss in *Mackmin*. *See* Bank Defs.' Mot. to Dismiss, *Mackmin v. Visa* [Dkt. # 39] ("Banks' Mot."). The parties also provided additional briefing on the issue of injury in fact. *See* Defs.' Suppl. Br., *NAC v. Visa* [Dkt. # 29], *Mackmin v. Visa* [Dkt. # 51], *Stoumbos v. Visa* [Dkt. # 23]; Consumer Pls.' Suppl. Br., *Mackmin v. Visa* [Dkt. # 52], *Stoumbos v. Visa* [Dkt. # 24]; NAC's Suppl. Br., *NAC v. Visa* [Dkt. # 30].

other ATM networks. *NAC v. Visa* First Am. Class Action Compl. ("*NAC* Compl.") [Dkt. # 22] ¶¶ 41–43; *Mackmin v. Visa* First Am. Class Action Compl. ("*Mackmin* Compl.") [Dkt. # 24] ¶¶ 69–70; *Stoumbos v. Visa* Corrected Class Action Compl. ("*Stoumbos* Compl.") [Dkt. # 3] ¶¶ 31–32. Put another way, ATMs that accept Visa- or MasterCard-branded cards cannot charge consumers using those cards more for their transactions than they charge consumers whose transactions are processed on other ATM networks. Visa and MasterCard maintain that the provisions in question simply establish a ceiling on ATM access fees, which benefits all consumers. But plaintiffs characterize the provision as setting not a ceiling, but a floor: a level beneath which prices for transactions processed on other networks cannot be discounted. All three complaints assert that these access fee requirements injure competition in violation of Section 1 of the Sherman Antitrust Act.[4]

## I. ATMs, Networks, and ATM Transactions

To understand the parties' claims and defenses, it is necessary to understand how ATMs operate and how funds flow in an ATM transaction. ATMs enable consumers to conduct banking transactions, such as withdrawing cash and obtaining account balances, without entering the bank. *Stoumbos* Compl. ¶¶ 4, 7. Consumers activate the ATMs with personal identification number ("PIN")-based payment cards, issued by their banks or depository institutions, that link

4 The Court notes at the outset that its dismissal of plaintiffs' antitrust claims should not be interpreted as a ruling accepting the defendants' argument that the access fee requirements are actually procompetitive. The Court did not reach the question of whether the challenged contract provisions are acceptable because they are cast in terms of a ban on charging consumers more when they use Visa and MasterCard networks rather than as a restriction on charging them less to use other networks. Nor has the Court expressed an opinion on defendants' argument that the access fee requirements can be aptly compared to "most favored nation" clauses that have been upheld by courts in other cases. The defects in these complaints compel the dismissal of the pending claims even if there are anti-competitive aspects to the arrangements in question.

to their accounts.[5] *NAC* Compl. ¶¶ 35–37; *Mackmin* Compl. ¶¶ 48, 52; *Stoumbos* Compl. ¶¶ 6–7, 25.

ATMs can be owned and operated by banks or by independent operators. To process a consumer's ATM transaction, an ATM must access a network that can communicate with the consumer's bank to complete the transaction. Defendants Visa and MasterCard each operate ATM networks that transmit these communications, as do other networks, such as STAR, Pulse, NYCE Payment Network LLC, ACCEL/Exchange Network, Credit Union 24, CO-OP Financial Services, Shazam Inc., Jeanie, and TransFund. *NAC* Compl. ¶ 38; *Mackmin* Compl. ¶¶ 64, 66; *Stoumbos* Compl. ¶¶ 28–29.

The network used to process a particular transaction is determined by two factors: which networks the consumer's PIN card can access and which networks the ATM can access. Some PIN cards transmit transactions over a single payment network only, while others can send transactions over more than one network. *NAC* Compl. ¶ 38; *Mackmin* Compl. ¶ 66; *Stoumbos* Compl. ¶ 28. The reverse side of each card shows the service marks of the payment networks the card can access. *NAC* Compl. ¶ 38; *Mackmin* Compl. ¶ 66; *Stoumbos* Compl. ¶ 28. For example, a PIN card bearing the Visa, STAR, and NYCE service marks can only transmit ATM requests over the Visa, STAR, and NYCE networks, so that card can only be used on ATMs with access to those networks.

Whether an ATM can access a particular network depends on whether the ATM operator has a contract with the network provider. Banks that issue Visa- or MasterCard-branded PIN cards are automatically granted access to the Visa or MasterCard networks. Independent ATM operators who want their ATMs to have access to the Visa or MasterCard networks must be

---

5 Banks and depository institutions that issue PIN-based payment cards are sometimes referred to as "issuing banks."

sponsored by a "sponsoring financial institution" – a Visa or MasterCard member bank – or must affiliate with a sponsored entity. *NAC* Compl. ¶ 39, *Mackmin* Compl. ¶ 64; *Stoumbos* Compl. ¶ 29. Both independent and bank-owned ATM operators typically contract with multiple networks so their ATMs can serve as many consumers as possible.

Consumers can access funds and conduct transactions using ATMs at their own bank, at other banks, and at non-bank locations, such as convenience stores, shopping malls, and airports. When a consumer uses an ATM to obtain cash from her account, the ATM sends the transaction request over a network and, if the requested funds are available, the ATM provides the cash to the consumer. Thanks to modern technology, all of this typically happens within a few seconds. When the consumer initiates the transaction on an ATM operated by an entity other than her own bank, that ATM's operator – whether a different bank or an independent operator – usually charges the consumer an ATM access fee for the transaction. *NAC* Compl. ¶ 37; *Mackmin* Compl. ¶¶ 2–3; *Stoumbos* Compl. ¶¶ 8, 27. These are the access fees at issue in the three lawsuits before the Court.[6]

## II. The Parties

The three groups of plaintiffs represent different participants in ATM transactions. Plaintiffs in *NAC v. Visa* are the National ATM Council, a trade association that represents owners and operators of independent (i.e., non-bank owned) ATMs, along with thirteen owners and operators of independent ATMs. *NAC* Compl. ¶¶ 7, 9–21. Plaintiffs in *Mackmin v. Visa* are four consumers who have used ATMs, whether independent or bank-owned, and have paid ATM access fees as a result. *Mackmin* Compl. ¶¶ 12–15. Plaintiff in *Stoumbos v. Visa* is a consumer

---

6 A consumer may also be required to pay a fee charged by the consumer's own bank for using an ATM not operated by the bank, sometimes called a foreign ATM access fee. These foreign ATM access fees are not at issue in these lawsuits. *NAC* Compl. ¶ 37; *Mackmin* Compl. ¶ 3; *Stoumbos* Compl. at 8 n.1.

who has paid several ATM access fees specifically in connection with transactions at independent ATMs. *Stoumbos* Compl. ¶ 11.

Defendants Visa and MasterCard are each independent, publicly-traded corporations that issue PIN cards under their respective brands and process ATM transactions on their networks. Visa operates the Visa, PLUS, and Interlink payment networks and issues PIN cards that carry its Visa, Visa Electron, Interlink, or PLUS service mark. MasterCard operates the MasterCard Worldwide Network and issues PIN cards that carry its MasterCard, Maestro, or Cirrus service mark. Before they became independent, publicly-traded corporations in 2008 and 2006, respectively, Visa and MasterCard were each associations owned and operated by member banks. *NAC* Compl. ¶¶ 30, 33–34; *Mackmin* Compl. ¶¶ 44–45, 50–51; *Stoumbos* Compl. ¶¶ 20, 25–26.

The *Mackmin* plaintiffs have also sued Bank of America, N.A.; NB Holdings Corp.; Bank of America Corp. (collectively, "Bank of America"); Chase Bank USA, N.A.; JPMorgan Chase & Co.; and JPMorgan Chase Bank, N.A. (collectively, "Chase"); and Wells Fargo & Co. and Wells Fargo Bank, N.A. (collectively, "Wells Fargo"). These defendants are national retail banks that belong to the Visa and MasterCard networks. *Mackmin* Compl. ¶ 43.

## III. Plaintiffs' Claims

Plaintiffs complain that Visa and MasterCard violate Section 1 of the Sherman Antitrust Act by including provisions in their agreements with banks and ATM operators that prohibit the operators from charging higher access fees for transactions over the Visa or MasterCard networks than they charge for transactions on any other network. *NAC* Compl. ¶¶ 41–42; *Mackmin* Compl. ¶¶ 69–70; *Stoumbos* Compl. ¶¶ 31–32. This means that an ATM operator cannot charge a consumer whose PIN card only operates on the MasterCard network a $2.00

ATM access fee on a particular ATM terminal, while charging a consumer whose PIN card operates on the NYCE network a $1.50 access fee on that same terminal.

According to all three complaints, these agreements harm competition. By preventing ATM operators from charging different ATM access fees to consumers based on the networks their PIN cards can access, plaintiffs say, these agreements effectively prohibit operators from discounting, rebating, or directing consumers to less expensive networks, *NAC* Compl. ¶¶ 44–45; *Mackmin* Compl. ¶¶ 74–75; *Stoumbos* Compl. ¶ 36. Thus, it is alleged that the agreements cause consumers to pay "supra-competitive" fees, that is, fees higher than a competitive market would bear, for ATM transactions, *NAC* Compl. ¶ 46; *Mackmin* Compl. ¶ 76; *Stoumbos* Compl. ¶ 39, and insulate Visa and MasterCard from the rigors of competition from other payment networks. *NAC* Compl. ¶ 43; *Mackmin* Compl. ¶ 80; *Stoumbos* Compl. ¶ 34. Plaintiffs claim that but for these contract clauses, price competition would ensue in the ATM transaction market, which would result in lower ATM access fees for consumers. *NAC* Compl. ¶ 47; *Mackmin* Compl. ¶ 76; *Stoumbos* Compl. ¶ 39. The *NAC* complaint, filed by independent ATM operators, also claims that the access fee rules enable Visa and MasterCard to "charge artificially high network fees for ATM transactions, to remit inadequate compensation to ATM operators, and to steer excessive and disproportionate compensation for ATM transactions to their member banks." *NAC* Compl. ¶ 46.

On January 30, 2012, Visa and MasterCard and the bank defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) on multiple grounds. The network defendants asserted that plaintiffs failed to allege sufficient facts to establish the existence of a conspiracy, an antitrust injury, or a violation of D.C. or state antitrust laws. Visa/MC Mot. at 9–24. The bank defendants asserted that plaintiffs have not pled facts to support the alleged *per se*

violation of Section 1 of the Sherman Act, the allegation of a horizontal agreement, or an antitrust injury. Banks' Mot. at 8–22. Subsequently, in response to the Court's request, the parties provided supplemental briefing on the issue of injury in fact. *See* Defs.' Suppl. Br., *NAC v. Visa* [Dkt. # 29], *Mackmin v. Visa* [Dkt. # 51], *Stoumbos v. Visa* [Dkt. # 23]; Consumer Pls.' Suppl. Br., *Mackmin v. Visa* [Dkt. # 52], *Stoumbos v. Visa* [Dkt. # 24]; and NAC's Suppl. Br., *NAC v. Visa* [Dkt. # 30].

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (applying this standard in an antitrust case in which the allegations of conspiracy were found to be insufficient because the plaintiffs had not set forth enough facts to state a plausible claim on its face). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has

acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." *Id.* at 679, quoting Fed. R. Civ. P. 8(a)(2) (second alteration in original) (internal quotation marks omitted). A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.* at 678, quoting *Twombly*, 550 U.S. at 555, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *id.*

## ANALYSIS

### I. The Sherman Antitrust Act

Plaintiffs allege a violation of Section 1 of the Sherman Antitrust Act. Section 1 declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1 (2006). Thus, a violation involves two critical components: the combination or agreement, and the restraint of trade.

The Supreme Court has made clear that a restraint of trade violates Section 1 of the Act if it causes "antitrust injury, which is to say, injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The antitrust injury must "stem[] from a

competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).[7]

The federal government is authorized to enforce the antitrust laws by seeking civil or criminal sanctions. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 652 (1985). And under Section 4 of the Clayton Act, private parties who have been injured by Sherman Act violations may also seek relief in court. 15 U.S.C. § 15(a) (stating that a private "person injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.").[8]

### A. The Complaints Must Allege Both Prongs of Antitrust Standing

Although the language of Clayton Act Section 4 is broadly written, the "potency of the remedy implies the need for some care in its application," and not every party affected by an antitrust violator's "ripples of harm" is allowed to sue. *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001), quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982) (quotation marks omitted). To have standing to sue on an antitrust claim, a private plaintiff must show two things: (1) that the defendant's alleged wrongdoing has caused

7 Restraints that, for example, result in low prices "benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition" and "cannot give rise to antitrust injury." *Atl. Richfield Co.*, 495 U.S. at 340; *see also Dial A Car v. Transp., Inc.*, 884 F. Supp. 584, 591 (D.D.C. 1995) (dismissing claim for lack of antitrust injury because "[d]efendants' conduct may have resulted in *lower* prices and *more* competition in the market; it has not resulted in *higher* prices and *less* competition"). Thus, for a complaint to survive a motion to dismiss, plaintiffs must allege sufficient facts in their complaints for the Court to conclude that defendants' actions plausibly resulted in some harm to competition. *See Atl. Richfield Co.*, 495 U.S. at 344.

8 The Clayton Act includes the Sherman Act as one of the "antitrust laws." *See* 15 U.S.C. § 12(a). Also, a person "threatened [with] loss or damage by a violation of the antitrust laws" can seek injunctive relief under section 16 of the Clayton Act. 15 U.S.C. § 26.

him to suffer an injury in fact that affects his business or property; and (2) that the injury is the kind of injury the antitrust laws were intended to prevent.

While allegations that competition has been restrained may satisfy the second prong, that circumstance alone is not enough to confer standing to sue under Section 4 of the Clayton Act. A plaintiff must personally suffer the harm. In that aspect, the injury-in-fact prerequisite in antitrust cases mirrors the Article III constitutional standing requirement that all plaintiffs in federal cases must satisfy.[9] Indeed, the D.C. Circuit recently overturned a grant of summary judgment in an antitrust matter because the lower court failed to analyze whether the plaintiff had demonstrated an Article III injury in fact. *Dominguez*, 666 F.3d at 1362 (D.C. Cir. 2012) (rejecting the notion that injury in fact can simply be inferred from anticompetitive acts, stating that the fact "[t]hat the merits of a particular claim may be clear is no reason to avoid the constitutionally required inquiry into this limit on our jurisdiction"); *see also Gerlinger v. Amazon.com Inc., Borders Group, Inc.*, 526 F.3d 1253, 1255–56 (9th Cir. 2008) (finding no Article III injury in fact in an antitrust case because the defendant did not show he personally paid a higher price for a book or that he himself experienced any reduced selection of titles, poorer service, or any other potentially conceivable form of injury).

---

9 "[E]very federal court has a 'special obligation to satisfy itself' of its own jurisdiction before addressing the merits of any dispute." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012), quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984). "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), citing *Allen*, 468 U.S. at 750. Within Article III standing, every plaintiff in federal court bears the burden of establishing the three elements that make up the "irreducible constitutional minimum" of Article III standing: injury in fact, causation, and redressability. *Dominguez*, 666 F.3d at 1362. Injury in fact requires a plaintiff to allege an injury that is both concrete and particularized and actual or imminent, rather than speculative or generalized. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Similarly, the first prong of the antitrust standing inquiry requires plaintiffs to allege that the defendants' conduct caused or threatened injury to their own business or property. *Andrx*, 256 F.3d at 806 ("As in any civil action for damages, the plaintiff in a private antitrust lawsuit must show that the defendant's illegal conduct caused its injury. The plaintiff's first step is to plead an injury-in-fact . . . to business or property.") (citations omitted).

By contrast, the second requirement of antitrust injury looks at the marketplace in general. It requires plaintiffs to allege an injury that is "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969) (internal quotation marks omitted). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Id.* Although both standing requirements involve questions of injury, they present two separate inquiries. *See Atl. Richfield Co.*, 495 U.S. at 339 n.8 (rejecting a theory that equates injury in fact with antitrust injury: "antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity").

Thus, a private plaintiff's antitrust claim may proceed only if the complaint satisfies both inquiries under the conventional Federal Rule of Civil Procedure 8(a) pleading standards that govern "in all civil actions." *Iqbal*, 556 U.S. at 684, quoting Fed. R. Civ. P. 1 (quotation mark omitted).

### B. The Complaints Must Also Allege an Agreement or Conspiracy

The Supreme Court has repeatedly made it clear that the existence of an agreement or conspiracy is an essential element of a Sherman Act violation.

> Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful.

*Twombly*, 550 U.S. at 553–54 (citations, edits, and internal quotation marks omitted). So, to plead a violation of Section 1 of the Sherman Act, plaintiffs must allege not only the antitrust injury, but also the existence of an agreement or conspiracy, or facts sufficient to support the inference of an agreement or conspiracy.

While the standard articulated in *Twombly* for the sufficiency of a complaint is recited in practically every motion to dismiss filed in every sort of action in this court, it has particular relevance here. In *Twombly*, the Court specifically undertook to address what a plaintiff must plead in order to state a Sherman Act claim, and it asked "whether a §1 complaint can survive a motion to dismiss when it alleges that [the defendants] engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action." *Id.* at 548−49. The answer to the question was no.

The Court ruled that the Federal Rules of Civil Procedure require a plaintiff to put some meat on the bones from the outset: "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (edits and internal quotation marks omitted). Allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent

action." *Id.* at 557. The complaints must include "further circumstance pointing toward a meeting of the minds." *Id.* The Court concluded that the *Twombly* plaintiffs' allegations of agreement and conspiracy were insufficient because the claims rested "on descriptions of parallel conduct and not on any independent allegation of actual agreement." *Id.* at 564. Therefore, the plaintiffs had not set forth "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

Notwithstanding plaintiffs' insistence that there is something special about antitrust litigation that exempts this case from the usual pleading requirements, the Court is bound to follow *Twombly's* unambiguous guidance when it analyzes the three complaints before it.

## II. The Complaints Do Not Allege Injury in Fact

Plaintiffs acknowledge in their briefs that they must establish injury in fact as part of antitrust injury. *See* Consumer Pls.' Suppl. Br. at 3; NAC's Suppl. Br. at 1. They take the position, though, that by alleging anticompetitive conduct, they have more than satisfied the requirements for pleading antitrust injury in fact. *See, e.g.*, NAC Suppl. Br. at 8; Tr. of Hr'g on Mot. to Dismiss ("Tr.") [Dkt. # 32] at 81, Sept. 5, 2012 ("[I]f you can establish that competition has been harmed . . . there are certain injuries that flow from that . . . . It is not required in an antitrust complaint to plead the economics textbook that goes in between the allegation of the competition injury and the actual injury . . . ."); Tr. at 100 (*Mackmin* counsel citing *Cardizem CD* for proposition that an allegation of anticompetitive activity establishes injury in fact and antitrust injury "all in one"); *see also* Tr. at 87, 96, 114–16 (arguing that plaintiffs were injured because "[t]hey paid an ATM access fee in a restrained market" that was greater than the price would be otherwise: "What's that other price? . . . It's a price in what's called the but for world.").

But a "'naked assertion' of antitrust injury . . . is not enough; an antitrust claimant must put forth factual 'allegations plausibly suggesting (not merely consistent with)' antitrust injury." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007) (en banc), quoting *Twombly*, 550 U.S. at 557. Antitrust injury involves a two-step showing, *see Andrx*, 256 F.3d at 806, and none of the cases cited by the plaintiffs supports the proposition that the injury-in-fact step can be merged with the allegations of competitive harm.

In *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896 (6th Cir. 2003), the court stated that a "private antitrust plaintiff, *in addition to having to show injury-in-fact* and proximate cause, must allege, and eventually prove, antitrust injury." *Id.* at 909 (emphasis added) (internal quotation marks omitted). The court specifically found that facts the *Cardizem CD* plaintiffs pled were sufficient to satisfy the injury-in-fact requirement: in that case, purchasers of heart medication alleged that an agreement between the brand drug manufacturer and a generic manufacturer prevented any generic from entering the market and thereby deprived plaintiffs of a less expensive generic alternative. *Id.* at 910. The court ruled that plaintiffs suffered injury in fact because they incurred the out-of-pocket expense of the price difference between the brand drug and a generic version. *Id.* at 904–05.[10]

Consumer plaintiffs also cite *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ("*LCD*"), for the proposition that to plead antitrust injury, all a claimant must allege is that he paid for a product at a supra-competitive price. *See* Tr. at 102–04 ("[A]ll we need to do as consumers is to say that . . . there's a restraint in the marketplace, the marketplace is broken."). But that is not what the *LCD* case holds. The court simply ruled that it

10 The court also emphasized, "Our conclusion that the Agreement was a *per se* illegal restraint of trade does not obviate the need to decide whether the plaintiffs adequately alleged antitrust injury." *Cardizem CD*, 332 F.3d at 909 n.15. And in that case, the "but for" allegations satisfied the "antitrust injury" prong of the standing test, but they were not the sole foundation for the "injury in fact" prong.

was not necessary at the pleading stage to allege the exact *measure* of damages. *LCD*, 586 F. Supp. 2d at 1124. The court found that the *LCD* plaintiffs sufficiently alleged that overcharges are in fact passed on to consumers "and that such overcharges can be traced through the relatively short distribution chain." *Id.* In other words, the *LCD* plaintiffs provided factual allegations to demonstrate that consumers were being affected, so the complaint satisfied the injury-in-fact requirement.[11]

Plaintiffs pointed the court to *Ross v. Bank of America, N.A. (U.S.A.)*, 524 F.3d 217 (2d Cir. 2008), and urged it to conclude that an allegation of competitive harm was sufficient. Consumer Pls.' Suppl. Br. at 6. But *Ross* does not diminish the requirement that plaintiffs plead injury in fact. The harm plaintiffs alleged that they suffered in that case was that they were forced to accept arbitration clauses in credit card agreements with their banks. *Ross*, 524 F.3d at 223 (finding that the cardholders' assertion that they were "deprived of any meaningful choice on a critical term and condition of their general purpose card accounts" satisfied injury-in-fact requirement").

Thus, in *Cardizem CD*, *LCD*, and *Ross*, there was no factual or logical gap between the complained-of conduct and the alleged harm. In those cases, the complaints provided sufficient facts to support an inference that the defendants' concerted actions caused injury to the plaintiffs' business or property. That is not the case in the three complaints before the Court.

---

11 The *LCD* complaint also included significant detail about the market and the defendants' complex and unusual pricing behavior that could not be attributable to supply and demand. *See id.* at 1115–16 (describing detailed allegations of declining LCD panel prices before the conspiracy, due to advances in technology, improving efficiencies, and new market entrants, and post-conspiracy pricing characterized by unnatural and sustained price stability, periods of substantial price increases, and a compression of price ranges for the products). There is nothing comparable in the complaints before the Court. Plaintiffs also point to *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390 (1906), to support their argument. Tr. at 115. But the issue in that case was which statute of limitations would apply. *Chattanooga*, 203 U.S. at 397. The case does not analyze what facts plaintiffs must allege to plead injury in fact.

### A. The Consumer Complaints

Plaintiffs in the *Mackmin* case represent consumers who have used both independent and bank-owned ATMs, while plaintiff Mary Stoumbos has sued only on behalf of consumers who use independent ATMs. *Mackmin* Compl. ¶¶ 12–15, 89; *Stoumbos* Compl. ¶¶ 11, 22. Both complaints allege that plaintiffs have been forced to pay inflated, "supra-competitive" ATM access fees as a result of the Visa and MasterCard access fee rules, because without the access fee rules, ATM operators could send transactions to "lower cost networks" and would pass that cost savings on to consumers in the form of lower access fees. *Mackmin* Compl. ¶¶ 4–5; *Stoumbos* Compl. ¶¶ 33, 37–38, 40. But the consumer plaintiffs do not allege facts to support the necessary allegation that they were personally affected by those circumstances, or that the access fees charged by the ATM operators were actually inflated.

#### 1. The *Mackmin* complaint

The *Mackmin* complaint starts out by explaining how ATM transactions work. Paragraph 3 explains that the ATM access fee at the heart of the dispute is paid by the customer. *Mackmin* Compl. ¶ 3. Paragraphs 1, 4, and 5 set out the conclusion that these fees are inflated, and that "[b]y prohibiting [ATM operators] from offering more attractive terms to consumers who use lower cost, competing networks, Visa and MasterCard are able to maintain their market position." *Id.* ¶¶ 1, 4–5. But the complaint never follows up with any factual detail that would indicate that consumers have any ability to "use" competing networks: there is no allegation that any choices can be offered at the ATM, and there is a critical lack of factual support for the notion that other networks cost less.

While paragraph 59 explains that the customer pays the access fee to the ATM operator and a foreign ATM fee to his own bank, and "the card-issuer bank" pays a switch fee to the ATM network and an interchange fee to the owner of the foreign ATM, there is no allegation

that anyone pays a fee to the networks. *Id.* ¶ 59. So what is the complaint's often-repeated phrase "lower cost network" supposed to mean? The complaint charges that the challenged rules require ATM access fees to be the same for any transaction "irrespective of whether the transaction is actually completed over Visa or MasterCard's PIN Debit network, and without regard to any savings incurred by the ATM owner from obtaining services from one of the alternative PIN-based networks." *Id.* ¶ 68. "Any" savings? Are there savings? None are alleged. Nothing in the complaint explains whether or how the network utilized affects the ATM operator's costs.

Similarly, there are no facts from which a reasonable person could draw the conclusion in paragraph 74 that the rules create an arrangement "that prohibits discounting, directing consumers to less expensive competitor networks, and other pricing behavior characteristic of a free and competitive market." *Id.* ¶ *74.* What is stopping ATM operators from offering customers who use their machines a discount? The complaint asserts that "[i]n a reasonably competitive market, ATM Operators would set ATM Access Fees at a level reflecting the cost of obtaining the network services and other inputs necessary to complete the transaction," *id.* ¶ 77, and that by requiring that access fees be the same regardless of the network utilized, the "restraints break the essential economic link that would exist in a reasonably competitive market between the price a consumer is charged for a service and the cost to the seller of providing it," *id.* ¶ 79. What is missing is any discussion of what the ATM operator's costs are, and whether they change if the operator uses a Visa or MasterCard network or an alternative network. Those missing facts are fundamental, and without them, there is no basis for the conclusions in paragraph 87 that the access fees are "inflated" or "supra-competitive."

There are also significant problems with injury in fact here because the *Mackmin* plaintiffs do not articulate how these restrictions affected them in particular.[12] The complaint alleges that each of the named plaintiffs has paid at least one ATM fee at some unspecified time or place. *Id.* ¶¶ 12–15. But it does not state whether the plaintiffs were conducting transactions at an ATM where an alternative network was even available. The *Mackmin* plaintiffs allege that "some" ATM transactions using Visa- or MasterCard-branded cards may be completed over alternate networks – transactions initiated with cards displaying the service marks of other networks on the reverse side. *Id.* ¶ 66. But there are no allegations that any of the named plaintiffs actually carry PIN cards in their wallets that can be used on alternative networks, or whether those particular networks, if any, were offered at the ATMs where plaintiffs conducted their transactions and paid their fees.

### 2. The *Stoumbos* complaint

Plaintiff Stoumbos also begins the factual background section of her complaint with a description of how ATM transactions work and how they are priced. *Stoumbos* Compl. ¶¶ 27–29. In paragraph 28, Stoumbos states that "[s]ome ATM transactions using Visa- and MasterCard-branded PIN-debit cards may be completed over alternate networks" and that the PIN cards that offer this access bear the other service marks on the back of the card. *Id.* ¶ 28. But there is no allegation in the complaint that Stoumbos herself had such a card. She does

---

12 According to the information provided in the complaints, the complained-of contract provisions do not necessarily affect all ATM transactions. First of all, the access fees are only imposed when a consumer is somewhere other than at his own bank. *Mackmin* Compl. ¶ 56. Second, the rules only affect transactions made with PIN cards that have multiple service marks and permit the bearer to utilize alternative networks. Otherwise – whether it is the consumer or the ATM operator who selects the network – there is no option available to choose an alternative network and obtain the alleged "cost savings" even if they exist. Third, the consumer complaints allege that the "overwhelming" majority of the cards issued are Visa or MasterCard-brand cards. *Mackmin* Compl. ¶ 55; *Stoumbos* Compl. ¶ 45. And customers obtaining Visa and MasterCard transactions must be afforded the benefit of the lowest access fee an operator is willing to charge.

allege that she used an independent ATM, but there is no indication of whether she used one that was connected to any alternative network, or whether she used an ATM that could have accessed whatever particular alternative network may have been available to her. These omissions mean that there is no link between the alleged harm to competition and the plaintiff's pocketbook.

And what is said about the elusive discounts that supposedly are not being passed on to consumers due to the restraints imposed by the defendants? The *Stoumbos* complaint alleges that Visa and MasterCard force ATM operators to charge an access fee for all transactions that is no less than the fee charged at that ATM for Visa and MasterCard transactions. *Id.* ¶ 30. According to the plaintiff, they do this "irrespective" of whether the transaction is actually completed over the Visa or MasterCard networks, and "without regard to any actual or potential cost savings to the ATM operator" of using an alternative network. *Id.* ¶ 33.

As was the case with the *Mackmin* complaint, this language is telling. "Potential" cost savings? The complaint does not allege any facts to indicate that alternate networks actually provide the service at a lower cost or that completing an ATM transaction over an alternate network would give rise to *any* savings for the ATM operator. So, the sentence in paragraph 33 stating that plaintiffs are harmed because "they are forced to pay supra-competitive ATM Access Fees" is an unsupported conclusion. So is: "The ATM restraints operate to prohibit discounting by competing ATM operators to reflect the variability of costs of using competing networks." *Id.* ¶ 34. The problem with that statement is that there are no facts alleged that show that there *is* any "variability of costs of using competing networks." These sorts of allegations are repeated throughout the complaint. *See, e.g., id.* ¶ 36 (alleging that the rules "prohibit[] discounting" and "prevent[] Independent ATM operators from setting profit-maximizing prices and . . . other pricing behavior characteristic of a competitive market"); *id.* ¶¶ 38–40 (alleging that consumers

"are forced to pay higher ATM Access Fees than they otherwise would if there were competition in the market," the ATM access fees "result in supra-competitive ATM Access Fees and artificially constrain growth in ATM deployment, and that "[c]ompetition between ATM operators would pass these lower costs on to Plaintiffs").

In the midst of these conclusory recitations, Stoumbos does include one sentence that claims, "Alternative PIN-debit networks are less costly." *Id.* ¶ 41. This assertion hardly suffices to support the inferences the Court is being asked to draw in this case. Less costly to whom? Less costly to operate? Less costly to use? Again, nowhere in this complaint does plaintiff allege that the networks – either Visa and MasterCard or the competing networks – charge anyone for using their facilities at all.

Stoumbos also asserts that the contract provisions are unlawful because "[i]ndependent ATM operators may not offer a discount or other benefit to persuade consumers to complete their transactions over competing, lower cost . . . networks." *Id.* ¶ 36; *see also id.* ¶ 37 (alleging that the rules deter ATM operators from "steering" transactions to other networks, which "hinders the growth and development of more efficient, lower cost competing ATM networks"). But how can a customer be "steered?" There are no factual allegations that establish that even a persuaded consumer would have any ability to affect which network the operator is using. Moreover, none of the allegations support the conclusion that ATM operators cannot discount to compete with each other. Plaintiff does not allege that there is anything barring ATM operators from using the so-called lower cost networks and lowering their prices across the board to attract consumers to their machines.

Paragraph 37 contends that "[a]bsent these agreements, independent ATM transacting networks would be able to compete with the Visa and MasterCard networks by offering lower

ATM Access Fees than those charged in the Visa and MasterCard networks." *Id.* ¶ 37. But plaintiff's speculation depends on a huge number of assumptions – most notably, that ATM operators would realize some savings if they used the other networks – but also that there would be some mechanism whereby they could pass that savings onto consumers by incorporating some sort of consumer network choice into the transaction. Moreover, the suggestion that the new competing networks would "offer lower fees" than Visa and MasterCard is inconsistent with the allegation in the complaint that it is the ATM operator, not the network, who charges the consumer the access fee in the first place. *See id.* ¶ 8.[13] These conclusory statements do not provide sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.[14]

---

13 This same confusion is evident in paragraph 45. Stoumbos alleges that the contract provisions "secure compliance by [Visa and MasterCard's] customers and suppliers." *Stoumbos* Compl. ¶ 45. Customers *and* suppliers? Which is it? Should it not be apparent by the time one has reached this point in the complaint whether the allegation is that the independent ATM operators are the networks' customers or if they are their suppliers?

14 The complaints are also quite fuzzy about what market the consumer plaintiffs think is being restrained by the access fee rules and where the change will be if those rules are eliminated. At certain points, the complaints seem to indicate that what has been affected is the competition between networks. *See Mackmin* Compl. ¶ 4 (alleging that access fee rules allow Visa and MasterCard to maintain their market position and restrict competition between card networks). They suggest that this competition is supposed to occur at the individual machines. *See Stoumbos.* Compl. ¶ 41 ("[T]he ATM restraints suppress competition with rival networks at the point of the transaction, where ATM operators interact directly with consumers."). But plaintiffs also express concerns about the market for PIN cards. *See id.* ¶ 47 ("Visa and MasterCard maintain their market power in light of the insurmountable barriers to entry faced by a potential competitor that might seek to achieve comparable consumer acceptance of its PIN-debit card, while at the same time the ATM restraints effectively foreclose competitive ATM networks from competing to carry a larger share of ATM transactions.") And the plaintiffs alternate between complaining that the networks are not competing with each other, *id.* ¶ 37, and that the ATM *operators* are not competing with each other. *Id.* ¶ 34. The schizophrenic nature of plaintiffs' world view comes to a head in the odd allegation in the *Stoumbos* complaint that the ATM operators are "unwilling co-conspirators." *Id.* ¶ 21. If the essence of conspiracy is an agreement, then this is something of an oxymoron, and the plaintiffs seem torn between casting the operators as fellow victims or as participants in the scheme.

### B. The *NAC* Independent ATM Operators' Complaint

The *NAC* plaintiffs represent independent ATM operators. *NAC* Compl. ¶¶ 7, 9–22. As such, they stand between the consumer and the network in a transaction involving an independent ATM. The *NAC* plaintiffs insist that since they have alleged antitrust injury, they have also alleged Article III injury in fact. NAC Suppl. Br. at 8 (stating that the *NAC* complaint "reveals allegations of a compensable antitrust injury that more than satisfy the requirements for pleading antitrust injury and, *a fortiori*, Article III injury in fact"). That might be true if the NAC plaintiffs had properly alleged both prongs of antitrust injury – that is, both harm to competition *and* injury in fact – but the second showing is missing.

In opposition to the motion to dismiss on antitrust standing grounds, the *NAC* plaintiffs point to their allegations that the access fee rules "enable both Visa and MasterCard to charge artificially high network fees for ATM transactions, to remit inadequate compensation to ATM operators, [] to steer excessive and disproportionate compensation for ATM transactions to their member banks . . . and to establish terms that benefit the defendants and their co-conspirator banks and harm ATM operators." *Id.*, quoting *NAC* Compl. ¶ 46 (alteration in original) (quotation marks omitted). They also allege that as a result of the access fee rules, "the ATM Operator Plaintiffs and the putative class have been injured in their business and property in an amount not presently known. . . . by supracompetative fees that greatly exceed the fees that would be paid by ATM operators for network and bank services in a competitive market." *Id.*, quoting *NAC* Compl. ¶ 67 (quotation marks omitted).

But none of this sets forth facts that could support an inference that the access fee requirements injure the *plaintiffs* – the ATM operators. It is the consumers, not the operators, who pay the allegedly inflated ATM access fees. *NAC* Compl. ¶ 37 ("Consumers pay for ATM

services from banks of which they are not customers and from non-bank ATM operators by paying a surcharge levied at the point of the transaction (an 'access fee'). . . . The access fee is added to the amount withdrawn from the cardholder's account at the time of the transaction . . . ."). Thus, the allegations that the access fee requirements prevent ATM operators from offering consumers a discount to use lower cost networks does not allege harm to the operators themselves. *See id.* ¶¶ 45, 49. If ATM operators are required to charge consumers more for ATM transactions than they might absent the access fee rules, the rules tend to benefit operators by increasing their revenue. This does not constitute antitrust injury. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (explaining that conspiracy to charge higher-than-competitive prices for televisions and other electronic products could not injure competing manufacturers of such products because they would stand to gain from a conspiracy to raise prices for the products).

The *NAC* plaintiffs also allege that the access fee requirements enable Visa and MasterCard "to charge artificially high network fees," "remit inadequate compensation to ATM operators," and "steer excessive and disproportionate compensation" to their member banks, to the benefit of the card companies and member banks. *NAC* Compl. ¶ 46. But these allegations are highly conclusory and therefore, need not be accepted at face value. The *NAC* complaint provides no facts suggesting how requirements equalizing access fees that consumers pay plausibly resulted in these alleged harms.[15] The complaint draws absolutely no connection

15 Counsel for *NAC* plaintiffs stated in oral argument that the requirements harm operators because the clauses prevent operators from gaining volume by preventing them from offering incentives to consumers to choose lower cost networks for their transactions. Tr. at 66–67. But this is not stated in the complaint. The complaint does not indicate that a consumer has any opportunity to choose which network will carry his transaction, and furthermore, it provides no facts from which one could conclude that there are networks that cost less than others.

between the access fees and funds flowing to the banks. Nor does it provide any detail about whether and how the ATM operators are supposed to be compensated.

Most important, the *NAC* complaint does not allege that Visa and MasterCard charge "network fees" at all, much less make clear how they have been "artificially" inflated. There are no allegations that indicate that Visa and MasterCard ask the ATM operators – or anyone else – to pay anything, what the fees might be, how they are calculated, how and when they are paid, or who pays them. Similarly, the complaint does not include the fact that Visa and MasterCard pay "compensation to ATM operators" at all, much less any facts that would support the inference that it is "inadequate." At oral argument, counsel for *NAC* plaintiffs explained that the consumer's bank pays an "interchange" fee to the network for processing a transaction, which the network then forwards to the ATM operator after deducting a network fee. Tr. at 57–58. But none of this is in the complaint. The fact that operators receive access fees from consumers and separately receive "interchange" from the issuing bank suggests the two fees are not directly related. The complaint provides the Court no facts from which the Court can understand or infer how the access fee relates to the interchange fee relates to the network fee, much less how the Visa and MasterCard requirements affect the amount of interchange operators receive. Accordingly, the *NAC* complaint does not allege injury in fact.

Thus, none of the complaints does anything more than make the "but for" claim. The complaints do not specify what market is being restrained, how it is supposed to work, how it was adversely affected, and how that circumstance injured the plaintiffs. A critical problem is that plaintiffs do not make clear who pays whom in these transactions. They do not explain what the ATM operators' costs might be or how they are tied to the pricing of the fees, and there are

no facts in the complaints that support a conclusion that prices would be lower if the restrictions at issue were lifted.

The complaints allege that the contract provisions prohibit ATM operators from passing on the savings that could be realized when using "lower cost networks," and that consumers are therefore paying "supra-competitive" fees. But the notion that there *are* other networks that actually can or do charge the ATM operators less – thereby giving rise to savings that could be passed along to the consumer – is not stated anywhere. Plaintiff Stoumbos comes the closest when she states, "Alternative PIN-debit networks are less costly." *Stoumbos* Compl. ¶ 41. But neither Stoumbos nor any other plaintiff offers facts to flesh out that characterization. And the fact that this is a problem at the heart of the case was exposed during oral argument, when counsel explained that in fact, the operators charge the networks and not the other way around. Tr. at 57–58.

As they stood before the Court, defendants pointed out and plaintiffs did not dispute that ATM operators do not incur "costs" for accessing different networks at all. Rather, issuing banks pay the ATM operators "interchange fees" via the networks, and networks deduct a portion of these interchange fees before passing them on to the ATM operators. *See* Tr. at 12–13, 54–58. It is unclear to the Court how businesses that do not incur costs can pass "cost savings" along to someone else. More important, the fact that the money flows in this direction is not stated clearly in the consumer complaints. *See NAC* Compl. ¶ 46. (alleging that the "ATM restraints . . . enable both Visa and MasterCard to charge artificially high network fees for ATM transactions, to remit inadequate compensation to ATM operators, and to steer excessive and disproportionate compensation for ATM transactions to their member banks"). And it is altogether absent from the operators' complaint. NAC's counsel justified this omission by

explaining that the term "*lower cost networks*" in all three complaints was meant to refer to alternative *networks that pay the operators higher fees* than those paid by Visa and MasterCard. Tr. at 54. But nothing in the complaints would alert the reader to the fact that plaintiffs are relying upon this novel and unsustainable definition of the term "cost."

Moreover, at oral argument, plaintiffs advanced a different theory of competitive harm than the one advanced in the pleadings. The lawsuits assert primarily that the problem is that consumers are being denied the opportunity to choose to use a "lower cost network" at the point of the ATM transaction, that the ATM operators are being denied the opportunity to pass along the savings that would thereby be achieved, and therefore, banks and independent operators get away with charging too much. So initially, it seemed that this case was about a lack of competition in a market where banks and independent ATM operators compete for individual customers' ATM transactions at individual ATM machines. *See, e.g.*, *Stoumbos* Compl. ¶ 41 ("[T]he ATM restraints suppress competition with rival networks *at the point of the transaction*, where ATM operators interact directly with consumers.") (emphasis added). But the ground shifted at oral argument, when plaintiffs acknowledged that by "lower cost networks," they meant networks that pay the ATM operators more; that it is the ATM operators, and not the consumers, who select which network to utilize for a given transaction, Tr. at 54–58; and that the ATM operators *already automatically* route transactions over the "lower cost" networks. *Id.* So they posited a different theory instead: that ATM operators prefer to use the alternative networks that pay them the higher fees; that they can only select those networks for transactions involving PIN cards branded with the alternative service marks; that if they could, the ATM operators would discount the access fees for customers utilizing those PIN cards to increase the volume of those transactions at their ATMs; and that therefore, if the restrictions at issue here were struck

down, consumers would start to demand that their banks issue cards branded with the alternative marks, and there would be more competition among networks at *that* point in the chain. Tr. at 76, 82, 97.

Whether that theory holds water or not, it is not alleged in the complaints. A court can only assess the sufficiency of what is on the face of the complaints and not allegations that have been amplified or supplemented or brought in to pinch hit at oral argument. In the end, notwithstanding plaintiffs' adamant insistence that consumers are being overcharged, the Court simply could not find facts to support that contention in the complaints. [16]

---

16 The case will be dismissed on the grounds that plaintiffs have failed to satisfy the first prong of the antitrust injury: injury in fact. But defendants have also challenged the sufficiency of the second prong: whether the complaint sets out the necessary injury to competition. They point out that the Visa and MasterCard requirements do not fix prices for ATM services since they do not require operators to charge a specific amount in access fees to consumers. Visa/MC Mot. at 18. They also do not bar ATM operators in any way from discounting the ATM access fees they charge to consumers across the board in order to compete with other operators and attract more customers to their terminals. *Id*. Further, defendants assert that the access fees requirements are actually procompetitive, and not anticompetitive. *Id.* at 14–17; Banks' Mot. at 9–13. The bank defendants note that by virtue of these provisions, consumers using the Visa or MasterCard networks get the benefit of the lowest access fee an ATM operator is willing to charge. Banks' Mot. at 19–20. Thus, the banks argue, the access fee requirements benefit the vast majority of consumers, since most PIN cards use the Visa or MasterCard networks. *See Dial A Car*, 884 F. Supp. at 591 (dismissing antitrust claim, in part, because defendants' conduct resulted in lower prices in the market). Defendants also argue that the contract provisions are akin to most favored nation clauses, which are not *per se* anticompetitive. Visa/MC Mot. at 14–19; Banks' Mot. at 9–13. The Court is skeptical about this analogy since those clauses are designed to ensure that buyers pay the lowest price available. *See, e.g.*, *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 926 (1st Cir. 1984) (finding Blue Shield to be *like* a buyer because it pays the bill and seeks to set the amount of the charge). Visa and MasterCard are not analogous to buyers in this situation. Defendants also stress that plaintiffs have not alleged that consumers can even choose at the ATM which payment network will process their transactions. Visa/MC Mot. at 18; Banks' Mot. at 21. Because of this, any benefit ATM owners might theoretically provide to consumers without the access fee rules cannot be passed on to consumers – there is no competition at the point of transaction, so there cannot be injury to competition. *Id.*

Given the failure of the pleadings on injury in fact, which is necessary for Article III purposes as well as under the Clayton Act, *see Dominguez*, 666 F.3d at 1362, and the flaws in the conspiracy allegations, the court need not reach these questions. Thus, the order dismissing the cases should not be viewed as a finding by this court that the restrictions are procompetitive or that they are merely most favored nation provisions.

## III. The Complaints Do Not Allege an Agreement or Conspiracy

Plaintiffs in all three cases allege a horizontal conspiracy to restrain trade.[17] *NAC* Compl. ¶¶ 31, 43; *Mackmin* Compl. ¶¶ 45–46; *Stoumbos* Compl. ¶¶ 21, 34.[18] Plaintiffs allege that before March 18, 2008, and May 24, 2006, when Visa and MasterCard respectively made initial public offerings to become public companies, they were associations owned and operated by a majority of the retail banks in the United States. *NAC* Compl. ¶ 30; *Mackmin* Compl. ¶ 44; *Stoumbos* Compl. ¶ 20. Visa and MasterCard are no longer associations, but plaintiffs allege that "banks continue to hold non-equity membership interests" in their subsidiaries and "the largest among them also hold equity interests and seats on [their] boards of directors." *NAC* Compl. ¶ 30; *Mackmin* Compl. ¶ 44; *Stoumbos* Compl. ¶ 21. The *Mackmin* complaint also contains general allegations that the named bank defendants have been involved with Visa and MasterCard's governance: Bank of America "currently and/or has been" represented on the Visa board of directors. *Mackmin* Compl. ¶ 32. Chase used to have representation on the MasterCard and Visa boards of directors before each association's IPOs. *Id.* ¶ 37. Its representation on the MasterCard board ended in 2003, and its representation on the Visa board ended in 2006. *Id.* Wells Fargo was represented on the companies' boards "[d]uring parts of the relevant time period." *Id.* ¶ 42. *Mackmin* plaintiffs conclude that all of the bank defendants belong to both networks and have periodically served on the board of directors of each network. *Id.* ¶ 43. According to all the plaintiffs, the network defendants still refer to their bank customers as

---

17 Horizontal agreements are agreements among competitors, and vertical agreements are those among firms at different levels of distribution. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). Horizontal price fixing agreements are *per se* illegal under the Sherman Act. *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 607–08 (1972).

18 Because the factual allegations regarding agreement and conspiracy in the three complaints are substantially similar, the Court addresses the complaints together.

"members" and "operate principally for the benefit of their member banks." *NAC* Compl. ¶ 30; *Mackmin* Compl. ¶ 45; *Stoumbos* Compl. ¶ 21.

Plaintiffs allege that the challenged access fee rules originated in the rules and regulations agreed to by the banks before Visa and MasterCard became public corporations and that these rules create a horizontal conspiracy. *Mackmin* Compl. ¶ 45 ("These restraints originated in the rules of the former bankcard associations agreed to by the banks themselves. By perpetuating this arrangement, the banks collectively have ceded power and authority to the Network Defendants to design, implement, and enforce a horizontal price-fixing restraint . . . ."); *Stoumbos* Compl. ¶ 21 ("The unreasonable restraints of trade in this case are horizontal agreements among Visa, MasterCard and their member banks to adopt, adhere to, and enforce rules . . . that require ATMs to grant most-favored-nation ('MFN') treatment with respect to the ATM Access Fees charged for Visa and MasterCard network transactions."); *NAC* Compl. ¶ 31 ("The unreasonable restraints of trade in this case include horizontal agreements among the issuers of Visa and MasterCard products to adhere to rules and operating regulations that require ATM access fees to be fixed at a certain level."). Plaintiffs' claims of an agreement or conspiracy, thus, rest on the allegation that before Visa and MasterCard became publicly held corporations, their member banks created the associations' rules and regulations containing the access fee rules that remain in place today. None of the complaints allege that the banks agreed among themselves to do anything. Rather, the claim of a horizontal conspiracy arises from the prior existence of the bankcard associations.

Given this, the question before the Court is whether allegations that the access fee rules originated when Visa and MasterCard were managed and operated by their member banks and that today, some banks have or have had in the past some undefined amount of equity and/or

number of board seats on the Visa or MasterCard boards of directors is enough to allege a current agreement or conspiracy to restrain trade under the Sherman Act. In other words, is the allegation that the access fee rules originated with the bankcard associations and that the rules still exist enough to allege a current agreement among banks to restrain trade?

Visa and MasterCard argue that plaintiffs cannot assert a conspiracy simply based on the allegation that banks are members of Visa or MasterCard and follow the networks' rules. Visa/MC Mot. at 9–11. They further argue that the fact that bank employees have, at times, served on the boards of Visa or MasterCard or that banks have held unspecified equity interests in Visa or MasterCard does not establish a conspiracy to restrain trade. *Id.* at 11–12. Finally, they argue plaintiffs allege no basis for conspiracy under *American Needle.* *Id.* at 12–14. Similarly, the bank defendants assert that plaintiffs have not pled facts to support an inference of a horizontal agreement because they do not allege that the bank defendants agreed among themselves to adhere to the networks' access fee rules. Banks' Mot. at 13.

Plaintiffs' allegations that banks used to belong to the bankcard associations does not provide factual support for the conclusion that banks are engaged in a horizontal conspiracy to restrain trade. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (holding that belonging to an association or being on a board of directors of a network does not establish a horizontal agreement).[19] As in the cases before the Court, the complaint in *Kendall* depended upon allegations describing the Visa and MasterCard bankcard associations, or consortiums, as they were called in *Kendall*. *Id.* at 1045. There, plaintiffs alleged that banks participated in the management of and had proprietary interests in the consortiums, that they charged plaintiffs an interchange rate fixed by the consortiums, and that they adopted the fees set by the consortiums.

---

19 Contrary to argument from NAC counsel that this case was dismissed for a failure of proof, Tr. at 89, the court there granted a motion to dismiss. *Kendall,* 518 F.3d at 1045.

*Id.* at 1048. Based on these allegations, plaintiffs there claimed the banks engaged in a conspiracy to restrain trade. The Ninth Circuit disagreed and ruled that plaintiffs did not allege sufficient facts to support their theory, holding that allegations about the existence of the association alone are not enough to establish an agreement. "[M]embership in an association does not render an association's members automatically liable for antitrust violations committed by the association. Even participation on the association's board of directors is not enough by itself." *Id.* (citation omitted).

Plaintiffs here argue that they have alleged much more than what was asserted in *Kendall*, Tr. at 127, but they have not. Indeed, they allege less. In *Kendall*, the bankcard associations were still in existence and the banks still belonged to the associations. *See Kendall*, 518 F.3d at 1048. Here, plaintiffs can only allege that banks *previously* belonged to the associations, and membership in an association – much less membership in a defunct association – is not enough to establish agreement or conspiracy.

Plaintiffs' allegations that banks today have some equity interest in and hold some seats on the boards of Visa and MasterCard also do not provide factual support for the conclusion that banks are engaged in a horizontal conspiracy to restrain trade. Vague allegations that banks "hold non-equity membership interests" in Visa and MasterCard subsidiaries and "the largest among them also hold equity interests and seats on [their] boards of directors" does not show that banks control Visa and MasterCard. Even the *Mackmin* complaint, which attempts to set forth allegations about the continuing role of the named defendant banks in Visa and MasterCard, can only muster generalized claims. *See Mackmin* Compl. ¶¶ 32, 37, 42 (stating that Bank of America "currently and/or has been" represented on the Visa board of directors, Chase had representation on the MasterCard and Visa boards before their IPOs, and Wells Fargo was

represented on the companies' boards "[d]uring parts of the relevant time period"). These general allegations are not enough to support the theory that banks control Visa and MasterCard today such that the card companies are simply a vehicle by which the banks exercise a horizontal agreement. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2008 WL 5082872, at *10 (E.D.N.Y. Nov. 25, 2008) (granting motion to dismiss in part because plaintiffs failed to allege facts demonstrating that banks continued to control MasterCard after its IPO). And the allegation that these publicly held companies are operating for the benefit of the banks instead of their shareholders is if no assistance: that allegation is conclusory, with no facts alleged to support this claim. Thus, there are no factual allegations that allow the Court to conclude that any control that banks may have once exercised over Visa and MasterCard when they were associations continues today.

Furthermore, the complaints allege no facts to suggest the existence of either an actual or a tacit agreement among banks to restrain trade by individually agreeing to the Visa and MasterCard agreements. At most, plaintiffs allege that ATM operators – both banks and independent operators – make independent business decisions whether to participate in the Visa and MasterCard networks. A statement of parallel conduct alone, without factual allegations to plausibly suggest an illegal agreement, is not enough. *Twombly*, 550 U.S. at 567–70 (dismissing antitrust complaint because allegations of parallel conduct without more did not plausibly suggest an unlawful agreement).

Plaintiffs attempt to compare their cases to *Starr v. Sony BMG Music Entertainment,* 592 F.3d 314 (2d Cir. 2010). *Starr* involved a claim that sellers of digital music had conspired to fix the price of digital music. *Id.* at 317. The court denied a motion to dismiss on the basis that plaintiffs' allegations of parallel conduct were sufficient to state a Section 1 Sherman Act claim.

*Id.* The court reached that conclusion, in part, because the *Starr* complaint included *factual* allegations that suggested a preceding agreement among defendants, which could not be explained absent an unlawful agreement. *Id.* at 323. First, plaintiffs alleged that defendants controlled more than 80% of the digital music sales in the U.S. market. *Id.* Second, they alleged facts indicating that two companies that defendants created to distribute digital music, MusicNet and pressplay, would have been unprofitable absent an unlawful agreement. *Id.* at 324. Third, they pointed to statements by one defendant's CEO that supported the existence of an unlawful agreement. *Id.* (referencing a quote from the CEO of a defendant company, who suggested that "pressplay was formed expressly as an effort to stop the 'continuing devaluation of music'"). The *Starr* court concluded that these facts taken together suggested a preceding agreement and not merely parallel conduct that could just as well have been independent action. *Id.* at 323.

Plaintiffs also cite *Interstate Circuit v. United States*, 306 U.S. 208 (1939), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), for the proposition that the existence of a horizontal conspiracy can be inferred from the series of similar vertical arrangements between Visa or MasterCard and different banks – a so-called "hub and spoke" conspiracy. Tr. at 126. *Interstate Circuit* involved a conspiracy among distributors and exhibitors of movies, and *Toys "R" Us* involved a conspiracy between toy retailer Toys "R" Us and toy manufacturers. In *Interstate Circuit*, the court found evidence of a horizontal conspiracy when movie exhibitor Interstate, which had a monopoly on first run movies in Texas, sent an identical letter to eight movie distributors naming all eight distributors as addressees, asking them to agree to a minimum price for first-run theaters and a policy against double features at night. *Interstate Circuit*, 306 U.S. at 215–217. The trial court drew an inference of agreement from the nature of the proposals, the manner in which they were made, the substantial unanimity of action taken,

and the lack of evidence of a benign motive. *Id.* at 221. The Supreme Court affirmed. *Id.* The Court viewed as important the fact that the new distribution policies represented a radical shift from the industry's prior business practices and rejected arguments that such unanimity of action was explainable by chance. *Id*. at 222.

*Toys "R" Us* involved a series of vertical agreements between the toy retailer and toy manufacturers to restrict distribution of products to lower priced warehouse club stores. *Toys "R" Us*, 221 F.3d at 931–32. The Seventh Circuit upheld the Federal Trade Commission's finding of a horizontal conspiracy based on the series of vertical agreements in which toy manufacturers boycotted sales to warehouse stores. *Id.* at 935. In doing so, the FTC – which the Seventh Circuit affirmed – emphasized that the boycott was against the manufacturers' own interest and depended on all the manufacturers participating. *Id.* at 932.

It is true that an agreement can be shown by either direct or circumstantial evidence. *Id.* at 934. But when the agreement is purely circumstantial, there must be some evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Id.* What facts are alleged in the complaints before this Court that *exclude* that possibility? Why would it not be in each bank's independent self-interest to adopt the rules proffered by Visa or MasterCard to be able to handle the vast majority of ATM transactions? Even if Visa or MasterCard were pressuring them to do something that is ultimately anticompetitive and not in the consumers' interest, what alleged facts suggest that any individual bank would only want to do it as long as other banks did it? These complaints do not have the additional facts that were important in both *Interstate* and *Toys "R" Us*: the restraints here are not a sudden break from past practice that would be inexplicable without the agreement, as in *Interstate*, and they are not contrary to the

banks' own interests or dependent on all banks participating, like the sales boycott executed by manufacturers in *Toys "R" Us*.

Finally, plaintiffs' allegations that the banks ceded control and authority to the networks does not establish a conspiracy under *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 560 US __, 176 L. Ed. 2d 947 (2010). That case involved the question of whether the defendant, the National Football League Properties ("NFLP"), was a single entity or whether it was a group of individual entities acting in concert. This is important because Section 1 of the Sherman Act requires an allegation of concerted action that restrains trade. 15 U.S.C. § 1. Section 2 of the Sherman Act covers independent action and concerted action, but it requires a showing of monopolization, not just a restraint of trade. 15 U.S.C. § 2.[20] The *American Needle* court had "only a narrow issue to decide: whether the NFL respondents are *capable* of engaging in a 'contract, combination . . . , or conspiracy.'" *American Needle*, 130 S. Ct. at 2208 (emphasis added). In other words, was there an agreement? Was the unincorporated association of football teams just one entity, or was it appropriate for the court to consider them to be more than one entity capable of combining and violating Section 1?

In providing some background for the issue it had to decide, the Supreme Court explained why Section 1 of the Sherman Act has a lower threshold for liability than Section 2. The Court stated that concerted action is more fraught with anticompetitive risk than independent action, and therefore, concerted action is treated more strictly under the Sherman Act than independent action – *because* it deprives the marketplace of the independent centers of decision making that are fundamental to competition. *Id.* at 2209. But the Court did not hold that anytime there is a diminution in independent decision making, that automatically means an

---

20 Plaintiffs in all three cases before the Court allege violations of only Section 1 of the Sherman Act.

antitrust conspiracy exists. And it did not purport to, nor did it, articulate any substitute for the requirement of an agreement or combination. In deciding the question before it, the Supreme Court simply recognized that the legal structure of the venture was not determinative, and that the key issue on the question of whether the defendant was a single or collective entity was whether the organization joined together independent centers of decision making. Thus, *American Needle* did not create a new test for the sufficiency of conspiracy allegations.

Here, there is no question that Visa, MasterCard, and the banks are separate entities. Visa and MasterCard are each public corporations, and the bankcard associations, which were once controlled by the banks, no longer exist. Further, there is no allegation that the independent banks are currently joined together in a collective entity for decision-making purposes. Thus, *American Needle* is inapposite and of limited assistance in these cases.

In sum, the plaintiffs fail to allege sufficient factual allegations to support a claim that defendants have entered into an agreement or conspiracy to restrain trade.

**CONCLUSION**

For the reasons explained above, the Court finds that the complaints do not allege injury in fact or the existence of an agreement or conspiracy and therefore, it will grant defendants' motions to dismiss without prejudice. The Court has not concluded that plaintiffs could never make factual allegations to support their claims; it simply rules that plaintiffs have not done so here. Given that the federal claims are insufficient, the Court declines to consider plaintiffs' state law claims.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: February 13, 2013

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ATM COUNCIL, INC., *et al.*,<br><br>Plaintiffs,<br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | CA No. 1:11-cv-01803 (ABJ) |
| ANDREW MACKMIN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | CA No. 1:11-cv-01831 (ABJ) |
| MARY STOUMBOS,<br><br>Plaintiff,<br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | CA No. 1:11-cv-01882 (ABJ) |

**ORDER**

Pursuant to Federal Rule of Civil Procedure 58, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby **ORDERED** that plaintiffs' motions for leave to file second amended complaints, *National ATM Council, Inc. v. Visa, Inc.* [Dkt. # 39], *Mackmin v. Visa, Inc.* [Dkt. # 65], and *Stoumbos v. Visa, Inc.* [Dkt. # 32] are **DENIED**, and that

plaintiffs' motions to alter the Court's February 13, 2013 judgment, *National ATM Council, Inc. v. Visa, Inc.* [Dkt. # 36], *Mackmin v. Visa, Inc.* [Dkt. # 59], *Stoumbos v. Visa, Inc.* [Dkt. # 29], are **DENIED** as moot. This is a final, appealable order.

AMY BERMAN JACKSON
United States District Judge

DATE: December 19, 2013

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL ATM COUNCIL, INC., *et al.*,<br><br>Plaintifs,<br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | ) | CA No. 1:11-cv-01803 (ABJ) |
| ANDREW MACKMIN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | ) | CA No. 1:11-cv-01831 (ABJ) |
| MARY STOUMBOS,<br><br>Plaintiff,<br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | ) | CA No. 1:11-cv-01882 (ABJ) |

**MEMORANDUM OPINION**

Before the Court are motions to amend the complaints in three separate antitrust lawsuits. Plaintiffs in all three cases allege that certain pricing requirements that defendants Visa and MasterCard impose on operators of automatic teller machines ("ATMs") violate section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq*. (2012). On February 13, 2013, the Court dismissed

the lawsuits without prejudice for failing to plead sufficient facts to allege either injury in fact or the existence of an agreement or conspiracy. *Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73 (D.D.C. 2013). Shortly after, plaintiffs filed motions to alter or amend the Court's judgment under Federal Rule of Civil Procedure 59(e), asking the Court to amend the judgment to dismiss the complaints, but not the cases, so plaintiffs could then move to amend their complaints.[1] While these motions were pending, plaintiffs filed motions for leave to amend their complaints under Federal Rule of Civil Procedure 15(a).[2]

Plaintiffs attempt to remedy the pleading deficiencies in their first amended complaints by setting forth new factual allegations in their proposed second amended complaints. The allegations of injury in the new complaints are still highly conclusory, and since they depend upon a series of intervening actions by parties not before the Court, they fail to state a redressable injury in fact. And even if the consumer plaintiffs have overcome the standing

---

1 *See* Pls.' Mot. to Alter or Amend the Ct.'s Feb. 13 Order Pursuant to Fed. R. Civ. P. 59(e), *NAC* [Dkt. # 36], *Mackimin* [Dkt. # 59], *Stoumbos* [Dkt. # 29]. Visa, MasterCard, and the bank defendants filed a single joint memorandum in opposition to plaintiffs' motions to alter or amend. *See* Mem. P. & A. in Opp. to Pls.' Mot. to Alter or Amend this Ct.'s Feb. 13 Order Pursuant to Fed. R. Civ. P. 59(e), *NAC* [Dkt. # 37], *Mackmin* [Dkt. # 60], *Stoumbos* [Dkt. # 30].

2 *See* Mot. of Pls. National ATM Council Inc. for Leave to File 2d Am. Class Action Compl. [Dkt. # 39] ("NAC Mot. to Amend"); Mot. of Mackmin Pls. for Leave to File 2d Am. Class Action Compl. [Dkt. # 65] ("Mackmin Mot. to Amend"); and Pl.'s Mot. for Leave to File 2d Am. Compl. [Dkt. # 32] ("Stoumbos Mot. to Amend").

Visa and MasterCard filed a single joint opposition to the motions to amend. *See* Visa and MasterCard Defs.' Mem. P. & A. in Opp. to Pls.' Mot.s for Leave to Amend, *NAC* [Dkt. # 42], *Mackimin* [Dkt. # 69], *Stoumbos* [Dkt. # 34] (collectively, "Visa/MC Opp.") The bank defendants filed a joint memorandum in opposition for leave to amend in *Mackimin*. *See* Bank Defs.' Mem. in Opp. to Pls.' Mot. for Leave to File 2d Am. Class Action Compl. [Dkt. # 68] ("Banks' Opp.").

Each set of plaintiffs filed separate reply briefs. *See* Reply Mem. of P. & A. of Pl. ATM Operators to Bankcard Ass'n Defs.' Opp. to Pls.' Mot. for Leave to Amend [Dkt. # 44] ("NAC Reply"); Pls.' Reply Mem. in Further Supp. of Their Mot. for Leave to File an Am. Compl. [Dkt. # 70] ("Mackmin Reply"); Pls.' Reply in Further Supp. of Mot. for Leave to Amend [Dkt. # 35] ("Stoumbos Reply").

hurdle, they have yet to allege facts to support the conspiracy allegations. Accordingly, the Court will deny the motions to amend because the amendments in all three cases would be futile. The Court will also deny the motions to alter the judgment as moot.

**BACKGROUND**

All three proposed second amended complaints set forth additional allegations about ATM transactions, including additional facts about the role of the entities involved in these transactions and the fees they pay, and they add detail to support plaintiffs' theory of injury.

As the new complaints recount, consumers use personal identification number ("PIN") cards issued by their banks to access ATMs at locations other than a bank branch. When a consumer uses an ATM, the transaction request is transmitted electronically from the ATM to the bank that acquires the transaction, called the "acquiring bank." 2d Am. Class Action Compl., Ex. A to NAC Mot. to Amend [Dkt. # 39-2] ("NAC Proposed Compl.") ¶¶ 40, 45; 2d Am. Class Action Compl., Ex. A to Mackmin Mot. to Amend ("Mackmin Proposed Compl.") [Dkt. # 65-2] ¶ 58. The acquiring bank then sends the request electronically to the "issuing bank," which is the bank that issued the ATM card to the consumer and maintains the account from which the consumer seeks to withdraw money. NAC Proposed Compl. ¶ 45; *see* Mackmin Proposed Compl. ¶ 61. If the issuing bank confirms that the consumer has sufficient funds for the withdrawal, it sends an authorization back to the ATM operator, and the ATM dispenses the cash to the consumer. NAC Proposed Compl. ¶ 54.

ATM networks, such as Visa, MasterCard, Star, NYCE, Star, Pulse, or others, provide the infrastructure through which the data in an ATM transaction is transmitted electronically

from the ATM to the acquiring bank, to the issuing bank, and back.[3] Some ATMs are bank-owned, while others are owned and operated by independent entities. *Id.* ¶ 54; Mackmin Proposed Compl. ¶ 69; 2d Am. Class Action Compl., Attach. A to Stoumbos Mot. to Amend [Dkt. # 32-3] ("Stoumbos Proposed Compl.") ¶ 5. In order to transmit a transaction through an ATM network, the ATM operator must have a contract with that network. Banks that issue Visa- or MasterCard-branded PIN cards are automatically granted access to the Visa or MasterCard networks. Non-bank, independent operators obtain access to Visa, MasterCard, and other ATM networks by affiliating with a sponsoring financial institution, which acts as the acquiring bank for the independent operator. NAC Proposed Compl. ¶ 48; Mackmin Proposed Compl. ¶ 69; Stoumbos Proposed Compl. ¶¶ 55, 76. Sponsoring financial institutions ensure that the independent operator is properly registered with a network provider and follows the network's agreements. NAC Proposed Compl. ¶ 48; Mackmin Proposed Compl. ¶ 69; Stoumbos Proposed Compl. ¶¶ 76–77.

The designation of which network is used to process an ATM transaction depends not only on the networks the ATM can access, but also on the network or networks the consumer's PIN card is authorized to use, which are ordinarily identified by network logos, or "bugs," on the reverse side of the card. NAC Proposed Compl. ¶ 52; Mackmin Proposed Compl. ¶¶ 58–59; *see* Stoumbos Proposed Compl. ¶ 69. So, for example, if a consumer's PIN card carries only the Visa bug, an ATM transaction can only be sent through the Visa network, but if it carries

3 It is not clear from the complaints whether a network, such as Visa, MasterCard, or NYCE, is used to transmit a transaction between an ATM and an acquiring bank when the acquiring bank owns the ATM. *See* NAC Proposed Compl. ¶ 46. For example, if a consumer uses a Bank of America PIN card at an ATM owned and operated by Wells Fargo, it is not clear if the transmission between Wells Fargo's ATM and Wells Fargo as the acquiring bank occurs through a network or through an internal Wells Fargo system.

multiple bugs, such as Visa, STAR, NYCE, and Pulse, the transaction can be sent through any of those networks that the ATM can access.

When a customer uses an ATM that is not owned by his bank – whether it is owned by another bank or by an independent operator – the transaction is called a "foreign ATM transaction."[4] NAC Proposed Compl. ¶ 46; Mackmin Proposed Compl. ¶ 60; *see* Stoumbos Proposed Compl. at 20 n.2. The consumer in this type of transaction may be subject to two fees: (1) foreign ATM fees and (2) surcharge or access fees. NAC Proposed Compl. ¶¶ 53, 55, 57, 60; Mackmin Proposed Compl. ¶ 63; Stoumbos Proposed Compl. ¶¶ 61, 72. The foreign ATM fee is a fee the consumer's own bank may charge its customer for using another entity's ATM. NAC Proposed Compl. ¶ 55; Mackmin Proposed Compl. ¶ 63; Stoumbos Proposed Compl. at 20 n.2. These fees are not at issue in these cases.

The access fee is the fee a consumer pays to the ATM operator for using its ATM. NAC Proposed Compl. ¶ 53; Mackmin Proposed Compl. ¶ 63; Stoumbos Proposed Compl. ¶ 61. The consumer has the option of accepting or declining the fee at the point of the transaction: if the consumer accepts the fee, the transaction proceeds, and if not, the consumer's card is returned and the transaction ends. NAC Proposed Compl. ¶ 53. These are the fees at issue in these cases – or, more specifically, rules imposed by Visa and MasterCard on ATM operators governing these fees are at issue in these cases.

Visa and MasterCard each require ATM operators to agree that they will not charge consumers higher access fees for transactions processed over the Visa and MasterCard networks than for transactions processed over other networks. NAC Proposed Compl. ¶¶ 63–71; Mackmin

---

4 When a customer uses an ATM operated by his own bank, the acquiring bank and issuing bank are the same. These transactions are called "on us" transactions, NAC Proposed Compl. ¶ 46, and are not at issue in these cases.

Proposed Compl. ¶¶ 77–78; Stoumbos Proposed Compl. ¶¶ 78–79. These access fee rules prevent ATM operators from offering consumers differentiated access fees based on the networks used for the transactions.

To understand plaintiffs' claims that the rules harm competition, it is necessary to delve more deeply into the financial relationships underlying an ATM transaction. In the complaints that were dismissed, plaintiffs' allegations centered around the claim that consumers were harmed by the rules because they prevented ATM operators from passing to consumers the savings obtained through the use of "low cost" networks. But as the Court's opinion explains, plaintiffs failed to allege facts to support this conclusion since they did not allege that other networks cost less to use than the Visa and MasterCard networks. *See Nat'l ATM Council*, 922 F. Supp. 2d 73. Indeed, at oral argument, it was revealed that it is the networks that pay the ATM operators, and not the other way around. So the new complaints advance a more nuanced theory based upon these financial realities, and they explain that what plaintiffs previously meant by "low cost" networks are the alternative networks that enable the ATM operators to realize higher returns.

Independent operators can earn revenue on an ATM transaction from two sources: through the consumer-paid access fees described above, and through "interchange" fees paid to the networks by the banks and then shared with the operators by the networks. NAC Proposed Compl. ¶ 60; Mackmin Proposed Compl. ¶¶ 63, 66, 91; Stoumbos Proposed Compl. ¶¶ 71–72.

Networks charge interchange to the consumer's issuing bank. NAC Proposed Compl. ¶¶ 58, 60. As the association of ATM operators explains:

> The interchange fee originally served to compensate foreign banks for granting an issuing bank's customer access to the foreign bank's ATM services. After the advent of nonbank ATM operators, however, interchange became an important source of income for ISOs [Independent Sales Organizations] and allows ISOs [to] keep access fees low while still making a profit. Each ATM network sets its own ATM interchange rate to issuing banks, ranging from zero to as much as $0.60 per transaction.

*Id.* ¶ 56. According to the ATM operator plaintiffs, ATM operators are not paid interchange directly. *Id.* ¶ 55. Rather, networks determine the amount of interchange they will charge to the issuing bank, and then the networks pass some portion of the interchange from the issuing bank to the ATM operator.[5] *Id.* ¶ 58.

The amount of the interchange received by the ATM operator can be affected by another fee: the network service fee, which is called the "acquiring fee" when the ATM operator pays it to the network, and referred to as the "switch fee" when the issuing bank pays it to the network. *See id.* ¶¶ 57–58; Mackmin Proposed Compl. ¶¶ 63–64. Some networks, including Visa and MasterCard, deduct a portion of the interchange fee paid by the issuing bank before it is passed to the ATM operator, and the share they keep is called the network service fee. *See* NAC Proposed Compl. ¶ 58; Stoumbos Proposed Compl. ¶ 14; *see also* Mackmin Proposed Compl. ¶¶ 91, 93. Other networks do not deduct anything from the interchange fee, so the full amount of interchange goes to the ATM operator.

The amount of interchange the ATM operator receives from the issuing bank after any deduction for the network service fee is called "net interchange." NAC Proposed Compl. ¶ 58; Stoumbos Proposed Compl. ¶ 71. The net interchange received from the banks and the access

5 It is unclear from the complaints why the networks determine the level of interchange the issuing bank must pay if the purpose of interchange is to compensate ATM operators for granting an issuing bank's customer access to their ATMs.

fee paid by the consumer are the two components of an ATM operator's revenue on an ATM transaction.

Visa and MasterCard charge the highest network service fees of all the networks. So the amount of net interchange, and thus the overall revenue that ATM operators receive for transactions processed on the Visa and MasterCard networks, is lower than what they receive for transactions processed on other networks. NAC Proposed Compl. ¶ 59; Mackmin Proposed Compl. ¶ 93; *see also* Stoumbos Proposed Compl. ¶ 45. In other words, it is more profitable for ATM operators to use the alternative networks, which plaintiffs refer to as "less costly" in their complaints. International transactions through the Visa and MasterCard networks can bear a negative interchange, leaving ATM operators to subsidize these transactions with interchange from other transactions. NAC Proposed Compl. ¶ 59; Mackmin Proposed Compl. ¶ 92.

Under the terms of the challenged rules, ATM operators may not charge consumers access fees for Visa or MasterCard transactions that are higher than the access fees charged for transactions using other networks. Plaintiffs allege that this means the operators cannot "steer" consumers to use the "less costly" networks that take a smaller bite out of the interchange and leave the operator with higher revenue. Plaintiffs contend that the access fee rules result in inflated access fees for consumers because ATM operators must set the fees to cover the costs – or reduced revenue – of transactions on the Visa and MasterCard networks. They also complain that the rules prevent ATM operators from offering lower fees to consumers who use networks with lower network fees and higher net interchange. They claim that the rules reduce competition in the network services market because the rules prevent consumers from being able to discern a price difference among network providers and demand a lower price for ATM services.

## STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 15(a)(2), the Court should "freely give leave [to amend] when justice so requires." But the decision to grant leave to file an amended complaint is not automatic. The Court may assess the proposed new pleading to determine whether the amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 181–82 (1962). And a court does not abuse its discretion if it denies leave to amend or supplement based on futility. *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (agreeing with the district court that an amendment was futile when the facts alleged in the complaint "establish[ed] beyond doubt that the Government did not violate [plaintiff's] due process rights"); *Ruffalo v. Oppenheimer & Co.*, 987 F.2d 129, 132 (2d Cir. 1993) (holding that leave to amend was properly denied on futility grounds since new pleading failed to allege any additional significant facts); *Ross v. DynCorp*, 362 F. Supp. 2d 344, 364 n.11 (D.D.C. 2005) ("While a court is instructed by the Federal Rules of Civil Procedure to grant leave to amend a complaint 'freely,' it need not do so where the only result would be to waste time and judicial resources. Such is the case where the Court determines, in advance, that the claim that a plaintiff plans to add to his or her complaint must fail, as a matter of law . . . ."); *M.K. v. Tenet*, 216 F.R.D. 133, 137 (D.D.C. 2002) ("A court may deny a motion to amend the complaint as futile when the proposed complaint would not survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss."); *see also* 3 Moore's Federal Practice § 15.15[3] (Matthew Bender 3d ed.) ("An amendment is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss.").

## ANALYSIS

### I. THE PROPOSED AMENDED COMPLAINTS DO NOT ALLEGE AN INJURY IN FACT OR INJURY THAT IS REDRESSABLE BY THE COURTS

As the Court previously held, every plaintiff in federal court bears the burden of establishing the three elements that make up Article III standing: injury in fact, causation, and redressability. *Nat'l ATM Council*¸ 922 F. Supp. 2d at 80 n.9, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Court dismissed plaintiffs' first amended complaints, in part, for failing to allege injury in fact, because they did not allege facts to support a claim of injury that was concrete and particularized and actual or imminent, rather than speculative or generalized. *Id.* Plaintiffs attempt to remedy this deficiency by providing additional facts about how the access fee rules affect their businesses and pocketbooks. Although the new complaints do more clearly elucidate both the financial relationships at issue and plaintiffs' theory of the case, the claims are still too conclusory and too dependent on a number of intervening actions by a series of third parties to state an injury in fact. The Court also finds that the details set out in the new complaints indicate that plaintiffs' alleged harms would not be redressable, even if the Court were to provide them the relief they seek.

#### A. The NAC Proposed Amended Complaint

Plaintiffs in the *NAC* case are an association of independent ATM operators and thirteen individual independent ATM operators. NAC Proposed Compl. ¶ 6. The Court held that the NAC first amended complaint failed to allege the necessary injury in fact because it did not set forth "facts that could support an inference that the access fee requirements injure the *plaintiffs* – the ATM operators." *Nat'l ATM Council, Inc.*, 922 F. Supp. 2d at 88. In their revised complaint, NAC plaintiffs have now made it clear that their real concerns are based upon the network service fees that Visa and MasterCard deduct from the interchange – not the access fees or the

access fee rules. This is one reason why their challenge to the access fee rules under the antitrust laws ultimately fails.

ATM operators have no control over the interchange that networks charge to issuing banks or the amount of service fees the networks deduct from the interchange as a charge to the ATM operators. NAC Proposed Compl. ¶ 58. Rather, they must take what they get as net interchange. Visa and MasterCard take a higher deduction, and in the case of international transactions over Visa and MasterCard networks, the net interchange can be a negative amount. *Id.* ¶ 59. The Visa and MasterCard access rules at issue here prohibit the ATM operators from charging more to customers who use those networks, so ATM operators must set one access fee for each ATM terminal, "which serves as its retail price for all ATM transactions at that terminal." *Id.* ¶ 79. The upshot of this arrangement, then, is that independent ATM operators reap lower profits on Visa and MasterCard transactions, and they must partially subsidize Visa and MasterCard international transactions with interchange revenue from other networks. *Id.* But for the access rules, NAC plaintiffs assert, ATM operators would be able to make up for the revenue shortfall by charging higher access fees for transactions using the Visa and MasterCard networks, charging less for transactions over other networks, and steering consumers to use other networks that generate more revenue for them. *Id.* ¶ 82. This, they assert, would lead to more competition in the network services market. *Id.* ¶ 83.

Assuming that all of these facts are true, the NAC second amended complaint still does not show that the ATM access rules injure the ATM operators. First of all, ATM operators already route transactions through whatever network is available that pays them the highest net interchange. As the operators themselves state: "When an ATM has access to multiple networks that match the bug(s) on the customer's card, the ATM operator's processor can choose which

network over which to route the transaction and customarily routes the transaction through the 'least costly' network, that is, the network that deducts the lowest network services fee and remits the greatest net interchange." *Id.* ¶ 41. So even if consumers lack a choice at the point of the transaction, the operators have the means already in place to maximize their profits.

Second, the second amended complaint makes plain that what really bothers the ATM operators is the service fee – the fact that Visa and MasterCard deduct a higher portion of the interchange than other networks do, leaving the operators to make less money on Visa and MasterCard transactions. As paragraph 82 of their complaint indicates, what it appears that they would like to do, then, is *raise* the access fee they charge to Visa and MasterCard customers, not lower the fees charged for other networks: "But for the ATM Restraints, ATM ISOs would charge different access fees depending on the level of network services fees deducted by the different networks and the cost of carrying those networks international transactions." *Id*. ¶82. So this does not suggest that the operators are the victims of an antitrust conspiracy.

Third, the challenged rules do not prevent operators from increasing access fees across the board to cover any revenue shortfall associated with the use of the Visa and MasterCard networks. Plaintiffs contend that Visa and MasterCard are the primary global brands, and ATM operators must accept their branded cards to remain viable, but if the operators can pass the economic impact of higher network fees on to customers, it is difficult for the Court to discern how the access fee rules cause them any harm.

NAC plaintiffs contend they are nonetheless harmed because they "prefer networks that pay a higher net interchange, as this gives them the best price for their ATM services and allows them to charge a lower access fee to maximize the quantity of ATM services demanded." *Id.* ¶ 61. They attempt to liken the access fee rules to "anti-steering" rules, such as merchant

restraints that have been condemned by the Department of Justice. According to plaintiffs, at one time, Visa and MasterCard imposed rules on merchants, which are now the subject of a consent decree, that prevented merchants from providing "discounts or non-price benefits, to encourage customers to use the brands of General Purpose Cards that impose lower costs on the merchants." *Id.* ¶ 85; *see also id.* ¶¶ 86–88.[6] But the objectionable merchant rules differ from the access rules challenged here because consumers are able to choose among the credit cards in their wallets when offered a discount or other incentive to use a particular credit card at the point of a transaction. In other words, those consumers can actually be "steered." But in an ATM transaction, consumers do not have any opportunity to choose which network will be used to process their transactions. The network is determined by which bugs appear on the PIN cards issued by the customers' banks and which networks are available at – and then selected by – any given ATM.

Given these facts, the NAC plaintiffs articulate their anti-steering theory of injury as follows: in the absence of the access fee rules, ATM operators would offer consumers differentiated access fees at the point of transaction, consumers would then demand multi-bug PIN cards from their banks, their banks would provide these cards, and the market for network services would become more competitive, all resulting in more choice of networks and lower access fees for consumers.

Again, this scenario is focused on relieving an alleged burden on consumers and not the ATM operators. But in any event, if this is plaintiffs' theory of harm, it is too speculative. As the Court noted previously, injury in fact requires a plaintiff to allege an injury that is both

---

6 The NAC proposed complaint does not identify the case or the source of the quoted statement. *See id.* ¶¶ 85–88.

concrete and particularized and actual or imminent, rather than speculative or generalized. *Nat'l ATM Council*, 922 F. Supp. 2d at 80 n.9, citing *Lujan*, 504 U.S. at 560.

The Court agrees with defendants that this alleged injury is based on an attenuated, speculative chain of events, that relies on numerous independent actors, including the PIN card issuing banks. Visa/MC Opp. at 10; *see also* Bank's Opp. at 4. "Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996). There is no guarantee that independent ATM operators would reduce access fees for alternative networks rather than raising access fees for Visa and MasterCard networks. It is not clear that consumers troubled by access fees would rise up and demand multi-branded cards from their banks when they can already avoid access fees all together by using their own bank ATMs in the first place. And it is not clear whether the banks would have any incentive to offer PIN cards that are different than those they are issuing now. Accordingly, the Court holds that the new NAC complaint does not present a particularized, but rather a speculative and generalized, claim of injury, and the operator plaintiffs lack standing.

For similar reasons, the ATM operators' claims pose issues of redressability. The more independent factors in a chain of causation, the more unlikely it will be that the Court can address the alleged harm even if it were to grant plaintiffs the relief they request. *See Lujan,* 540 U.S. at 560–61 (holding that plaintiff's injury must be fairly traceable to the challenged action of the defendant and not the result of some third party not before the court); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 496 n.10 (1982) (Brennan, J., dissenting) (explaining that, in cases in which standing was denied, "the

difficulty was that an intermediate link in the causal chain – a third party beyond the control of the court – might serve to bar effective relief. Even if the court acceded to plaintiffs' view of the law, the court's decree might prove ineffectual to relieve plaintiffs' injury because of the independent action of some third party"). Here, plaintiffs ask the Court to eliminate Visa's and MasterCard's access fee rules. But for the operator plaintiffs to obtain what they seek – an increased volume of consumer transactions on alternative networks at their terminals, resulting in either added pressure on Visa and MasterCard to reduce their network fees or sufficient additional profits to enable the operators to more easily absorb those fees – multiple independent actors must take multiple independent steps. Given that effective relief for operators depends, in part, on the actions of these independent actors, the Court finds that their claim is not redressable and, accordingly, they lack standing for that reason as well.

**B. The Two Consumer Complaints**

In dismissing the Mackmin first amended complaint, the Court held that the plaintiffs did not allege an injury in fact because they did not "articulate how these restrictions affected them in particular." *Nat'l ATM Council*, 922 F. Supp. 2d at 85. They did not allege that the named plaintiffs conducted transactions at an ATM where an alternative network was available, that they had PIN cards that could be used on alternative networks, or that the ATMs they used could access these alternative networks. *Id.* at 85–86. In dismissing the Stoumbos first amended complaint, the Court held that it failed to allege that named plaintiff Mary Stoumbos had a PIN card that allowed transactions to be processed over alternative networks or that she used it on an ATM connected to any alternative networks. *See id*. at 86.

The consumers' proposed second amended complaints plead additional facts with respect to these issues,[7] but like the NAC plaintiffs, they do not allege that consumers have the ability to choose which network will be used to transmit their transactions at the point of the transaction. *See* Mackmin Proposed Compl. ¶ 59 (alleging that the ATM operator, not the consumer, chooses the network to use for each transaction); Stoumbos Proposed Compl. ¶ 85 (alleging only that current technology would allow for ATMs to be reprogrammed in the future to allow this). Thus, they could not have suffered an actual, current injury because, even if the alternative networks had lower access fees, they could not have selected one of those networks to handle their transaction.[8]

More importantly, their theory of antitrust injury is the same as the NAC plaintiffs': that the access fee rules prevent competition in the ATM network market and that their elimination would ultimately result in lower access fees for consumers. *See, e.g.*, Mackmin Reply at 5 ("[Osborn's] access fees were higher than they would be in a competitive market, because absent the Restraints, Defendant banks, ATM operators, and networks would be competing for the transaction, both through providing access to alternative networks, and lowering their fees to compete with other ATM operators, networks, and each other."); Stoumbos Reply at 10 ("The

---

7 The Mackmin proposed amended complaint states that plaintiff Andrew Mackmin has a Visa-branded card "with no bugs on the back" and plaintiff Sam Osborn has a MasterCard-branded card which "shows no other network 'bugs' on the card." Mackmin Proposed Compl. ¶¶ 15, 17. Plaintiff Barbara Inglis has a multiple-bug card and "has incurred access fees in connection with cash withdrawals from Defendant Banks." *Id.* ¶ 16.

The Stoumbos proposed amended complaint alleges that plaintiff Mary Stoumbos has a PIN card that bears the Visa, MasterCard, CU Services Centers, Co-Op Network, and Star network bugs and that she used an ATM connected to the Visa, MasterCard, and Star networks. Stoumbos Proposed Compl. ¶ 18. She also alleges that the Star network pays a higher net interchange to ATM operators than either Visa or MasterCard. *Id.*

8 Furthermore, the claim that eliminating the rules would reduce the access fees is highly speculative. It is equally likely that the ATM operators would raise the fees for Visa and MasterCard transactions if freed from the restrictions.

anticompetitive impacts in each market lead directly to higher network costs (lower interchange revenues) to ATM operators and higher ATM Access fees to consumers.”). These assertions are highly conclusory, and they depend on a series of actions by multiple, independent actors who are not before the Court.

While the Court appreciates that these plaintiffs, unlike the ATM operators, are consumers, and that the purpose of section 4 the Clayton Act was to create a remedy for consumers “who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets,” *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983), consumer plaintiffs must nonetheless have standing to sue. The complaints still founder on the injury in fact and redressability elements, and plaintiffs do not have standing. Even if the Court is incorrect about that matter, and the consumer plaintiffs have alleged a sufficiently actual and imminent injury to confer standing, they have not yet cured the other deficiency that led to the dismissal of the complaints: the lack of a conspiracy.

## II. THE PROPOSED AMENDED COMPLAINTS DO NOT ALLEGE AN AGREEMENT

A violation of Section 1 of the Sherman Antitrust Act requires a showing of an agreement and a restraint of trade. 15 U.S.C. § 1 (“Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal.”). The Court ruled that the first amended complaints failed to plead sufficient facts to allege the existence of an agreement. They failed to allege that the member banks of Visa or MasterCard agreed among themselves to do anything. Allegations that the member banks made a prior agreement when they were members of the bankcard associations do not suffice to allege a current agreement. *Nat’l ATM Council*, 922 F. Supp. 2d at 92. Further, they did not allege facts

that the banks could or did exercise any control over Visa or MasterCard making the networks a vehicle through which they could carry out the alleged conspiracy. *Id.* at 93. And, plaintiffs did not allege facts to allow the Court to infer an unlawful agreement, such as facts showing that the actions of the participants represented a radical shift from the industry's prior business practices or that they were against the participants' own interests. *Id.* at 94–95. The proposed complaints seek to remedy these issues by providing additional factual allegations.

Plaintiffs reassert many of the same facts as originally pled.[9] They allege that Visa's and MasterCard's member banks are participants in an agreement because they know that they are all bound by the access fee rules that existed prior to the IPOs. NAC Proposed Compl. ¶ 103; Mackmin Proposed Compl. ¶ 119; Stoumbos Proposed Compl. ¶ 41. But as the Court previously held, "membership in an association – much less membership in a defunct association – is not enough to establish agreement or conspiracy." *Nat'l ATM Council*, 922 F. Supp. 2d at 93. Thus, plaintiffs provide no additional facts that constitute direct evidence of agreements that would support a claim of a current horizontal conspiracy among the member banks.[10]

---

9 They reassert that Visa and MasterCard were formerly bankcard associations owned and operated by their competing member banks. NAC Proposed Compl. ¶ 89; Mackmin Proposed Compl. ¶ 108; Stoumbos Proposed Compl. ¶¶ 28–29. Member banks elected the associations' Board of Directors, and these Boards created rules and operating regulations, including the ATM Restraints. NAC Proposed Compl. ¶ 90; Mackmin Proposed Compl. ¶ 109; Stoumbos Proposed Compl. ¶ 29. In 2006 and 2008 respectively, MasterCard and Visa each completed IPOs and became independent corporations. NAC Proposed Compl. ¶ 89; Mackmin Proposed Compl. ¶¶ 116–17; Stoumbos Proposed Compl. ¶ 38–39. The member banks "retain a significant financial and equity interest" in the resulting entities. NAC Proposed Compl. ¶¶ 99–100; Mackmin Proposed Compl. ¶¶ 116–17; Stoumbos Proposed Compl. ¶¶ 38–39.

10 Also, the new complaints acknowledge that, after the IPOs, member banks do not control Visa and MasterCard, so there is no basis to conclude the corporations are simply a shell through which the banks continue a horizontal agreement. NAC Proposed Compl. ¶¶ 99–100; Mackmin Proposed Compl. ¶¶ 116–17; Stoumbos Proposed Compl. ¶¶ 38–39.

As for facts that would allow the Court to infer the existence an unlawful agreement, the proposed consumer complaints allege that the access fee rules are not in the individual interests of the member banks, and that they would only make sense if all member banks agreed to them. Mackmin alleges that the rules are contrary to any one bank's self-interest because "[a] bank that was not bound by the Restraints could charge lower prices for transactions conducted over networks that pay a higher net interchange fee, and attract customers away from banks that complied with the Restraints." Mackmin Proposed Compl. ¶ 98. Stoumbos alleges that the rules are against the interests of ATM operators, who would rather maximize revenues by retaining the flexibility to set discounted access fees for transactions that can be routed to other networks that pay higher net interchange. Stoumbos Proposed Compl. ¶ 53. But Stoumbos does not explain how this applies to banks. The NAC plaintiffs do not expressly state that the rules conflict with an individual bank's interest, but they do allege that the rules aid the banks if all banks agree to them because the rules "shield[] banks (as issuers of cards) from facing interbrand competition (from other banks using more efficient ATM networks) on the basis of the kind of debit card each bank" issues and that it is "in their interests as banks to abide by the ATM Restraints to avoid competitive ATM access fees." NAC Proposed Compl. ¶¶ 103, 105.

Assuming the truth of these allegations, the question for the Court is whether they are sufficient for the Court to infer an unlawful agreement. The Court concludes they are not, because other alleged facts indicate that banks have reasons to join or stay in the Visa and MasterCard networks based on their individual interests. The fact that Visa and MasterCard process the majority of ATM transactions, NAC Proposed Compl. ¶ 39, Mackmin Proposed Compl. ¶ 57, Stoumbos Proposed Compl. ¶ 63, suggests it is in each bank's individual interests to join these networks. The Mackmin plaintiffs further allege that Visa and MasterCard offer

member banks favorable network fees to enter into exclusive deals to market their cards only. Mackmin Proposed Compl. ¶¶ 83–87. These facts support a conclusion that entering into agreements with these networks is in the banks' individual interests, which weighs against an inference of an agreement.

In the absence of any other allegations that support a finding of an agreement, the conspiracy claims lack the one thing they need: a conspiracy.

## CONCLUSION

For the reasons set forth above, the Court will deny plaintiffs' motions for leave to file amended complaints with prejudice and deny as moot their motions to amend the judgment.

AMY BERMAN JACKSON
United States District Judge

DATE: December 19, 2013