IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ATM COUNCIL, INC. | ) |
| | ) |
| Plaintiff, | )CV No. 11-1803-1831-1882 |
| | ) |
| | ) Washington, D.C. |
| vs. | ) January 12, 2017 |
| | ) 2:30 p.m. |
| VISA, INC., ET AL., | ) |
| | ) |
| Defendants. | ) |
| ___________________________________ | ) |

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:

Jonathan L. Rubin
RUBIN PLLC
2101 L Street, NW
Suite 800
Washington, D.C. 20037
(202) 776-7763
jr@rubinpllc.com

Cyrus Mehri
Craig L. Briskin
Mehri & Skalet PLLC
1250 Connecticut Ave, NW
Suite 300
Washington, D.C. 20036
(202) 822-5100
cmehri@findjustice.com

Stephen R. Neuwirth
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com

APPEARANCES CONTINUED

For the Plaintiff:

Adam Wolfson
Quinn Emanuel
Urquhart & Sullivan, LLP
865 South Figueroa Street
10th Floor
Los Angeles, California 90017
(213) 443-3000
adamwolfson@quinnemanuel.com

APPEARANCES CONTINUED:

For the Plaintiffs:

Jennifer F. Connolly
Hagens Berman Sobol
Shapiro LLP
1701 Pennsylvania Ave, NW
Suite 300
Washington, D.C. 20006
(202) 248-5403
jenniferc@hbsslaw.com

Don A. Resnikoff
DON RESNIKOFF LAW
5335 Wisconsin Ave, NW
Suite 440
Washington, D.C. 20015
(202) 344-0089
DonResnikoff@donresnikofflaw.com

Douglas G. Thompson, JR.
Michael G. McLellan
Finkelstein Thompson LLP
1077 30th Street, NW
Suite 150
Washington, D.C. 20007
(202) 237-8000
dthompson@finkelsteinthompson.com

APPEARANCES CONTINUED

For the Defendants:

Mark R. Merley
Mattthew A. Eisenstein
Arnold & Porter LLP
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
(202) 942-5321
mark.merley@aporter.com

Gary Carney
Donna Ioffredo
Justin Anderson
Paul, Weiss, Rifkind,
Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3051
gcarney@paulweiss.com

Wells Fargo Defendant:

Niji Jain
Patterson Belknap Wells Fargo
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

Bank of America Defendant:

Mark Ladner
Morrison Foerster
250 West 55th Street
New York, NY 10019-9601
(212) 468-8000

JPMorgan Chase Defendant:

Boris Bershteyn
Skadden, Arps, Slate,
Meagher & Flom LLP
4 Times Square
New York, NY 10036
(212) 735-3000

APPEARANCES CONTINUED:

Court Reporter:

William P. Zaremba, RMR, CRR
Registered Merit Reporter
Certified Realtime Reporter
Official Court Reporter
U.S. District Court
for the District of Columbia

333 Constitution Avenue, NW
Room 6511
Washington, D.C. 20001
(202)354-3249
WilliamPZaremba@gmail.com

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

P R O C E E D I N G S

DEPUTY CLERK: All rise. The United States District Court for the District of Columbia is now in session, the Honorable Richard J. Leon presiding. God save the United States and this Honorable Court. Please be seated and come to order.

Your Honor, this afternoon we have three cases, Case 11 Civil 1803, National ATM Council, Inc., et al., versus Visa, Inc., et al; Civil Case 11-1831, Andrew Mackmin, et al., versus Visa, Inc., et al.; and Civil Action Number 11-1882, Mary Stoumbos versus Visa, Inc., et al.

Would counsel for the plaintiffs and then counsel for the defendants please approach the lectern and identify yourself for the record and the party or the parties that you represent, please.

MR. RUBIN: Good afternoon, Your Honor. Jonathan Rubin on behalf of the National ATM Council, Inc., and 13 independent representatives of independent ATM operators.

THE COURT: Welcome.

MR. THOMPSON: Good afternoon, Your Honor. Doug Thompson, Finkelstein and Thompson here in D.C., on behalf of the Mary Stoumbos case, 11-1882. And I have some colleagues here with me as well from my office, Michael McLellan. And from the firm of Lovell Stewart Halebian and Jacobson in New York, Mr. Gary Jacobson.

THE COURT: Welcome.

MR. NEUWIRTH: Good afternoon, Your Honor. Stephen Neuwirth from Quinn Emmanuel for the Mackmin plaintiffs. I'm joined by my partner, Adam Wolfson, and also Jennifer Connolly from the Hagens Berman firm.

Thank you, Your Honor.

THE COURT: Welcome.

MR. BRISKIN: Craig Briskin from the firm Mehri & Skalet. I'm here with Cyrus Mehri. And we're also here for the Mackmin plaintiffs.

THE COURT: Welcome.

MR. CARNEY: Good afternoon, Your Honor. Gary Carney from Paul, Weiss here for the MasterCard defendants. With me is my colleague, Justin Anderson, of Paul, Weiss as well. Thank you.

THE COURT: Welcome.

MS. JAIN: Good afternoon, Your Honor. I'm Niji Jain from Patterson Belknap for the Wells Fargo defendants in the Mackmin case.

THE COURT: Welcome.

MR. LADNER: Good afternoon, Your Honor. Mark Ladner from Morrison Foerster for the Bank of America defendants.

THE COURT: Welcome.

MR. BERSHTEYN: Good afternoon, Your Honor.

Boris Bershteyn from Scadden, Arps for JPMorgan Chase, the defendant in 1831.

THE COURT: Welcome.

MR. MERLEY: Good afternoon, Your Honor. Mark Merley, Arnold & Porter Kaye Scholer, for the Visa defendants. And my partner, Matthew Eisenstein, is also here with us today.

THE COURT: Welcome.

I'll have to get you guys shirts with your names on them or something. I don't know how I'm going to keep track of all of you.

Well, I guess we're going to get the process going here of discovery in some way, shape, or form.

It's not clear to me why the PI is even a theoretical possibility at this point. With the October deadline having passed for the integrating of chip technology into the computers, which is cards, the bank cards -- which was my understanding of what was the reason for the need for a PI in the past.

Now, we're past that date in October of 2016 now. So am I right or am I wrong? Are you still seeking a PI in this case? And is there even any basis to be seeking emergency relief?

MR. RUBIN: I'll answer, Your Honor. I don't mean to be presumptuous, but I represent the party that filed the

PI --

THE COURT: Sure.

MR. RUBIN: -- National ATM Council.

THE COURT: That's what I'm asking you.

MR. RUBIN: And I'm probably the right person to answer.

THE COURT: Good.

MR. RUBIN: You are correct that there was an impending liability shift, as it's known, that occurred in October -- on October 21st of 2016.

THE COURT: Right.

So why do we need emergency relief at this point?

MR. RUBIN: Well, okay. The liability shift has to do with how ATM operators will be treated if they do not make their conversion to a chip-capable machine. It also applies only to MasterCard and not to Visa, whose deadline is October 1st, 2017.

THE COURT: Okay.

MR. RUBIN: We were not, as, I'm sure -- any movant in a preliminary injunction is not exactly sure what's going to happen.

THE COURT: No.

MR. RUBIN: We felt that there were going to be bad things happening.

THE COURT: Sure.

MR. RUBIN: Indeed, bad things are happening.

One of the things that is happening is that the liability shift -- and I should preface this part by saying that there are estimates somewhere between 30, 25 to 30 percent to 50 percent of the independent ATM operators that have made the conversion for various reasons.

Some of those reasons are because those machines are operated by merchants who have had a less-than-stellar experience with the conversion in their point-of-sale equipment and are reluctant to make the conversion with ATMs.

Those ATM machines that have not been converted are subject to, at this point, MasterCard's liability shift rule.

Unlike the liability that attaches and has attached for the 20 years since independents have been around, which in that case is covered by a fed regulation, Reg E, which allows the ATM operator to present evidence that money, in fact, was dispensed or any other evidence that bears on what is known in the industry as a chargeback.

Under the MasterCard liability shift, and as far as we know under Visa's impending liability shift, there are no such rights.

And the problem is, there is no way to appeal or even object to a chargeback. Some independent ATM operators

have experienced extremely high numbers of chargebacks. For example, there are certain places where criminal enterprises have, before the -- I'm sorry -- right after the liability shift, have undertaken fraudulent transactions.

These were charged to the ATM operator. The ATM operator does not have the procedural safeguards of Reg E to show that money was, in fact, dispensed or the other procedural protections that are given to ATM operators.

So that's point one. We didn't know how bad it was going to be. We also believe there's going to be a lag with respect to the amount of money that is ultimately going to be charged to independent ATM operators because of chargebacks on machines that are not yet converted.

Those folks are suffering. And they are -- and they fear that they will be suffering more in the future. And that is only with respect to MasterCard.

In that regard, I think it's also relevant to say that because of the problem, some of the processors that deal with independent ATM operators have set up software in other ways to allow these folks to limit their liability and, in some cases, simply refuse to transact MasterCard transactions because of the fear of the liability.

So we're getting an extreme distortion in the ordinary process of the market because of a liability shift to which there are absolutely no procedural rights to

complain about the chargeback.

That's just MasterCard alone. That problem has existed since October 21st.

There are other problems that we could not have anticipated at the time that the motion was made, although the logic of the motion, we believe, still applies. One of them is what's known as fallback. That's where a machine has been converted but for some reason the transaction does not go through the chip part of the card; it goes -- it falls back to the mag stripe part of the card.

What Visa and MasterCard have done is to announce penalties against ATM operators that have fallbacks.

Now, these are new -- those machines that have been converted are new machines. It's not a question of dirty readers and machines being in service a long time and not being maintained.

There is, similar to the situation with a chargeback for the non-converted machine, there is really no recourse. When the network says, "You owe us a penalty because of a fallback," there's no way for an ATM operator to know, "Is this a faulty chip? Do I have a problem with my reader? Is it because my technology vendor has not installed the software correctly?"

There are legions of stories of various operators that have run into this problem. And they are -- and it has

gotten so bad that, in fact, it's my understanding that both MasterCard and Visa have suspended the penalty, which, in Visa's case, I believe, if a -- if the number of fallbacks is greater than 2.5 percent of all the transactions -- in MasterCard's case, I think it's 5 percent -- both of them have suspended those penalties.

But those penalties do not give the ATM operator anything. They don't recompence the networks for any costs that they've incurred because the transaction goes through exactly as it ordinarily would. It just uses the stripe and not the chip.

And the temporary standstill on the imposition of the penalties is something very different than saying, Oh, no, these penalties are not appropriate and we don't -- we're not going to impose them.

All they're saying is that we're not going to impose them now.

Your Honor may recall that part of the fundamental problem with the rule that we're challenging and which we believe should and must be abrogated before a four- or five- or eight-year period of litigation goes on, that rule, in essence, insulates the networks from any kind of competitive response by the independent ATM operators when they impose fees.

So, for example, when we initially drafted the

preliminary injunction, our concern at that point was that the two -- MasterCard and Visa are known as global networks, although some of the other networks are almost just as large. But the two global networks, they were, in essence, unlike other networks, taking part of the interchange revenue from the ATM operator and keeping it for themselves. And they've introduced some tiering criteria which favor very large banks that -- or very large operators of ATMs so that their revenue is greater than the smaller operators.

All of this is occurring without the possibility of any kind of price change or any kind of competitive response because of the rule.

So I raise the fallback and the chargeback problem, the fallback being the one where the machine has been converted, yet we are exposed to the potential for penalties.

The chargeback being the situation where there is a no-recourse charge for any kind of fraud, any kind of problem, any kind of claim that anyone might make.

I put my card in the machine. I didn't get the money. Under normal circumstances, before the EMV transition, there was a procedure for the ATM operator's sake: But we have a record that shows that the money was dispensed. Now so there is no such procedure.

All of these things are of a piece. And the

reason they are is because there is no way to respond in the market to these fees and these burdens that are being placed on the ATM operators, and I might say only by the network defendants in this case.

To be completely technically correct, there is one other network that does charge a 5-cent network fee; but they pay a 5-cent higher interchange, so it's a wash for the ATM operator.

So, essentially, we're talking about behavior my MasterCard and Visa, and it is behavior that started prior to this lawsuit, got worse during the lawsuit, and, in fact, insulates them in a way that it's -- I mean, I've never seen it in any other commercial setting where there is a rule that says you cannot change your prices when the cost of what you're selling is going up.

And, of course, so now we have the network fee. We have the chargeback problem. We have the fallback problem. And what is there to limit any other additional fees, any other additional burdens that -- to which, again, we have no competitive response?

That, in essence, is why there is still a need for preliminary injunction.

The alternative is to let the litigation play out for as long as it will take and query whether there will be an independent ATM sector after that happens. And I say

that in part because of -- I think it's fairly clear that some of the banks are being very aggressive about expanding their ATM networks and sort of moving into that space.

So the independent ATM operators are in an extremely precarious position. It is no less precarious because of the MasterCard liability shift. In fact, it's worse. We greatly fear what'll happen at the Visa liability shift date of October 2017. And we have these other fees.

Finally, Your Honor, I want to say, Visa has decided that every ATM operator must also pay something called a locater fee. This is yet another fee to the network that is not discretionary.

Visa apparently is compiling a list and is charging ATM operators to be on the list so that users of ATMs can locate ATMs. That's all very well and good, but it also has the side effect of indicating to fraudsters which ATMs have been converted to EMV chip-capable machines and which haven't. And all of this is being paid for by the ATM operator, again, because of the rule that we challenge in this lawsuit without the possibility of any kind of competitive response, any kind of price increase. Any ability to recruit that, they simply have to take it.

And so we believe that the motion is still well-taken and have a proposal for how to move forward when and if Your Honor is prepared to entertain it.

THE COURT: All right. Do you want to say anything on this point?

MR. MERLEY: Very briefly, Your Honor.

Mark Merley for the Visa defendants. When we were last here last time, I believe I said that the defendants thought the PI motion could be resolved on the papers. We continue to believe that. We don't think there's a showing of irreparable injury or of non-economic injury of the sort required under the Circuit's standards.

We heard a lot here this afternoon about Regulation E, liability shift, chargebacks. With all respect, none of that is in this case. That's not being challenged in this case.

It came up only because the plaintiffs said in their papers that they would like to reprogram their machines to avoid the liability shift. At the same time, they would make other changes if these rules that they are challenging went away.

The plaintiffs use that as an argument for why they should get preliminary relief. We thought, again, that's just money. That's just trying to save money. It's not irreparable injury. But as Your Honor recognized, the October date has come and passed.

In our view, the papers, the motion is ripe and can be decided on the papers.

THE COURT: So what do you view the crux of this case to be about?

MR. MERLEY: The access fee rules. The rule, the nondiscrimination rules in the networks regarding the imposition of access fees. I mean, they aren't challenging the liability shift. They aren't challenging chargebacks.

And that's what they want the preliminary injunction on. Again, we think it's ripe on the papers.

THE COURT: Well, I can tell you this at a minimum: The current papers are going to have to be all reconstituted. If they're going to proceed with a PI, the playing field has changed. October has come and gone. Whatever arguments they're going to make, they think make. But they have to be made based on what the reality of the case is today, not what it was a year ago.

So I don't know if it really -- I don't know enough about it to know if it does rise to the level of irreparable harm or not. I guess that's what the thrust of the arguments are going to be.

But if that's not what this case is really about in the final analysis -- it does seem to be about a sideshow. And I don't know if that makes a lot of sense, to be getting distracted on a sideshow here.

So I'll give the plaintiffs an opportunity to reconstitute their pleadings based on where we stand today.

They can have 30 days to do it. You all can respond to it. I don't know long you'll need to respond. Do you want 30 days to respond?

MR. MERLEY: 30 days would be adequate.

THE COURT: Is that adequate?

MR. MERLEY: I believe it would, Your Honor, yes.

THE COURT: And they can have 15 days to reply.

And at that point, the PI papers will be, I guess, ripe.

And depending upon how those look -- and I'll take a look at them. I'll set a hearing for oral argument. They have a right to an oral argument.

MR. MERLEY: Understood.

THE COURT: And so we're probably looking at two and a half months from now before they're ripe, have an oral argument a couple weeks later, so that's three months from now. So maybe we're going to have an argument in April.

You might get an opinion, if you're lucky, within 90 days. That's if you're lucky.

So that's, because, you know, we've got lots of other things going on around here that are time-sensitive, especially criminal cases.

So that's July. And if that's how you all want to proceed, it seems like a big distraction to me. And, you know, maybe or maybe they won't have the ability to

demonstrate there was irreparable harm. I don't know. We'll wait and see.

But I'm not going to do these three cases simultaneously on different tracks. So that's not an option.

MR. RUBIN: We agree with that, Your Honor.

THE COURT: So I'll deal with the PI, and we'll go from there.

And I don't see any reason why I need discovery. So --

MR. RUBIN: Your Honor, could I be heard briefly on the discovery issue?

THE COURT: If you want to, go ahead.

MR. RUBIN: Thank you, Judge.

There was a stipulation that was entered that was not approved by the Court with respect to -- this was prior to the petition to the U.S. Supreme Court.

As part of that, the defendants had agreed to provide us with the text of the rule that is the center of this case, and that is some specific discovery other than an agreement with respect to taking the depositions of the depone -- of the declarants.

THE COURT: Aren't the companies that are the customers of these banks, aren't they -- and the users of these networks, aren't they given that rule? Aren't they --

isn't it part of the information they provided when they sign up, so to speak.

MR. RUBIN: It was not until the networks became publicly held companies, which was a good 14 years after, something like that, after the rule -- the rule came in in 1996.

THE COURT: Right.

MR. RUBIN: And we are looking and we had an agreement, which I don't -- apparently we don't have. But we would like the rule as it was initially promulgated in 1996, which was well before the IPOs at the time that the networks were simply consortium of banks. And we would like each version of the rule since then. That, I think, is a -- you know, the fact that we don't have that and the fact that it's withhold and to prepare the papers without it is, I think it's an unnecessary, you know, lack of information on our part.

I'm not sure what the networks' counsel's position on providing us with a rule. Last time we were here, it didn't seem to be a big problem. So my only ask would be: Can we get the rule as it was initially promulgated again?

THE COURT: I'll tell you one thing: If the Court is going to need to see it, you might as well give it to them now because if I've got to see it, they're going to get to see it.

If I can't resolve this case without seeing it, then I don't see how you can keep it from the counsel for the plaintiffs. That doesn't make any sense to me.

MR. MERLEY: Your Honor, just a narrow point: We're not looking to keep anything from them. We've said in our papers that the rule in substance hasn't changed materially. We'd be happy to provide those documents.

THE COURT: Right.

MR. RUBIN: Excellent. If we could have the rule within the 30 days, that would be wonderful.

THE COURT: You all can work that out.

MR. RUBIN: Okay.

MR. MERLEY: I think we need to put it in place, but we'll be fine.

MR. RUBIN: Very.

THE COURT: My experience has been cases of this size, the key to these things working smoothly is a good working relationship between the counsel. And I'm not particularly interested in micromanaging the working relationship between the counsel.

I will if I have to. And you can talk to the lawyers in my In Re: Fannie Mae Securities Litigation. That went on for ten years. And that was the largest securities -- class action securities fraud case in the history of this circuit that I presided over.

So if we've got to go to the D.C. Circuit and we've got to do -- I've got to do all kinds of sanctions and things, we'll do them, but I'm not interested in doing that, frankly.

MR. RUBIN: Well, I don't mean to speak for counsel. But Mr. Merley and I had a conversation before this hearing, and we are striving to be exemplary in that regard. I speak for myself.

THE COURT: Good. That's the attitude I want to hear.

What's your theory going to be here? I'm not sure I understand your theory.

MR. RUBIN: Well, Judge, it's not death by a thousand cuts. It's death by four or five cuts. We've got a liability shift by MasterCard and one coming in by Visa. We've got penalties on fallbacks that are nothing but, we think, confiscation of money for no reason.

We've got a locater fee that we have no discretion over and what else is coming down the pike that is going to take money out of the independent ATMs' pockets and no way to respond in the market.

And that is the thing that brings the whole thing sort of together, is that we have -- I mean, the unusual thing about this rule is, this is a rule by MasterCard and Visa that regulates what the banks themselves may charge for

a consumer service. It also covers us, but it also covers them.

THE COURT: So what law -- what's your theory of law as to what's being violated here?

MR. RUBIN: Well, we believe this is a Section 1 violation, as it would be in any case where a consortium gets together to regulate what an individual member may charge to the public for a given service, as the D.C. Circuit held.

THE COURT: Well, there's a first time for everything. This will be my first time. I don't know what the D.C. Circuit precedent and what the case law is going to hold on all this, but I'll do my best to learn as we go along.

MR. RUBIN: As will we, Your Honor.

THE COURT: I certainly hope you'll keep that in mind, counsel, because unlike you all, I am not steeped in this stuff.

MR. RUBIN: Thank you.

THE COURT: This is all new stuff to this Court. And I'm willing to learn as I go, but I'll be depending upon counsel to write with clarity and with accuracy.

MR. RUBIN: We'll do our best, Your Honor. At least I speak for myself.

THE COURT: If you can do that, you'll do better

than if you can't; that's for sure.

MR. RUBIN: Thank you for your attention today, Judge?

THE COURT: Yes.

MR. CARNEY: Your Honor, may I be heard just very briefly, just for one minute on some of Mr. Rubin's most recent comment?

Thank you.

THE COURT: Sure. You all can be heard if you want to.

MR. CARNEY: That's fine. Gary Carney for MasterCard.

Just a couple of observations as I listened. I won't repeat Mr. Merley's point that all of the issues that Mr. Rubin has raised about the chargebacks and the fallbacks and the like really, from our perspective, will be a sideshow.

We'll see what Mr. Rubin prepares in his papers and shows us. I'm not in a position right now to respond to them, because, frankly, I don't know exactly what it is that they have in mind.

From our perspective, this case is about the nondiscrimination rules, the rules that Visa and MasterCard have put in place. And, indeed, we submit all of the ATM networks in this industry that basically provide that any

ATM operators shall not be charging access fees for particular network's card that is higher than those that they charge for other ATM networks.

Two quick points. These non-discrimination rules of Visa and MasterCard are good for cardholders. Very simply, they ensure that cardholders pay the very least amount as possible when they're withdrawing cash from ATMs. That's point one.

Point 2, Visa and MasterCard both have good and valid reasons for enacting these ATM rules. Not only are they protecting their cardholders from higher prices, but also these rules ensure that the network brands are protected. If the brands and the networks are associated with higher fees resulting from ATM cash withdrawal access fees, then the public perception of the value of the brand gets sacrificed and is undermined.

And for that reason, these rules are very pro-competitive, very legitimate, business-justified measures to protect not only the network's cardholders but the network's brand as well.

One last point. I think the record will show in this case, Your Honor, that Visa and MasterCard first enacted these rules back in the mid-1990s, but they did it to actually meet competition from other ATM networks who had started at that time surcharging and imposing these access

fees when people wanted to take cash out of ATM machines.

So the industry had moved in that direction. Visa and MasterCard actually responded to it and put in place these same type of nondiscrimination rules that other networks had already put in place.

At that point, Visa and MasterCard had roughly 3 to 5 percent of the market. So this was not an instance where either Visa or MasterCard were trying to maintain any kind of dominant position in the market or exercising market power, quite simply because there was no market power to exercise.

And even to this day, the plaintiffs acknowledge in their papers that Visa and MasterCard may have crept up to 15 or 20 percent market shares for each of them. But even that, Your Honor, under the law is, is not market power.

So there are -- I'll leave it at that. There are other points obviously we can make as we get into this. We've argued the issue that went up to the Supreme Court on the lack of conspiracy, but I won't get into that now. You'll see that eventually.

But I just wanted to make clear that from the defense perspective, there are important reasons why these rules are in place. And they're important.

So with that, I'll sit down. Thank you.

THE COURT: All right.

MR. NEUWIRTH: If it please the Court, Your Honor, Mr. Neuwirth.

THE COURT: Say your name and firm and who you represent.

MR. NEUWIRTH: Yes, Your Honor. Stephen Neuwirth from Quinn Emmanuel, and we represent the Mackmin plaintiffs.

THE COURT: And who they?

MR. NEUWIRTH: Yes. The Mackmin plaintiffs are users of ATMs that are owned and operated by Visa and MasterCard member banks. So our case doesn't involve the independently operated ATMs that have filed the motion for preliminary injunctive relief.

Our case has to do with the ATMs that are operated by Visa and MasterCard member banks.

And we represent --

THE COURT: Which is basically everyone, isn't it?

MR. NEUWIRTH: Well, it's not everyone because you have a group of independently owned ATM --

THE COURT: I mean, their own banks, though.

MR. NEUWIRTH: Yeah.

THE COURT: Don't basically all banks have a Visa or MasterCard option?

MR. NEUWIRTH: I don't know that the answer is

"all," but I think Your Honor's perception that it's very widespread is accurate.

THE COURT: It's got to be in a 90s, high 90 percents.

MR. NEUWIRTH: Correct. But the Mackmin plaintiffs are the users of the ATMs who pay the fees.

And there's a second group of plaintiffs who are the users of the independently owned ATMs.

And then we have the preliminary injunction motion that's been filed by the owners of these independently operated ATMs.

We certainly appreciate very much Your Honor's observation earlier that it would be problematic to have all these cases on different tracks.

THE COURT: All right.

MR. NEUWIRTH: And we defer completely to Your Honor on that.

The one observation I would make, though, is that we would respectfully submit that it would make sense here and be efficient to have at least certain discovery activity begin even during this period when Your Honor will be considering the preliminary injunction motion, because whatever happens to that motion, granted or denied, the case of the -- the cases of the card users are going to go forward in this court where the cases have all been

consolidated before Your Honor, because the underlying rules that are at issue are the same in all of the cases. But obviously the different plaintiff groups are coming from different perspectives with respect to those rules.

We believe that it would be unfortunate if those cases had to just sit on hold while the preliminary injunction motion is being considered. At the very least, we believe that there are certain things that can be done that would not create any interference with the Court's principle that we want to keep these cases on the same track.

Certainly, there could be negotiation of ESI protocols that are going to have to be used in this case once the preliminary injunction motion is decided.

Second, there could be identification of the custodians and other issues related to document production.

And, third, we believe, respectfully, that it would be appropriate as those things are taking place for the defendants to either begin document production or at the very least put themselves in a position to be able to make document production as soon as Your Honor has ruled on the preliminary injunction motion.

And while certainly we haven't had the benefit of Your Honor's input on the schedule yet, one benchmark we can look to is Judge Facciola's opinion in the railroad case

where he set a schedule of approximately one year for discovery before the plaintiffs had to move for class certification. But in that case, as reflected in the --

THE COURT: You're going to have a class action in this thing?

MR. NEUWIRTH: Yes. That was a class action.

THE COURT: In this case?

MR. NEUWIRTH: I'm sorry.

THE COURT: Are you going to be seeking class certification in this case?

MR. NEUWIRTH: Yes, we are. For the user plaintiffs, yes, the ATM user plaintiffs, yes.

THE COURT: Let me give you a heads-up right now.

MR. NEUWIRTH: Yes, Your Honor.

THE COURT: Based on my experience in the Fannie Mae securities litigation case, I don't use Magistrate Judges. There will be no cutouts.

MR. NEUWIRTH: Thank you, Your Honor.

THE COURT: There will be no appeals. It's one-stop shopping, and it's right here.

So if you're going to have a dispute, it's going to be in front of me.

MR. NEUWIRTH: Yes, Your Honor.

THE COURT: I certainly prefer you don't have disputes. I want you to work all your disputes out. I want

to have as few disputes as possible. But if you do have a dispute, it's going to be in front of me, not in front of some Magistrate Judge.

MR. NEUWIRTH: Thank you, Your Honor.

THE COURT: So you're going to have to deal with this Court.

And like I said before, I'm not interested in micromanaging this case. I have no desire to do that. I will if I have to, but I don't want to.

This is a very high-priced gaggle of lawyers here. You all are very experienced. Lot of gray hair in this room right now, heck, a lot more than I have on my head.

So you all should pretty much know how to make things work in a reasonable and efficient and relatively cost-effective way for your clients, especially.

So I'm going to start on the assumption that you all are going to work real hard to try to make things work and there won't be lot of these pretrial discovery disputes. But if there are, you won't have the luxury of a Magistrate Judge to go to whine to in the first instance. You're going to be right here.

MR. NEUWIRTH: We appreciate that very much, Your Honor. Thank you.

And in that regard, if I could respectfully make a suggestion, perhaps one approach to take here consistent

with that, if Your Honor were to indicate that it is appropriate for at least document discovery steps to take place during this period while the preliminary injunction is being considered by Your Honor, that would, I think, create an environment where the plaintiffs and the defendants could at least attempt to work together to set up some sort of schedule and a procedure that they could use without burdening the Court with any disputes or at least narrow the disputes as much as possible so that if there are any issues, we can bring them to Your Honor.

THE COURT: Do you have any idea what the volume of the discovery would be in a case like this?

MR. NEUWIRTH: Well, there's --

THE COURT: Do you have any conception of it?

MR. NEUWIRTH: Without knowing exactly, I think that there are three categories of discovery, which would be very substantial.

One is going to be, obviously, document discovery. And as in most antitrust cases, both given the time period involved and the subject matter, we would expect that this could be millions of pages of documents that need to be exchanged.

THE COURT: Well, in Fannie Mae, we had 30 million documents produced.

MR. NEUWIRTH: Right. So I think --

THE COURT: I hope we're not in that neighborhood.

MR. NEUWIRTH: So do we. I hope it's not that big.

THE COURT: That was a very big neighborhood. And something like 14 million of it was emailed. And I asked the counsel at one point after about five years of litigation: How many of those emails are worth anything?

And the answer, maybe not surprisingly, was: Oh, less than a thousand.

Come on. I mean, this is silliness. I mean, this is just -- this is silliness.

MR. NEUWIRTH: We genuinely appreciate that, Your Honor. And I think that one of our goals would be to use this period to work with the defendants to try to narrow as much as possible what has to be produced to the core materials that will allow us and Your Honor to address the facts of the case.

The second category is deposition discovery. And here, one of the issues that we will have to grapple with is that we have three different plaintiffs' groups who will not necessarily all want to depose the same witnesses. But we are certainly committed and have been trying to already work with the other plaintiffs to narrow this.

THE COURT: Well, help me with that because, to me, up until you started talking about deposition discovery,

this sounded like this was a case of -- this would be a case of: These are the rules that were concocted and imposed upon these consumers, and these rules result in anticompetitive procedures in the marketplace. I understand how you'd need experts to talk about the ramifications in the marketplace.

But the rules are what they were. And you can't -- I mean, obviously, that's just a fact.

At first blush, I don't see why there would be the need for much, if any, depositions for the creation of the rules or when they were created or how they were created. That seems to me that's all kind of sideshow stuff.

MR. NEUWIRTH: We agree, Your Honor.

And I think that where discovery will be needed will be, for example, to address some of the issues that have come up in the presentations of counsel today, where different characterizations of the conduct and different characterizations of its impact have come up.

And I think we would certainly look forward, again, to working with the defendants to try to narrow the discovery as much as possible to those core issues that are going to bear on an assessment of how the rules operated and impacted the conduct.

We agree with Your Honor that what the rules say and when they were adopted, et cetera, is straightforward,

assuming we get the relevant documents.

THE COURT: Yeah. This isn't a fraud case. You're not trying to prove people are trying to defraud people or something like that.

MR. NEUWIRTH: Correct. Yes.

And the last category is, which I think may be the most straightforward, although it takes some work to work it out, but it's very critical in a case like this, is transactional data, which is the data about what fees were paid and related information.

And in all of these antitrust cases, the ability to demonstrate a common impact on the alleged class and also to calculate the damages is very dependent on the exchange of good transaction data.

And another very good use that could be made of the time period coming up in these coming months would be for us to work with the defendants to try to develop an appropriate set of data and a protocol. And that usually involves having the respective experts that have been retained by both sides involved in discussions to determine exactly what data needs to be produced and in what form.

And in an antitrust case like this one, that type of data is as important as any other discovery. But it ends up usually being produced in the form of some computer-related materials that just get exchanged. And

so -- and that usually is the subject of expert reports, both at the class certification stage and at summary judgment. So --

THE COURT: Now, the users of the ATMs that are -- that you're representing --

MR. NEUWIRTH: Yes, sir.

THE COURT: -- as opposed to the initial group, let's say, they're not going to have any data to supply, are they?

MR. NEUWIRTH: Correct. Usually in antitrust cases, virtually all of the data gets produced by the defendants because as part of the ordinary course of business, they retain data.

And we'll obviously have to have a discussion with the defendants to determine what data exists at this point in time and in what form. But normally we find that through those discussions, we can work out a protocol.

And while there may be some issues that, at the margins, need to be addressed with the input of the Court, normally, in our experience, we can work these things out through discussions and try to come up with a reasonable compromise on data that everyone can live with.

And I think that if we can use this period to work on those three categories so that everything --

THE COURT: You wouldn't expect the independent

operators to have data produced, do you? Would you?

MR. NEUWIRTH: Well, our case doesn't involve the independent operators. So I don't want to rule out the possibility that there could be some third-party discovery issues that are relevant. But the data that we would be focused on is the data from the defendants and the other Visa and MasterCard member ATM owners that are the subject matter of our suit.

And we're certainly committed to try to run our suit as leanly and efficiently as possible, both to reduce the burden on moving the case forward and to reduce the burden on the parties and the Court.

We appreciate Your Honor's statements earlier today, both about efficiency and trying to keep everything on the same track.

THE COURT: Well, I can tell you another reason why you should do it leanly and efficiently is because at some point, I might have to approve attorneys' fees. And I can tell you right now, I look at those. And if I start seeing gaggles and gaggles of associates and four partners from one firm attending the same deposition, red lights, flashing red lights. I will not tolerate it.

So fair notice to all of you from firms that are large firms particularly: Don't be stocking depositions with multiple layers of lawyers, especially if you're going

to be seeking fees. It's bad enough if you're not going to be seeking fees because it makes you look stupid, frankly, or inefficient, at a minimum. But if you're going to be seeking fees, it's never going to work.

MR. NEUWIRTH: Thank you, Your Honor.

THE COURT: And if I have to, I'll use a Magistrate Judge to fly-speck them.

MR. NEUWIRTH: Thank you, Your Honor. We take that notice very seriously, and it's consistent with how we try to operate. But we will be extra diligent here to try to stay within those parameters.

THE COURT: Yeah. Good. Happy to hear that.

MR. NEUWIRTH: Thank you, Your Honor.

THE COURT: Good. Have you got anything else?

MR. NEUWIRTH: That's it, Your Honor. Thank you.

THE COURT: Okay. Thank you.

Thank you. Come on up.

MR. THOMPSON: Thank you, Your Honor. Doug Thompson.

I have the luxury of being a very small firm and unable to stock. So -- and given the cost of litigating these cases, I'm not sure that's going to change much in the future.

THE COURT: Probably not.

MR. THOMPSON: The Mary Stoumbos case is a class

action also. And it's different from the other two classes, because we -- as Mr. Neuwirth pointed out, Mary Stoumbos is bringing the case on behalf of people who paid fees at these independently owned ATM machines.

And you recognize those as ones that sit in retail stores or 7-Elevens or somewhere but don't have a bank logo on them or are not on a bank branch premises.

And the essential theory of our case -- and I don't want to go much further into that -- is that without this rule, this pricing rule imposed by Visa and MasterCard, these independent ATMs, would, as any retailer would, would discount product to its customers based on its own costs.

And since the use of the Visa and MasterCard networks by the independent ATMs is the highest cost of them and there are other lower-cost networks available, if they would be permitted, they would charge customers at independent ATMs less money on access fees for using these alternative networks.

And so that is the damage and harm that we see to the class of users of independent ATMs.

As far as discovery goes, I think that you were correct in your discussions with Mr. Neuwirth. There are going to be some obvious differences in the discovery between our class of customers and his.

His class of customers is interested in the

transactional data and the cost and pricing mechanisms for banks' ATM machines. And ours is, on the other hand, interested in the cost and pricing mechanisms for independent ATM operators. And we understand those, although we don't know the details yet, to be fundamentally different.

So we would not be seeking, I don't think, very much discovery from banks. We would be seeking third-party discovery from independent ATM operators as to what they get charged by the networks; what the alternative cheaper networks are; and how they, in order to get to that bottom-line question, in the but-for world without this rule, how would you have priced these access services to your customers?

THE COURT: So how many of those would you be targeting to get documents from?

MR. THOMPSON: There are a few of them that are very large that have maybe more than 50,000 individual ATM locations.

THE COURT: 50,000?

MR. THOMPSON: I think so. I think --

THE COURT: Wow.

MR. THOMPSON: I think Mr. Rubin just told me of one.

MR. RUBIN: Your Honor, if you don't, just for the

Court's information, there are more independent ATMs in this country than there are ATMs that are owned by banks. So we're talking about something like 55 to 60 percent of the ATMs are in the --

THE COURT: Yeah. Well. I'm in a bubble. So, yes, thank you for bringing that to my attention, because those of us who live and work in Washington really are in a bubble in that regard.

MR. THOMPSON: Well, I.

MR. RUBIN: Depends on the neighborhood, Your Honor.

THE COURT: That's probably true.

MR. THOMPSON: So anyway, a lot of -- we're going to be seeing a lot of information from independent ATM operators. But we can probably cover it with maybe less than ten of them of the actual companies, because they cover lot of territory.

THE COURT: They're not parties to the case.

MR. THOMPSON: No. We'd have to go third-party subpoena with them, but maybe they'll cooperate because they're interested in the case too.

THE COURT: Maybe.

MR. THOMPSON: I know maybe. That's why I had "maybe." I know. Right.

THE COURT: Yeah. Maybe.

MR. THOMPSON: Yeah. I mean, there's a lot of "maybes" in litigation.

THE COURT: I've got a feeling --

MR. THOMPSON: And getting third parties to cooperate is one of the big "maybes."

THE COURT: I've got a feeling they're going to be well represented; let's just say that.

MR. THOMPSON: And there's also information from people that operate independent ATMs in -- not within the 50 states. And some of these locations don't have rules like this.

So we're going to want to find out what the charges are for access fees there and how that might compare to what would exist here if we didn't have these rules.

THE COURT: You mean outside the United States?

MR. THOMPSON: There are some outside the United States, sure. But I think my information is -- and I haven't been able to confirm it yet -- but Puerto Rico may be without this rule, for example.

So we're going to be seeking information from them. How we go about getting it from them, that's our problem. We'll worry about that.

THE COURT: Yeah. No kidding.

Well, maybe Rex Tillerson can help you, but I don't know.

MR. THOMPSON: Well, you know, there are ways to --

THE COURT: There's nothing I can do.

MR. THOMPSON: There are ways to serve subpoenas on foreign entities, and that's been sort of perfected these days with all of the LIBOR and TIBOR and EBOR -- the BOR cases and so on and so forth.

THE COURT: Well, you might have a small, but you think big.

MR. THOMPSON: Yeah. Well, that's brings me to my -- the only thing I wanted to mention is really an administrative matter. We have a motion on file which we filed before the Supreme Court grant of certiorari for appointment of interim co-lead counsel for our case.

We already have interim co-lead counsel appointed for the other two cases. So I wanted to get that -- so the motion has been, is sub judice before you.

So we are -- we have brought in another firm that we do a lot of this kind of work with, the Lovell Stewart firm from New York. And Gary Jacobson, I mentioned, is here today.

THE COURT: I see.

MR. THOMPSON: So we would just like to mention that is unopposed. It's sub judice. We would just like to get that order signed.

And that's sort of -- I do second Mr. Neuwirth's request. I'd like to see the Court issue the first status order so that we can begin at least talking to the defendants about document discovery.

THE COURT: Did you have any reason to believe they don't want to meet and talk with you?

MR. THOMPSON: Well, I think we need an order -- my understanding is we need a court order to actually do that. I mean, that's the Rule 16 sort of thing you have to do.

THE COURT: Ah, you may cling to that rule if you wish.

MR. THOMPSON: Well, I just -- it gives me comfort. That's all.

THE COURT: Well, I understand that. But I've never known lawyers of goodwill and experience not willing to sit down and talk with one another.

You're starting on a journey that's going to go for years.

MR. THOMPSON: Well, I hope no.

THE COURT: There's no way this is going to go less than two years, my friend. You'd be -- you would be kidding yourself.

MR. THOMPSON: No, I don't think it's going to go --

THE COURT: Do the basics.

MR. THOMPSON: No, I don't think it's going to go less than two years from here on.

THE COURT: Do the basics. You're talking probably six to ten months, if you're lucky, of discovery. That's if you're lucky. It's probably closer to 12 months for discovery.

MR. THOMPSON: Yes, I think so.

THE COURT: Right.

Then there will be summary judgment motions.

MR. THOMPSON: Yes.

THE COURT: Four to six months to draft those.

We're in '18 now. We're at probably early '19 before those motions are even ripe.

MR. THOMPSON: Yes and I --

THE COURT: And, you know, depending upon the motions, it's probably '20 before we have a ruling.

So this -- look. Get comfortable, gang. You're going to be living together and working together a long time. And you might as well get accustomed to it.

And if you're clinging to the notion, well, I need an order to talk to the people on the other side, come on.

MR. THOMPSON: Okay.

THE COURT: You should have a working group, plaintiffs' and defense counsel working group, sitting down

and trying to talk through these kind of issues --

MR. THOMPSON: It's a good idea.

THE COURT: -- and coming up with proposals and then identifying where there's points of contention that you might need judicial assistance with.

You know, and the working group should be lean and mean, like one lawyer for each plaintiff group and each defendant group.

And, you know, you don't need three lawyers from each firm or whatever. It should be lean and mean and just get it done.

And you could start working on that tomorrow.

MR. THOMPSON: I think that's a great idea.

THE COURT: Go for it.

MR. THOMPSON: I just want to make --

THE COURT: Go for it.

MR. THOMPSON: You haven't been with us as long as the case has been around.

THE COURT: No.

MR. THOMPSON: We're already into our sixth year. So if I get this done in another two or three years, that's running fast.

THE COURT: You're a hero.

MR. THOMPSON: Yeah.

THE COURT: But, you know, who in the hell knows?

Three years from now I'll be 70. I don't know. Who knows if I'll be around? Come on.

MR. THOMPSON: Me either.

THE COURT: Yeah, that's right. So hopefully, we both will be.

MR. THOMPSON: Thank you, Your Honor.

MR. MERLEY: Your Honor, we'll take the Court's guidance, we're happy to talk with the plaintiffs about what makes sense here in this case.

We are very concerned about a point that I think Your Honor is also concerned about, which is coordination of discovery across the cases. We don't want to do it more than once. We're common to three cases.

THE COURT: No. I don't want it to be done more than once. I love the word "efficiency."

MR. MERLEY: And the parties submitted reports with proposed schedules. The turf has changed a bit here today with the notion that we're going to have further briefing on the PI. We need to think that through. There were things in their report that we disagree with certainly. For example, they're talking about 12 depositions per defendant. We think that's excessive in a case like this, but we'll sit down with them and see if we can work something out.

THE COURT: Yeah. You know, this will be the

first time you'll hear me utter these words, but it will not be the last: Less is more.

MR. MERLEY: Thank you, Your Honor.

THE COURT: Less is more. And this notion of more documents, more depositions, more experts, that might be good for billable hours and running up bills and things, but it is not good for getting this case, these cases resolved.

The name of the game here is: Bring this to fruition. Get it done. Get it resolved.

There's zero chance there's going to be a trial here, I would think. Maybe 2 percent.

So this isn't heading for trial. This is heading for judicial decision.

You're going to do your discovery. You're going to do your -- probably, there's probably a much higher percentage of chance that you're going to end up settling the case, I mean, as a practical matter.

So once you take all of this material and you narrow it down and you think through what the issues are, both factual and legal and surface some of them and maybe have some contentious disputes over certain discovery and they get resolved one way or the other, then you're in a better position to see where the end of the tunnel is likely to look, how far out it is, and how it's likely to come out.

And then you're probably -- you know, you get to

look at the summary judgment motions. And you start saying, Well, you know, we might not win this. We may win this. We may not win this. You know, then all of a sudden, then people start thinking maybe we ought to settle this case.

I'm not going to try this. There's not going to be a trial here. I mean, maybe 2 percent chance.

So the key is working together well on these discovery disputes, identifying the issues that are real issues, factual and legal. If we've got a side issue with a PI, we'll deal with -- I'll deal with that.

But you're not going to have any Magistrate Judge bouncing things off of and appealing. Forget about it. You're going to have to come and deal with me. And that's a little bit different than dealing with a Magistrate Judge, I assure you. One of your colleagues, he knows.

MR. MERLEY: I've found that many times, Your Honor.

THE COURT: It all worked out fine.

MR. MERLEY: It worked out great.

THE COURT: I'm open to learning. I'm no expert in antitrust law. I'd be less than honest if I told you otherwise. I'm not.

I'm looking to you to give me excellent, excellent briefs. And I'm pretty confident you probably will.

Have a good day, gentlemen.

MR. NEUWIRTH: Thank you, Your Honor.

MR. MERLEY: Thank you, Your Honor.

DEPUTY CLERK: All rise.

This Honorable Court will stand in recess until the return of court.

(Proceedings concluded at 4:10 p.m.)

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: January 17, 2017______ /S/__William P. Zaremba______

William P. Zaremba, RMR, CRR